167 P.3d 225

The ASSOCIATION OF APARTMENT OWNERS OF NEWTOWN MEADOWS, by its BOARD OF DIRECTORS, Plaintiff–Appellant/Cross–Appellee,

v.

VENTURE 15, INC., Royal Contracting Co., Ltd., A.W. Associates, Inc. dba Geolabs Hawaii, and R.H.S. Lee, Inc., Defendants–Appellees/Cross–Appellees,

and

S. Horita Contracting & Building Supplies, Ltd., and Does 4–100, Defendants.

Venture 15, Inc., Third–Party Plaintiff–Appellee,

v.

S. Horita Contracting & Building Supplies, Ltd., Third–Party Defendant,

Geolabs Hawaii, Defendant and Additional Third–Party Plaintiff–Appellee,

v.

Community Planning, Inc., Additional Third–Party Defendant,

and

Venture 15, Inc., Royal Contracting Company, Additional Third–Party Counterclaim Defendants–Appellees,

and

S. Horita Contracting & Building Supplies, Ltd., Additional Third–Party Counterclaim Defendants.

S. Horita Contracting & Supplies, Ltd., Defendant and Additional Third–Party Plaintiff

v.

Liu Construction, Inc., Additional Third–Party Defendant–Appellee/Cross–Appellant.

No. 26637.

Supreme Court of Hawai'i.

July 31, 2007.

As Corrected on Denial of Reconsideration Sept. 20, 2007.

Myles T. Yamamoto, Terrance M. Revere, and Jacqueline E. Thurston, Honolulu, on the briefs, for plaintiff-appellant/cross-appellee AOAO Newtown Meadows.

Dean E. Ochiai, Brenda Morris, Shannon L. Wack, Honolulu, and Randall Y. Kaya, on the briefs, for defendant-appellee/third-party plaintiff-appellee Venture 15, Inc.

Gary W.K. Au Young, on the briefs, for defendant-appellee Royal Contracting Company, Ltd.

Michael H. Tsuchida (of Miyagi, Nohr & Myhre), Honolulu, on the briefs, for defendant-appellee R.H.S. Lee, Inc.

Wesley H.H. Chin, Sheree A. Kon–Herrera, and Lois H. Yamaguchi (of Fukunaga, Matayoshi, Hershey & Ching), Honolulu, on the briefs, for additional third-party defendant-appellee Liu Construction, Inc.

Randall K. Schmitt and Paul B.K. Wong (of McCorriston Miller Mukai & MacKinnon), Honolulu, on the record, for defendant-appellee/cross-appellee Geolabs Hawaii, Inc.

MOON, C.J., LEVINSON, NAKAYAMA, and DUFFY, JJ.; ACOBA, J., concurring and dissenting separately.

Opinion of the Court by MOON, C.J.

The instant appeal and cross-appeal arise out of the alleged defective construction of the Newtown Meadows Condominium Project (Newtown Meadows or the Project) located in Waimalu, O'ahu, State of Hawai'i. Plaintiff-appellant/cross-appellee Association of Apartment Owners of Newtown Meadows by its Board of Directors (the AOAO) initiated the underlying action against several entities involved in the development and construction of Newtown Meadows, including defendants-appellees/cross-appellees Venture 15, Inc. (Venture 15), the developer; Royal Contracting Co., Ltd. (Royal), the site development general contractor; R.H.S. Lee, Inc. (Lee), the soils compaction subcontractor; A.W. Associates, Inc. dba Geolabs Hawai'i (Geolabs), the soils engineer;[1] and defendant-appellee/cross-appellant Liu Construction, Inc. (Liu), the masonry subcontractor [hereinafter, collectively, the Appellees]. The AOAO basically claims that, as a result of "severe ground settlement" and "defective concrete floor slabs," the buildings and foundations at Newtown Meadows have "shifted, settled, and cracked."

The AOAO appeals from the Circuit Court of the First Circuit's May 21, 2004 amended judgment, the Honorable Eden Elizabeth Hifo presiding, entered pursuant to Hawai'i Rules of Civil Procedure (HRCP) Rule 54(b) (2007) (relating to judgment upon multiple claims or involving multiple parties). On appeal, the AOAO challenges twenty-three orders granting summary judgment in favor of the Appellees and three orders denying reconsideration of several of the circuit court's oral rulings granting summary judgment in favor of the Appellees. Essentially, the AOAO contends that the circuit court erred in dismissing its claims of unfair or deceptive acts or practices, breach of express and/or implied warranties, negligent and intentional misrepresentation, breach of contract, negligence, strict products liability, and claims for punitive damages.

Liu cross appeals, challenging the circuit court's denial of several of its motions for partial summary judgment. Essentially, Liu contends that there are additional bases to affirm the circuit court's amended judgment in its favor.

---

1. Although the index to the supreme court record reveals that Geolabs received an oral extension to file an answering brief, it did not file a copy of the requisite notification to all other parties that the extension was granted. See Hawai'i Rules of Appellate Procedure (HRAP) Rule 29 (2007) ("Upon timely ... oral request, ... the appellate clerk shall grant one extension of time for no more than 30 days for the filing of an opening or answering brief.... The appellate clerk shall note on the record that the extension was granted and the date the brief is due. The requesting party shall notify all other parties that the extension was granted and shall file a copy of the notice in the record...."). The supreme court record does not indicate that Geolabs filed an answering brief or joined in any answering brief filed on appeal.

For the reasons discussed below, we affirm in part and vacate in part the circuit court's May 21, 2004 amended judgment.

## I. BACKGROUND

### A. Factual Background

The relevant facts of the instant case involve the pre-construction, construction, and post-construction events pertaining to Newtown Meadows. Newtown Meadows is a residential townhouse condominium comprised of 152 units within ten two-story buildings (referred to as Buildings 1 through 10), located on approximately five acres next to the Waimalu Stream.

### 1. Pre–Construction Events

On March 12, 1981, Venture 15 retained Geolabs to conduct a soil engineering investigation of the future site of Newtown Meadows. On April 14, 1986, Geolabs issued an "Updated Soil Engineering Investigation" report to Venture 15, essentially concluding that the site was suitable for a proposed multi-family cluster development, provided that Geolabs' recommendations were followed. The report also concluded that "slab-on-grade foundations can be utilized for the residential building construction."

At some point, Venture 15 contracted with third-party defendant Community Planning, Inc. (Community Planning) as the civil engineer and defendant S. Horita Contracting &

Building Supplies, Ltd. (S. Horita) as the general contractor for the Project. Venture 15 also retained Howard Lau of Shigemura, Lau, Sakanishi, Higuchi and Associates, Inc. (Shigemura Inc.) as the structural engineer "for the design, development and construction" of Newtown Meadows. At some point after being retained, S. Horita entered into a sub-contract with Liu for, *inter alia*, the construction of concrete slabs for the Newtown Meadows buildings.

On February 19, 1987, Venture 15 contracted with Royal as the site development general contractor for the Project. Royal was responsible for, *inter alia*, grading and constructing roadways, parking areas, and drainage, sanitary sewer, and water systems for Newtown Meadows. Royal, in turn, entered into a subcontract with Lee to perform certain work at the project site.[2]

### 2. Construction of Newtown Meadows

Site work and grading operations were performed by Royal and/or Lee, *see supra* note 2, under Geolabs' observation from October 9, 1986 to December 3, 1987. Meanwhile, on May 8, 1987, the Real Estate Commission of the State Department of Commerce and Consumer Affairs (the real estate commission) issued the final report on Newtown Meadows, entitled "The Condominium Public Report on Newtown Meadows" (the Condominium Public Report).[3]

---

**2.** Although the parties do not dispute that Royal entered into a subcontract with Lee, the parties dispute Lee's scope of work pursuant to the subcontract. Specifically, according to the AOAO, Lee was responsible for the "selection, placement and proper compaction of the soil." (Footnote omitted.) According to Lee, it did not perform any grading work or compaction of the fill material. Rather, Lee claims that the scope of its work included clearing and grubbing the site, hauling material to the site, demolition work, and various masonry work. According to Royal, however, there is a dispute between Royal and Lee as to which entity actually performed the grading and compaction work at Newtown Meadows. As discussed more fully *infra*, Royal's and Lee's records pertaining to Newtown Meadows were either destroyed by termites and/or rain or were discarded prior to the initiation of the present action. Lee's vice-president testified at her deposition that she was unable to find a copy of the subcontract between Royal and Lee.

**3.** According to *Ass'n of Owners of Kukui Plaza v. City & County of Honolulu*, 7 Haw.App. 60, 66 n. 7, 742 P.2d 974, 978 n. 7 (1987):

Prior to offering a condominium project for sale[,] the developer is required to notify the real estate commission ..., [Hawai'i Revised Statutes (HRS)] § 514A–31, which may inspect the project. HRS § 514A–33.... The [real estate] commission may issue a final report prior to completion of construction of a condominium project only if the developer has filed with the [real estate] commission all of the information and documents required by HRS § 514A–40. The developer is prohibited from entering into a contract or agreement for the sale of an apartment which is binding on a prospective buyer until a copy of the [real estate] commission's final report has been delivered to the purchaser. HRS § 514A–62.

Subsequent to the completion of the site work and grading operations, problems arose relating to soil settlement beneath Building 3 during the construction of the ten buildings.[4] On January 17, 1988, Humphrey Asher, the owner of unit 3F1 in Building 3, sent a letter to S. Horita, reiterating his earlier oral complaints that cracks had surfaced throughout his entire unit and that "[i]t appear[ed] that [his unit's] foundation [was] shifting and[,] as a result[,] serious damages have occurred[.]" Asher also mentioned that his doors "cannot close and the sliding doors are about to fall out of their frames." Asher stated that the units next to him have sustained similar damages. Asher further stated in his letter that:

On December 23, 1987[,] I telephoned Mr. Harry Horita[, president and general manager of S. Horita,] and I attempted to seek out answers in regards to the occurred damages to my [u]nit[.] Mr. Harry Horita responded by telling me that he had spoken to Mr. Matsui[, the onsite project supervisor,] and they concluded that it appeared to be a compactual [sic] ground problem. Mr. Harry Horita further stated that he was trying to get in touch with the contractor and engineers that were responsible for compacting the ground properly that my [u]nit is resting on.

. . . .

On December 25, 1987[,] I received a telephone call from Mr. Charles Honma (Project Mgr., Newtown Meadows) and he stated as follows, "Mr. Asher, I just wish to apologize for what has happened to your [u]nit that you moved in. . . . It appears to be a soil problem and perhaps the ground was not properly compacted."

In response to Asher's complaints, Royal retained Geolabs to perform sub-surface grouting[5] "to attempt to strengthen the subsoils to reduce the potential for further settlements and damage to the structure[,]" *i.e.*, Building 3, sometime in January or February 1988.

On February 18, 1988, Geolabs issued a report, entitled "Subsurface Grouting, Building 3, Newtown Meadows" [hereinafter, the Grouting Report], to Royal and sent a copy of the Grouting Report to Venture 15. The Grouting Report provided in relevant part:

The purpose of our work on the project was to inject neat cement grout under pressure at selected depths within the settlement affected area of Building 3 to attempt to strengthen the subsoils *to reduce the potential for further settlements and damage to the structure.*

The scope of our work included the drilling of 37 holes to depths of approximately ten (10) feet below the existing ground surface, the installation of grout tubes in the drilled holes and the injecting of approximately 4,200 gallons of grout.

. . . .

The injection grouting utilizing the "Tube a' Manchette" system at Building 3 indicates that *the underlying soils were soft and probably contained voids or loose seams.* The volumes of cement slurry pumped should help to densify the soil mass and help to stabilize the soils (reduce future settlements) underlying the building.

. . . .

Although the grouting should help to reduce the compressibility of the loose subsoils, *it is not possible to guarantee that further ground settlements will not occur.*

(Emphases added.)

Five days later, on February 23, 1988, Geolabs issued a second report, entitled "Compaction Report, Newtown Meadows," [hereinafter, the Compaction Report], to Community Planning. The Compaction Report stated in relevant part that, based on Geolabs' "observations and test results," it is Geolabs' "opinion that [Newtown Meadows] has been constructed to final grade and *compacted adequately.*" (Emphasis added.)

---

4. It is not entirely clear from the record which of the ten buildings were constructed at the time problems arose relating to soil settlement beneath Building 3. It appears that Building 3 was already fully constructed at that time.

5. "Grout" is "a thin, coarse mortar used for filling masonry joints, rock fissures, etc." The Random House College Dictionary 584 (rev. ed.1979).

On March 8, 1988, Honma sent a letter to Asher, "follow[ing] up on the corrective work that was done, and is being done, due to some uncompacted fill below portions of [Asher's] building[, i.e., Building 3]." Honma stated that "[t]he poorly compacted fill area was densified by a pump grout (a mixture of cement and water) under pressure, into the subsoils[,]" presumably referring to the work done by Geolabs. In his letter, Honma also set forth certain actions that would be undertaken in order "to remedy the problem caused by the soil settlement[ ]" in Asher's unit.

At some point, the Compaction Report was apparently submitted to the City and County of Honolulu (City) Building Department. According to the AOAO, the Compaction Report "was used to obtain final approval of the Newtown Meadows project from various governmental entities, including the City Building Department[.]" By May 6, 1988, construction of all ten buildings at Newtown Meadows was completed.

### 3. Post–Construction Events

Approximately four years after the completion of the Project, residents of Newtown Meadows again reported problems involving cracks in their respective units, this time involving buildings other than Building 3. On April 18, 1992, Alvin Tamaribuchi, one of the owners of unit 8A1 in Building 8, sent a letter to Ronald Kobashigawa of Ind–Comm Management, who at all times relevant herein was the managing agent for Newtown Meadows, indicating that his unit was experiencing numerous cracks. In his letter, Tamaribuchi stated that Steve Mosley, the resident manager, inspected the cracks in Tamaribuchi's unit on April 17, 1992. Mosley "suggested [to Tamaribuchi] that nothing be done for a few days or weeks when the cracks be observed [sic] periodically." Mosley also informed Tamaribuchi that "[u]nit 6 had problems with settling about four months ago."

Subsequently, Kobashigawa, at the request of the AOAO's board of directors, contacted Venture 15 "for assistance in investigating, diagnosing and correcting the problem[, i.e., the cracks in Tamaribuchi's unit.]" Venture

15 apparently turned to Geolabs and Shigemura Inc. to investigate the cracks in Tamaribuchi's unit. On May 13, 1992, Dayton Fraim (a representative of Geolabs), Lau (the vice-president of Shigemura Inc.), Kobashigawa, Mosley, and Tamaribuchi attended a site inspection to investigate the cracks in Tamaribuchi's unit. During the site inspection, "the units above and to the right [of unit 8A] were also checked as well as one particular unit at Building 6." The next day, Lau, on behalf of Shigemura Inc., sent a letter to Kobashigawa, reporting his findings and recommendations. Lau stated in pertinent part that:

> The exterior lanai slab of one unit on the [m]akai end of the building had a hairline crack down the middle. A straight edge was laid across the crack and found to seesaw over the crack. This is an indication that the crack is a flexural crack caused by heaving of the slab and might be an indication that the subgrade soil is slightly expansive. Another indication of upheaval was at the juncture where the lanai slab abuts the main building slab. The top of the lanai concrete slab was found to be higher than the joint material against the building.

> The grading and swales on the [m]auka end of the building was almost non-existent. In fact, the [o]wner and [r]esident [m]anager said that ponding of the water always occurred at that corner. Similarly, at the unit at Building 6 where damage was the worst, the grading away from the lanai was poor.

> *Based on the observations noted, we suspect that most, if not all, of the cracks may be attributed to settlement of the foundations caused by water infiltration into the subgrade ....*

> Our recommendations are to, first, correct the poor drainage conditions and then to simply patch the cracks with matching drywall finishing material. If patching is done without first correcting *the source of the problem (ponding of water)*, then subsequent damage can still occur. If the drainage is corrected, then settlement problems should subside and patching can be done. In some instances, additional

future patching may be necessary if the rate of subsidence is very slow and a little more settlement occurs. . . .

At this time, *we would like to re-assure you that these cracks do not appear to indicate any catastrophic structural failures or any impending collapse problems. They simply reflect a foundation settlement problem caused by water intrusion into the subgrade beneath the footings resulting from excessive water ponding problems* . . . .

(Emphases added.) On May 29, 1992, Bob Wong, the president of Geolabs, sent a "field report" to Kobashigawa, setting forth Geolabs' opinions and recommendations. Wong stated in relevant part that:

Based on our observations, it appears that the cracking is the result of *at least two (2) causes*. The exterior cracks in the lanai slabs appear to be the result of heaving *caused by swelling of moderately expansive soils*. The interior cracks appear to be the *result of minor amounts of foundation settlements*.

*It is our opinion that the poor drainage has caused water to infiltrate under the building*. In the very lightly loaded lanai slab areas, this has resulted in a slight heaving[,] causing cracking of the slab.

The infiltration has most likely caused a softening of the subgrade soils. Under the heavier foundation loads, this has resulted in minor settlement[,] causing cracking of the rigid drywall materials.

Therefore, we recommend the following actions:

1. The exterior areas should be regraded *to provide drainage away from the building*.

2. *Irrigation* of the yard areas should be reduced to limit saturation of the soils.

3. After the regrading and reduction of the irrigation, the cracks should be repaired.

4. After the repair of the cracks, they should be monitored on a bi-weekly basis for any future movements. If the cracks reopen, additional exploration may be required.

(Emphases added.)

During the 1992 investigation, Kobashigawa apparently was "never informed" of the "Grouting Report prepared by Geolabs regarding the remedial grouting work under Building 3 at Newtown Meadows." According to Kobashigawa, the "recommendation to correct the poor drainage around the building had been accomplished" at some point. Approximately a year later, on May 30, 1993, Tamaribuchi sent a second letter to Kobashigawa, indicating that "the crack on the wall in the master bedroom between the sliding door and window has continued to a point about a foot from the floor[']" despite the "efforts to reroute the water flow . . . done some months ago." By December 1993, Kobashigawa received complaints from other residents "about cracks and hard-to-open doors and sliding glass doors" in units located in Buildings 5, 6, and 7. Consequently, on December 21, 1993, Kobashigawa requested Geolabs and Shigemura Inc. to conduct another site inspection.[6]

On January 28, 1994, Clarice Lai, the owner of unit 6A2, sent a letter to Kobashigawa, stating in pertinent part that:

With respect to ground settlement problems being reported by other owners in . . . Newtown Meadows . . . as recorded in the [AOAO] minutes, I would like to bring to your attention that my unit also contains hairline cracks by the master bedroom windows. I have yet to notice, in the past few months, any other evidence of settlement in other areas of the unit.

As in other wood structure units, creeking [sic] is often heard when there is movement in my unit or in other adjacent units. While it is very difficult to determine the exact location of the source, this may also be a result of ground settlement.

---

6. It is not entirely clear whether a site inspection was conducted as a result of Kobashigawa's December 21, 1993 request. As discussed more fully *infra*, Lau and a representative of Geolabs attended a site inspection at Newtown Meadows on April 21, 1995; however, it is not clear whether such site inspection stemmed from Kobashigawa's December 21, 1993 request or a subsequent request.

On January 31, 1994, Kobashigawa wrote a letter to Tamaribuchi, stating that:

> After much discussion, *the Board [of Directors of Newtown Meadows] decided that[,] although the cracks may have been cause [sic] by ground movement which is beyond their control,* the [AOAO] cannot be responsible for repair to apartment interiors but only to the common elements.
>
> *We have spoken to the structural engineer[, presumably Shigemura Inc.,] about the cracks and they recommended that after the dirt is regraded around the building we need to wait about a year for the ground under the building to dry and resettle then patch the cracks and again wait and see if the problem persists.*
>
> The ground around the building was regraded twice, the most recent time was in September 1993.

(Emphases added.)

On January 12, 1995, Rodney Yanai, the owner of unit 6C1 and a member of the AOAO's board of directors, sent a letter to Kobashigawa, stating in relevant part that:

> As you know[,] my wife and I have been living in Newtown Meadows since 1987. We have been having a constant problem with major cracks in the walls and not being able to close doors for years. Though we have repaired all of the problems, most of the same problem, and more have returned.
>
> I believe that there is some ponding, by unit[s] "A" and "B" [of] [B]uilding 6, because when a tree fell down, near unit "A," there was sitting water deep inside the hole that the tree made, and it had not rained for at least 3 days.

A site inspection, attended by Lau, Honma, Teddy Kwock (on behalf of Geolabs), Kobashigawa, and various affected homeowners of Buildings 6, was conducted on April 21, 1995. In May 1995, Geolabs informed Honma that it was "highly likely that a leakage of the sewer system existed in the vicinity of Buildings 5 and 6." Consequently, Geolabs recommended that "the existing sewer system be inspected for leakage and [that] any repair work be performed prior to proceeding with any remedial actions in resolving the distresses observed in Building 6." On June 9, 1995, Yanai sent a letter to the other members of the AOAO's board of directors, Kobashigawa, and Mosley, stating that it "has become necessary to take a more assertive posture in the resolution to the problems of the cracks in the walls." The AOAO ultimately hired a contractor, American Leak Detection, to inspect the pertinent sewer lines; American Leak Detection apparently observed on September 25, 1995 that "no breaks or leaks were detected at this time."

According to Kobashigawa, "Venture 15 stopped responding to the [AOAO's] requests for assistance, and the [AOAO's] [b]oard [of directors] authorized the hiring [of] its own expert to investigate the problem[ ]" sometime in 1996. Subsequently, Kobashigawa sought proposals from several independent experts, seeking a second opinion in resolving the "soil and/or ground water problem." Weidig Geoanalysts (Weidig) submitted a proposal to Kobashigawa on January 20, 1997, and the AOAO ultimately retained Weidig sometime thereafter. In its April 15, 1997 report for Building 6, Weidig concluded that "[t]he observed foundation displacements and related symptoms of structural distress *are due to a combination of settlement and local bearing failure caused by **improper compaction of the fill material** and failure to intercept the subsurface water before it reaches the fill*[ ]" and recommended that "the building foundations be underpinned[.]" (Emphases added.) According to Kobashigawa, Weidig's April 15, 1997 report "[wa]s the first report by an expert that [he] had seen up to that time that attributed the problems at [B]uildings 6 and 8 to negligence on the part of any of the defendants."

At some point, the AOAO also retained Stewart Engineering, Inc. (Stewart), which conducted, among other things, a slab elevation and distress survey for several units located in Buildings 6 and 8. In its January 4, 2000 report, Stewart concluded that most of the "cracked dry wall, distorted door frames, [and] cracked slabs" "appear[ ] to be the result of differential settlement of the deep fills underlying the buildings, but some of the distress is probably related to expansive soil activity beneath the slabs. Groundwater is a contributory problem at Building

6." Stewart also concluded that "[t]he distress observed is consistent with settlement of **poorly compacted fill,** which was reported in the Weidig report[ ] and by some Geolabs data." (Emphasis added.) Stewart further concluded that:

> The foundations and slabs-on-grade were not designed appropriately for the ground conditions. The construction plans show a 4–inch thick slab with 6x6–10x10 welded wire fabric at the mid-point as the only "reinforcement." Our observation of the large crack in [u]nit 8B1 indicated a 4–inch slab, possibly with wire fabric at the bottom of the slab....
>
> Such a slab foundation system is inadequate to resist either expansive soil activity or distress from differential soil settlement.... The slab foundation system does not appear to conform to present [Uniform Building Code (UBC)] design requirements.

### B. *Procedural History*

#### 1. **The AOAO's Complaints**

On February 18, 1997, the AOAO filed a complaint pursuant to HRS chapter 514A (relating to condominium property regimes) against Venture 15 and Doe defendants, alleging that "[o]ne or more Defendants was negligent in the installing, supervising, inspecting, repairing, constructing, dredging, or in some other way in relation to the construction of the ... buildings and development of Newtown Meadows." Between June 3, 1997 and January 23, 2002, the AOAO moved to amend its complaint and/or sought permission of the circuit court to (1) identify certain parties as Doe defendants, (2) assert claims against certain third-party defendants, and (3) assert additional claims, which motions were granted by the circuit court. Subsequent to the filing of the AOAO's amended complaint and because of the filing of additional third-party complaints, the AOAO obtained permission from the circuit court to assert claims against the additional third-party defendants. Consequently, the AOAO has asserted direct claims against the following seven parties as defendants: (1) Venture 15; (2) Royal; (3) Lee; (4) Liu; (5) Geolabs; (6) S. Horita; and (7) Community Planning. None of the parties dispute that the governing complaint as to all parties is the AOAO's amended complaint, filed on October 20, 1998, notwithstanding the fact that the AOAO amended over to some of the parties after October 20, 1998.

The AOAO's amended complaint alleged in pertinent part:

> 8. The Defendants[7] were *negligent* with respect to the development, design, construction, compaction, grading, irrigation, installation, supervision, inspection, repairing, testing, building, site development, or in some other manner in relation to the Newtown Meadows project and the buildings thereon.
>
> 9. The Defendants are liable to [the AOAO] based on *breach of contract, breach of express and/or implied warranty, negligent misrepresentation, strict product liability, breach of statutes, ordinances and/or Building Code requirements and/or provisions, and unfair and/or deceptive acts or practices in violation of [HRS c]hapter 480[.]*
>
> 10. [The] Defendants are liable to [the AOAO] for *intentional misrepresentation.* The [D]efendants were furnished with and were aware of the information contained in the February 18, 1988 report prepared by ... Geolabs[, *i.e.,* the Grouting Report]....
>
> 11. On February 23, 1988, a mere five days after the [Grouting Report] was issued, ... Geolabs, without conducting any further investigation or testing to determine the adequacy of compaction under the remaining 10 buildings of [Newtown Meadows], issued [the] [ ]Compaction Report[ ] for the Newtown Meadows subdivision. This report was furnished to the [Defendants] and used to obtain final ap-

---

7. The AOAO's utilization of the phrase "the Defendants" appears to refer to all seven parties that were ultimately named as defendants by the AOAO. On appeal, the AOAO continues to utilize the phrase "the Defendants" when it appears from the context that "the Defendants" refers to only some of them. However, it is not always clear to which of the parties the AOAO is referring.

proval of the Newtown Meadows project from various governmental entities. . . .

12. The representation contained in the [ ]Compaction Report[ ] that the Newtown Meadows was "compacted adequately" was false and known by the [D]efendants to be false.

13. Despite the [D]efendants' knowledge, described above, the apartments at the Newtown Meadows were sold to members of the [AOAO] without disclosing the known inadequacies and deficiencies in the compaction of fill materials supporting the building structures of the Newtown Meadows.

14. As a result of the foregoing, among other things, the buildings and foundations at Newtown Meadows have shifted, settled and cracked, causing damage to the buildings and apartments contained therein.

(Emphases added.) The AOAO's amended complaint also alleged that the AOAO "has suffered injuries, damage, and losses and [is] entitled to recover general, special, compensatory, consequential and exemplary damages[.]" Specifically, the AOAO claimed that its damages "include but are not limited to" the following:

(a) physical injury to the buildings, apartments and grounds of Newtown Meadows;

(b) injuries, damage, and losses resulting from improper development, design,

and/or construction of the buildings, apartments and grounds;

(c) a continuous or repeated exposure to conditions which resulted in damage or injury to the buildings, apartments and grounds;

(d) loss in value of the apartments, buildings and grounds;

(e) the cost of experts;

(f) increase in maintenance costs;

(g) the cost to remedy settling and other defects; and

(h) other consequential damages.

## 2. The Appellees' Motions for Partial Summary Judgment on the AOAO's Claims

During a span of approximately two years, the Appellees, Community Planning, and S. Horita filed approximately thirty motions for partial summary judgment against the AOAO. Inasmuch as Community Planning and S. Horita settled with the AOAO,[8] their various motions for partial summary judgment against the AOAO are not relevant and, thus, will not be discussed. The AOAO also filed three motions for partial summary judgment, which are not before this court on appeal and, therefore, likewise will not be discussed. For purposes of clarity and ease of discussion, the following table summarizes the Appellees' relevant motions for partial summary judgment as they relate to the particular claims asserted by the AOAO.

| CLAIMS (Movant(s)) | PROCEEDINGS |
| --- | --- |
| UNFAIR OR DECEPTIVE ACTS OR PRACTICES (Venture 15, Royal, Lee, & Liu) | Venture 15, Royal, Lee, and Liu separately moved for partial summary judgment on the AOAO's unfair or deceptive acts or practices claims, essentially contending that the AOAO lacked standing to bring such claims inasmuch as the AOAO is not a "consumer" under HRS § 480-2(d) (1993), quoted infra. |
| | At a hearing held on 6/6/02, the circuit court orally ruled in favor of Venture 15, Royal, Lee, and Liu, stating, inter alia, that: "I don't think that the legislature or the proper analysis under statutory construction law would allow the [c]ourt to give standing to the AOAO to bring this [HRS c]hapter 480 claim." |

8. The AOAO's claims against Community Planning and S. Horita were voluntarily dismissed by stipulation of the parties subsequent to the circuit court's approval of good faith settlements between (1) the AOAO and Community Planning and (2) the AOAO and S. Horita. Consequently, Community Planning and S. Horita are not parties to the instant appeal and cross-appeal.

The circuit court **GRANTED** Venture 15's, Royal's, Lee's, and Liu's motions.

**BREACH OF WARRANTIES (Venture 15)**

**Venture 15** moved for partial summary judgment on, *inter alia*, the AOAO's breach of warranties claims, contending that it did not extend any warranties to the AOAO, pursuant to HRS § 514A-61 (1985 & Supp. 1988).[9] Specifically, Venture 15 asserted that the Condominium Public Report expressly stated that "[t]here are no express or implied warranties including any implied warranty of merchantability or fitness of the apartment for a particular case." According to Venture 15, "[t]he Condominium Public Report is a public record available to any prospective purchaser of a unit at Newtown Meadows." Venture 15 also argued that "there [is] no implied warranty of habitability with regard to purchasers of residential property[.]"

At a hearing held on 7/29/02, the circuit court orally ruled in favor of Venture 15 "as to the warranty of habitability," stating that the Condominium Public Report complied with HRS § 514A-61(a)(3).

The circuit court **GRANTED** partial summary judgment in favor of Venture 15 "as to the warranty of habitability."

**BREACH OF WARRANTIES (Royal, Lee, & Liu)**

• **Royal, Lee,** and **Liu** separately moved for partial summary judgment on, *inter alia*, the AOAO's breach of warranties claims. Essentially, they contended that such claims were barred by the six-year statute of limitations contained in HRS § 657-1 (1993) and that the AOAO's breach of implied warranties claims were barred by the four-year statute of limitations as purportedly discussed in *Larsen v. Pacesetter Systems, Inc.*, 74 Haw. 1, 837 P.2d 1273 (1992). They also contended that the AOAO's breach of warranties claims were barred by the ten-year statute of repose in HRS § 657-8 (Supp.2006) [hereinafter, the statute of repose] and laches.

The circuit court **GRANTED IN PART AND DENIED IN PART** Royal's, Lee's, and Liu's motions as to the breach of warranties claims. Specifically, circuit court granted the motions on the grounds that the applicable statute(s) of limitations barred the AOAO's breach of express and/or implied warranties claims against Royal, and the AOAO's breach of express warranties claims against Lee and Liu. The circuit court denied the motions on the bases that the statute of repose and laches did not bar the AOAO's breach of warranties claims.

• **Royal, Lee,** and **Liu** again separately moved for partial summary judgment on, *inter alia*, the AOAO's breach of warranties claims. Royal and Lee argued that the AOAO's claims were without merit because (1) they are not in privity of contract with the AOAO and (2) they were not the developers or sellers of the units at Newtown Meadows and, therefore, made no warranties to the AOAO. Liu argued that the AOAO "has not identified any express written or oral warranties by Liu to [the AOAO] in any of their pleadings or answers to interrogatories" and that "[the AOAO] has offered no authority for implying [the] warranties [of

---

9. At the time the relevant events took place in this case, HRS § 514A–61 provided in relevant part:

 (a) Each developer of a project subject to this chapter[, *i.e.*, HRS chapter 514A,] shall prepare and provide to each prospective initial purchaser an abstract which shall contain the following:

. . . .

(3) A description of all warranties for the individual apartments and the common elements, including the date of initiation and expiration of any such warranties; and if no warranties exist, the developer shall state that no warranties exist[.]

merchantability and fitness for a particular purpose] to a home purchase against a non-seller, non-lessor like Liu."

The circuit court **GRANTED** Royal's, Lee's, and Liu's motions.

**INTENTIONAL & NEGLIGENT MISREP. (Venture 15)**

• **Venture 15** moved for partial summary judgment on, *inter alia*, the AOAO's misrepresentation claims, contending that such claims were barred by: (1) the two-year statute of limitations contained in HRS § 514A-69 (2006);[10] and (2) the economic loss rule.[11]

The circuit court **DENIED** Venture 15's motion as to the misrepresentation claims.

• **Venture 15** again moved for partial summary judgment on, *inter alia*, the AOAO's misrepresentation claims, asserting that such claims were barred by the six-year statute of limitations in HRS § 657-1.

The circuit court **DENIED** Venture 15's motion as to the misrepresentation claims.

**INTENTIONAL & NEGLIGENT MISREP. (Royal, Lee, & Liu)**

• **Royal, Lee,** and **Liu** separately moved for partial summary judgment on, *inter alia*, the AOAO's misrepresentation claims, arguing that such claims were barred by the six-year statute of limitations in HRS § 657-1, the statute of repose, and laches.

The circuit court **DENIED** Royal's, Lee's, and Liu's motions as to the misrepresentation claims.

• Royal, Lee, and Liu again separately moved for partial summary judgment on the AOAO's misrepresentation claims. Royal and Lee argued, among other things, that: (1) the AOAO lacked standing to bring its misrepresentation claims; (2) there is no evidence that Royal or Lee made any representations to the AOAO; and (3) there was no justifiable reliance by the AOAO to support its misrepresentation claims. Royal again argued that the six-year statute of limitations in HRS § 657-1 barred the AOAO's misrepresentation claims. Liu contended that there was no evidence that it made any representations to the AOAO and that the AOAO "cannot prove reliance as an essential element of its [misrepresentation] claims[.]" (Capital letters altered.)

• The circuit court **GRANTED** Royal's, Lee's, and Liu's motions on the AOAO's misrepresentation claims.

**BREACH OF CONTRACT (Royal & Lee)**

• **Royal** and **Lee** separately moved for partial summary judgment on, *inter alia*, the AOAO's breach of contract claims. Basically, they argued that such claims were without merit because there is no contract between (1) the AOAO (or its members) and Royal and (2) the AOAO and Lee. Royal also pointed out that "there has been no allegation that the AOAO

---

10. HRS § 514A-69 provides in relevant part:
 Every sale made in violation of section 514A-68 [(relating to misleading statements and omissions)] is voidable at the election of the purchaser; ... provided that no action shall be brought for the recovery of the purchase price after two years from the date of the sale[.]

11. As discussed more fully *infra*, this court has recognized that the economic loss rule bars claims for relief based on products liability or a negligent design and/or manufacture theory for economic loss stemming from injury only to the product itself. *State ex rel. Bronster v. United States Steel Corp.*, 82 Hawai'i 32, 39–40, 919 P.2d 294, 301–02 (1996). *See also City Express, Inc. v. Express Partners*, 87 Hawai'i 466, 469, 959 P.2d 836, 839 (1998) ("In the context of construction litigation, where a party is in privity of contract with a design professional, economic loss damages are limited to contractual remedies, and a negligence action may not be maintained.").

or its members are third-party beneficiaries of the contract between Venture 15 and Royal" and that "there is no allegation that the AOAO is a third-party beneficiary of the contracts between the buyers [of the units at Newtown Meadows] and Venture 15."

The circuit court **GRANTED** Royal's and Lee's motions as to the AOAO's breach of contract claims.

• **Royal** and **Lee** again separately moved for partial summary judgment on, *inter alia*, the AOAO's breach of contract claims, maintaining that the AOAO's breach of contract claims were barred by the six-year statute of limitations in HRS § 657-1, the statute of repose, and laches.

The circuit court **GRANTED IN PART AND DENIED IN PART** Royal's and Lee's motions as to the breach of contract claims. Specifically, the circuit court granted the motions on the basis that HRS § 657-1 barred the AOAO's breach of contract claims. The circuit court denied the motions on the bases that the statute of repose and laches did not bar the AOAO's breach of contract claims.

**BREACH OF CONTRACT (Liu)**

• **Liu** moved for summary judgment on, *inter alia*, the AOAO's breach of contract claims, asserting that such claims were barred by the six-year statute of limitations in HRS § 657-1, the statute of repose, and laches.

The AOAO argued in its memorandum in opposition that, among other things, "there is no contract between Liu and [the AOAO]; therefore[,] HRS § 657-1 is inapplicable."

The circuit court **GRANTED IN PART AND DENIED IN PART** Liu's motion. Specifically, the circuit court granted the motion on the ground that HRS § 657-1 barred the AOAO's breach of contract claims. The circuit court denied the motion on the ground that the statute of repose and laches did not bar the AOAO's breach of contract claims.

• **Liu** again moved for summary judgment on the AOAO's breach of contract claims, asserting that "[t]here is no evidence of a contract between [the AOAO], either as an association of apartment owners or as individual apartment owners, and Liu."

The AOAO argued in its memorandum in opposition that, among other things, "[t]he individual apartment owners, as well as the [AOAO], are clearly third-party beneficiaries of the contract between Liu and [S.] Horita for work done by Liu at Newtown Meadows." (Citations omitted.)

The circuit court **DENIED** Liu's motion.

**BREACH OF CONTRACT (Venture 15)**

**Venture 15** moved for partial summary judgment on the AOAO's breach of contract claims, merely "incorporat[ing] by reference" the arguments made in Royal's, Lee's, and Liu's motions for partial summary judgment relating to HRS § 657-1, the statute of repose, and laches.

The circuit court **GRANTED** Venture 15's motion.[12]

12. Despite Venture 15's statement that it "incorporate[d] by reference" Royal's, Lee's, and Liu's arguments relating to HRS § 657-1, the statute of repose, and laches, it appears that Venture 15's motion focused solely on HRS § 657-1. Consequently, the circuit court's grant of Venture 15's motion in its entirety, which was deemed a non-hearing motion, was likely based solely on HRS § 657-1 and not on the statute of repose and laches. Indeed, inasmuch as Royal's, Lee's, and Liu's arguments relating to the statute of repose and laches were rejected by the circuit court, it reasonably follows that the circuit court should have likewise rejected Venture 15's incorporation of their arguments. Nevertheless, the circuit court's order granted Venture 15's motion in its entirety.

| | |
|---|---|
| **NEGLIGENCE**<br>**(Venture 15)** | • **Venture 15** moved for partial summary judgment on, *inter alia*, the AOAO's negligence claims, contending that the economic loss rule bars such claims.<br><br>The circuit court **DENIED** Venture 15's motion as to the AOAO's negligence claims.<br><br>• **Venture 15** again moved for partial summary judgment on, *inter alia*, the AOAO's negligence claims, asserting that the two-year statute of limitations in HRS § 657-7 (1993), quoted *infra*, bars the AOAO's negligence claims and that the two-year statute of limitations contained in HRS § 657–8 bars the AOAO's negligent design and construction claims.<br><br>The circuit court **GRANTED** Venture 15's motion as to the AOAO's negligence claims.[13] |
| **NEGLIGENCE**<br>**(Royal, Lee, &**<br>**Liu)** | • **Royal, Lee,** and **Liu** moved for partial summary judgment on, *inter alia*, the AOAO's negligence claims, maintaining that HRS § 657-7, the statute of repose, and laches bars such claims.<br><br>The circuit court **GRANTED IN PART AND DENIED IN PART** Royal's, Lee's, and Liu's motions as to the negligence claims. Specifically, the circuit court granted the motions on the basis that HRS § 657-7 bars the AOAO's negligence claims. The circuit court denied the motions on the bases that the statute of repose and laches did not bar the AOAO's negligence claims.<br><br>• **Royal, Lee,** and **Liu** again moved for partial summary judgment on, *inter alia*, the AOAO's negligence claims, alleging that the economic loss rule bars such claims.<br><br>The circuit court **DENIED** Royal's, Lee's, and Liu's motions. |
| **NEGLIGENCE**<br>**(Geolabs)** | **Geolabs** moved for partial summary judgment on, *inter alia*, the AOAO's negligence claims, essentially contending that such claims were barred by HRS § 657-7.<br><br>The circuit court **GRANTED** Geolabs' motion. |
| **STRICT PROD-**<br>**UCTS LIABILI-**<br>**TY (Liu)** | • **Liu** moved for partial summary judgment on, *inter alia*, the AOAO's strict products liability claims, asserting that HRS § 657-7, the statute of repose, and laches bars such claims.<br><br>The circuit court **GRANTED IN PART AND DENIED IN PART** Liu's motion. Specifically, the circuit court granted the motion on the basis of HRS § 657-7. The circuit court denied the motion on the bases of the statute of repose and laches.<br><br>• **Liu** again moved for summary judgment on, *inter alia*, the AOAO's strict products liability claims, arguing that the economic loss rule bars such claims. |

13. The circuit court's written order granting Venture 15's motion pertaining to the statute of limitations merely stated that Venture 15's motion was "granted with respect to all claims other than those for negligent and intentional misrepresentation[ ] and is denied with respect to those claims only." As such, it appears that the AOAO's negligent design and construction claims were dismissed pursuant to HRS § 657-8 and that the AOAO's negligence claims (apparently those claims not based on design and construction) were dismissed pursuant to HRS § 657–7.

The circuit court **GRANTED** Liu's motion as to the AOAO's strict products liability claims.[14]

PUNITIVE DAMAGES (Royal, Lee, & Liu)

**Royal, Lee,** and **Liu** moved for partial summary judgment on the AOAO's claims for punitive damages. Essentially, they contended that the evidence does not support an award of punitive damages against them.

The circuit court **GRANTED** Royal's, Lee's, and Liu's motions.

### 3. Judgment and Appeal

The following table summarizes the relevant events that occurred subsequent to the entries of the circuit court's written orders disposing the Appellees' motions for partial summary judgment.

| DATE | PROCEEDINGS |
|---|---|
| 7/3/03 | The AOAO filed a notice of appeal, purporting to appeal from, *inter alia*, the circuit court's three orders denying the AOAO's motions for partial summary judgment. |
| 10/15/03 | The circuit court entered a judgment pursuant to an order granting the AOAO's motion for HRCP Rule 54(b) certification. |
| 11/13/03 | The AOAO filed a second notice of appeal, this time purporting to appeal from twenty-three orders granting the Appellees' motions for partial summary judgment and three orders denying the AOAO's motions for reconsideration.[15] |
| 11/18/03 | This court dismissed the AOAO's first appeal for lack of appellate jurisdiction. |
| 3/23/04 | This court dismissed the AOAO's second appeal for lack of appellate jurisdiction. |
| 5/21/04 | The circuit court entered an amended judgment.[16] |
| 6/18/04 | The AOAO filed its notice of appeal. |
| 7/1/04 | Liu filed its notice of cross-appeal. |

## II. STANDARD OF REVIEW

■ "This court reviews a circuit court's grant or denial of summary judgment *de novo.*" *Price v. AIG Hawai'i Ins. Co.*, 107 Hawai'i 106, 110, 111 P.3d 1, 5 (2005) (citation omitted).

## III. DISCUSSION

On appeal, the AOAO maintains that the circuit court erred in dismissing its claims of unfair or deceptive acts or practices, breach of express and/or implied warranties, intentional and negligent misrepresentation,

**14.** The circuit court also granted summary judgment in favor of Venture 15, Geolabs, Royal, and Lee on the AOAO's strict products liability claims on the basis that HRS § 657-7 bars such claims. The circuit court granted summary judgment in favor of Royal and Lee on the additional basis that they did not manufacture any defective product. On appeal, however, the AOAO does not challenge the circuit court's entry of summary judgment in favor of Geolabs, Royal, and Lee on its strict products liability claims. As discussed *infra*, the circuit court's amended judgment did *not* enter final judgment in favor of Venture 15 on the AOAO's strict products liability claims. *See infra* note 16.

**15.** The AOAO unsuccessfully moved for reconsideration of the circuit court's oral rulings granting summary judgment in favor of: (1) Venture 15 on the AOAO's breach of warranties claims; (2) Royal, Lee, and Liu on the AOAO's breach of warranties claims; and (3) Venture 15, Royal, Lee, and Liu on the AOAO's negligence and breach of contract claims as to the statute of limitations.

**16.** The May 21, 2004 amended judgment was entered on the twenty-three orders disposing the

Appellees' motions for partial summary judgment and the three orders denying the AOAO's motions for reconsideration and certified pursuant to HRCP Rule 54(b) as a final judgment in favor of: (1) Venture 15, Royal, Lee, and Liu on the AOAO's unfair or deceptive acts or practices claims; (2) Venture 15, Royal, Lee, and Liu on the AOAO's breach of express and/or implied warranties claims; (3) Royal, Lee, and Liu on the AOAO's negligent and intentional misrepresentation claims; (4) Venture 15, Royal, Lee, and Liu on the AOAO's breach of contract claims; (5) the Appellees on the AOAO's negligence claims; (6) Royal, Lee, Liu, and Geolabs on the AOAO's strict products liability claims; and (7) Royal, Lee, and Liu on the AOAO's claims for punitive damages.

As previously noted, *see supra* note 14, the circuit court entered summary judgment in favor of Venture 15 on the AOAO's strict products liability claims. The circuit court's amended judgment, however, did not enter final judgment in favor of Venture 15 and against the AOAO on the AOAO's strict products liability claims.

breach of contract, negligence, strict products liability, and claims for punitive damages. We address each claim in turn.

### A. The AOAO's Unfair or Deceptive Acts or Practices Claims

The AOAO contends that the circuit court erred in granting summary judgment in favor of Venture 15, Royal, Lee, and Liu on its unfair or deceptive acts or practices claims. Specifically, the AOAO maintains that the circuit court erred in concluding that the AOAO lacks standing to assert such claims, arguing that:

> The [AOAO's] HRS § 480-2 claim[, i.e., its unfair or deceptive acts or practices claim,] was brought "on behalf of" the[ ] [individual Newtown Meadows] apartment owners under the authority of HRS § 514A-93 [ (1993) [17]], which provides [in relevant part]:
>
>> Without limiting the rights of any apartment owner, actions may be brought by the manager or board of directors, in either case in the discretion of the board of directors on behalf of two or more apartment owners, as their respective interests may appear, with respect to any cause of action relating to the common elements or more than one apartment.
>
>> .... The standing created by HRS § 514A-93 distinguishes condominium associations from other organizations attempting to sue under HRS [§ ] 480-2. In light of HRS § 514A-93, it is difficult to comprehend what reason the legislature could have to want to bar an [a]ssociation from bringing an action on behalf of its owners for violation of HRS [§ ] 480-2.

(Emphases omitted.) The AOAO further directs this court to the legislative history behind HRS § 480-2, claiming that the "[e]xpressed legislative intent ... undermines the circuit court's application of the amendment

to HRS § 480-2[,]" "which limited [HRS chapter] 480 actions to 'consumers[,]'" [18] because "[t]he legislature's purpose in limiting standing to 'consumers' was to 'preclude [the clause's] application to private disputes between businessmen.' In the dichotomy between business disputes and consumer actions, the present case clearly falls within the latter." (Footnote and citations omitted.)

Venture 15, Royal, Lee, and Liu basically contend that, because HRS § 480-2(d) provides in pertinent part that "no person other than a consumer, the attorney general or the director of the office of consumer protection may bring an action based upon unfair or deceptive acts or practices" and the AOAO does not fall in any of the aforementioned three categories, the AOAO lacks standing to assert its unfair or deceptive acts or practices claims. Specifically, they point out that a "consumer" is defined as "a natural person who, primarily for personal, family, or household purposes, purchases, attempts to purchase, or is solicited to purchase goods or services or who commits money, property, or services in a personal investment." (Quoting HRS § 480-1 (1993).) Venture 15, Lee, and Liu assert that, because the AOAO alleges that it is an unincorporated association, it is not a natural person and, therefore, the AOAO is not a consumer. Liu further argues that,

> [a]lthough [HRS] § 514A-93 may provide a procedural vehicle for [the AOAO] to file a cause of action on behalf of "two or more apartment owners," it does not override the specific statutory requirements of HRS [c]hapter 480[,] which dictate that a private claim may only be filed by a "consumer" or "natural person."

(Footnote omitted.) (Emphasis added.) Thus, Venture 15, Royal, Lee, and Liu maintain that the circuit court correctly concluded that the AOAO lacks standing to assert its unfair or deceptive acts or practices claims.

HRS § 480-2 provides in relevant part:

> based upon unfair or deceptive acts or practices to a consumer, the attorney general, or the director of the office of consumer protection. 1987 Haw. Sess. L. Act 274, § 2 at 837–38. The amendment took effect on June 24, 1987. *Id.* at 840.

---

**17.** HRS § 514A-93 was repealed effective July 1, 2006. *See* 2004 Haw. Sess. L. Act 164, § 26 at 813, *amended by* 2005 Haw. Sess. L. Act 93, § 35 at 237.

**18.** In 1987, the legislature passed an amendment to HRS § 480-2, which, among other things, limited the entities that could bring an action

(a) Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful.

. . . .

(d) No person other than *a consumer, the attorney general or the director of the office of consumer protection* may bring an action based upon unfair or deceptive acts or practices declared unlawful by this section.

(Emphasis added.) HRS § 480–1, in turn, defines a "consumer" as "*a natural person* who, primarily for personal, family, or household purposes, purchases, attempts to purchase, or is solicited to purchase goods or services or who commits money, property, or services in a personal investment." (Emphasis added.)

■ Inasmuch as the AOAO is clearly not the attorney general or the director of the office of consumer protection, it may only bring an action based upon unfair or deceptive acts or practices declared unlawful by HRS § 480–2 if it is a "consumer" within the meaning of HRS § 480–1. The parties in this case do not dispute that the AOAO is an unincorporated association. Indeed, the AOAO so alleged in its amended complaint. "An unincorporated association[, however,] is *not* a natural person[.]" *W.C.M. Window Co. v. Bernardi,* 730 F.2d 486, 493 (7th Cir.1984) (emphasis added). Consequently, an unincorporated association is *not* a "consumer" as defined by HRS § 480–1. The AOAO, therefore, lacks standing to bring an action based upon unfair or deceptive acts or practices declared unlawful by HRS § 480–2. *Cf. Joy A. McElroy, M.D., Inc. v. Maryl Group, Inc.,* 107 Hawai'i 423, 435, 114 P.3d 929, 941 (App. 2005) (determining that a corporation lacked standing to bring an action based upon unfair or deceptive trade practices under HRS § 480–2 inasmuch as "a corporation is not a natural person").

■ Moreover, it is well-established that, "where the statutory language is plain and unambiguous, our sole duty is to give effect to its plain and obvious meaning." *Diamond v. State, Bd. of Land & Nat'l Res.,* 112 Hawai'i 161, 172, 145 P.3d 704, 715 (2006) (citation omitted) (format altered). As such,

"in light of the plain and unambiguous language of HRS § [ ] 480–2[,]" *Hunt v. First Ins. Co. of Hawaii, Ltd.,* 82 Hawai'i 363, 373, 922 P.2d 976, 986 (App.1996), we need not resort to the use of legislative history as the AOAO urges on appeal. In addition, as Liu points out, HRS § 514A–93 "does not override" HRS § 480–2's specific requirement that a complainant must be a consumer, the attorney general, or the director of the office of consumer protection in order to bring an action based upon unfair or deceptive acts or practices, and the AOAO does not present any argument or explanation to the contrary.

■ Nonetheless, the AOAO further claims on appeal that the circuit court's dismissal of its unfair or deceptive acts or practices claims

conflicts with cases holding that the amendment limiting HRS [chapter] 480 claims to "consumers[ ]" is not retroactive. *GWC Restaurants v. Hawaiian Flour Mills,* 691 F.Supp. 247 (D.Haw.1988); *Dash v. Wayne,* 700 F.Supp. 1056 (D.Haw. 1988). Under these cases, the amendment is inapplicable to claims arising prior to the amendment. In their summary judgment motions, Defendants[, presumably, Venture 15, Royal, Lee, and Liu,] did not show—and indeed could not have shown— that [the AOAO's] cause of action arose after the effective date of the amendment.

(Emphases omitted.) Liu, however, asserts that,

assuming *arguendo* [ ] that [the AOAO's] [HRS c]hapter 480 claim arose before June 1987[, *i.e.,* the date the amendment to HRS § 480–2 took place, *see* supra note 18,] *this is tantamount to an admission by [the AOAO] that it knew or should have known about its claim at that time and was required to file its claim within the applicable four-year statute of limitations.* Pursuant to [HRS] § 480–24(a) [ (1993) ], any action brought under [HRS c]hapter 480 shall be barred unless commenced within four years after the cause of action accrues. However, [the AOAO's] original [c]omplaint in this case was filed on February 18, 1997, over five years after the purported limitations period expired in

June 1991. Based on [the AOAO's] own assertion of when its claim arose, [the AOAO's] unfair and deceptive trade practice claim should be time-barred as a matter of law.

(Citations omitted.) (Emphasis added.) Indeed, as Liu correctly points out, HRS § 480–24(a) provides in relevant part that "[a]ny action to enforce a cause of action arising under this chapter shall be barred *unless commenced within four years after the cause of action accrues*[.]" (Emphasis added.) In order for the AOAO's "retroactivity argument" to succeed, its claim must have arisen prior to the effective date of the amendment to HRS § 480–2, which, as previously noted, *see, supra* note 18, was June 24, 1987. Ironically, however, even assuming *arguendo* that the AOAO's retroactivity argument is meritorious such that the AOAO's claims accrued, at the latest, in June 1987, the AOAO's argument fails in light of the four-year statute of limitations found in HRS § 480–24(a), inasmuch as the AOAO's original complaint was filed on February 18, *1997*, over five years after the four-year limitations period would have expired in June *1991*.[19] Consequently, the AOAO's claims would be time-barred as a matter of law. We, therefore, conclude that the AOAO lacks standing to bring an action based upon unfair or deceptive acts or practices declared unlawful by HRS § 480–2. Accordingly, we hold that the circuit court did not err in granting summary judgment in favor of Venture 15, Royal, Lee, and Liu on the AOAO's unfair or deceptive acts or practices claims.

### B. *The AOAO's Breach of Express and/or Implied Warranties Claims*

As previously stated, the circuit court granted summary judgment in favor of Venture 15, Royal, Lee, and Liu on the AOAO's breach of express and/or implied warranties claims. Specifically, with respect to Venture 15, the circuit court ruled that the Condominium Public Report complied with HRS § 514A–61 and that, therefore, the AOAO's implied warranty of habitability claim was effectively disclaimed. The circuit court, with respect to Royal, Lee, and Liu, essentially ruled that: (1) the applicable statute of limitations barred the AOAO's breach of warranties claims; and (2) Royal, Lee, and Liu did not extend any warranties to the AOAO.

### 1. Venture 15

#### a. *implied warranties*

The AOAO maintains that the circuit court erred in granting summary judgment in favor of Venture 15 on its breach of implied warranties claims. First, the AOAO contends that an implied warranty of habitability extends to residential home purchases. In support, the AOAO relies on *Ass'n of Apartment Owners of the Park Towers v. Child,* 1 Haw.App. 130, 615 P.2d 756 (1980) [hereinafter, *AOAO Park Towers*], and cases from other jurisdictions. Second, the AOAO contends that the Condominium Public Report did not disclaim the implied warranty of habitability pursuant to HRS § 514A–61. The AOAO asserts that Venture 15 "furnishes no legal authority to support the proposition that a developer can 'disclaim' warranties via HRS § 514A–61, particularly implied warranties, which arise by operation of law."

Venture 15, on the other hand, contends that *AOAO Park Towers* did not expressly conclude "that an implied warranty of habitability indeed existed with regard to the sale or purchase of a new home." Venture 15 relies on *American Towers Owners Ass'n v. CCI Mechanical, Inc.,* 930 P.2d 1182 (Utah 1996), *declined to follow on other grounds by Grynberg v. Questar Pipeline Co.,* 70 P.3d 1 (Utah 2003) [hereinafter, *American Towers*],

---

**19.** In its reply brief to Liu's answering brief, the AOAO asserts that Liu "confuses the operative *act* constituting the unfair/deceptive act/practice with the accrual of the *cause of action* under the discovery rule for purposes of the statute of limitation[s]." (Emphases added.) The AOAO, however, overlooks the fact that, in order for its retroactivity argument to succeed, its *claim* must have accrued prior to the effective date of amendment, that is, June 24, 1987. *See GWC*

*Rests., Inc. v. Hawaiian Flour Mills, Inc.,* 691 F.Supp. 247, 249 (D.Haw.1988) (stating that "[HRS] § 480–2[,] while amended to preclude the bringing of unfair and deceptive trade practices by businessmen or merchants between themselves, does not preclude suit for *causes of action which arose prior to the effective date of amendment*[,] which was effective June 14 [sic], 1987") (emphasis added). The AOAO's assertion, thus, is without merit.

for the proposition that an implied warranty of habitability does not extend to residential home purchases. Venture 15 also asserts that it "followed the dictates of [HRS] § 514A–61 and very clearly stated in the Condominium Public Report that it was not providing any warranties, either express or implied, with regard to ... Newtown Meadows[.] The Condominium Public Report is a public record available to any prospective purchaser of a unit at Newtown Meadows. As such, the AOAO cannot logically maintain that Venture 15 violated any statutory requirements regarding a disclosure that it was not providing any warranties[.]"

In *AOAO Park Towers*, the Association of Apartment Owners of Park Towers (the plaintiff) brought a complaint against the owner of the land on which the Park Towers Condominium was situated (the defendant), alleging, *inter alia*, that the sale of a defective retaining wall constructed at the site was a breach of the defendant's implied warranty that the wall was structurally safe and was fit for its intended purpose. 1 Haw.App. at 131, 615 P.2d at 757. The defendant apparently moved for summary judgment on what was construed as the plaintiff's implied warranty of habitability claim, which the circuit court denied. *Id.* On appeal, the Intermediate Court of Appeals (ICA) stated:

> The defendant admits that an implied warranty of habitability extends to the sale and purchase of new homes (including condominium apartments) but argues that this is true only where the seller is a builder or real estate developer. Therefore, the defendant contends that she cannot be held liable under an implied warranty of habitability because she was only a passive owner and was neither a real estate developer nor builder. Furthermore, she contends that at the time of its sale the condominium was not "new housing."
>
> [The p]laintiff contrarily contends that[,] even assuming [the] defendant's statement of the law to be correct[, the] defendant was not a passive property owner but was a real estate developer or a builder-vendor and the condominium was "new housing."
>
> In light of the above, we conclude that a genuine issue of material fact exists and

hold that the [circuit] court properly denied [the] defendant's [m]otion for [s]ummary [j]udgment.

*Id.* at 132, 615 P.2d at 757–58 (citations and emphasis in original omitted). As evident from the foregoing, the ICA did not expressly recognize that an implied warranty of habitability extends to residential home purchases; rather, the ICA implicitly agreed with the defendant's concession of law that an implied warranty of habitability extends to the sale and purchase of new homes (including condominium apartments) where the seller is a builder or real estate developer.

■ Here, at the hearing on July 29, 2002 regarding Venture 15's motion, Venture 15's counsel conceded that *AOAO Park Towers* "stands for the proposition that there is an established implied warranty of habitability in [this] state[.]" Indeed, the circuit court subsequently stated that "both counsel agree that [*AOAO Park Towers* ] establishes [the implied] warranty [of habitability]." None of the parties on appeal, however, refer to Venture 15's apparent concession of law. Nevertheless, we are not bound by such a concession. *See McCandless v. Campbell,* 20 Haw. 404, 405 (1911) (concluding that, where a statement in question "is purely of a conclusion of law[, it] does not bind the court. If it becomes essential to a disposition of the appeal, the issue of the alleged unconstitutionality will be considered and decided."); *F.A.C.E. Trading, Inc. v. Todd,* 393 Md. 364, 903 A.2d 348, 355 n. 7 (2006) (stating that it is not bound by a party's concession of law). Other jurisdictions have recognized that a developer-vendor could be held liable for breach of an implied warranty of habitability. *See Tassan v. United Dev. Co.,* 88 Ill.App.3d 581, 43 Ill.Dec. 769, 410 N.E.2d 902, 908 (1980) (determining that a developer-vendor of condominium units could be held liable for breach of implied warranty of habitability); *see also Mazurek v. Nielsen,* 42 Colo.App. 386, 599 P.2d 269, 270–71 (1979); *Smith v. Miller Builders, Inc.,* 741 N.E.2d 731, 740–43 (Ind.Ct.App.2000); *Bolkum v. Staab,* 133 Vt. 467, 346 A.2d 210, 211–12 (1975). As one court explains:

> [T]he fundamental reason for requiring an implied warranty of habitability to attach

to the sale of new homes by a builder-seller is because of the unusual dependent relationship of the vendee to the vendor. Purchasers from a builder-seller depend on his ability to construct and sell a home of sound structure. *Purchasers from a developer-seller depend on his ability to hire a contractor capable of building a home of sound structure. The buyers here had no control over [the defendant-developer-seller's] choice of a builder. [The defendant-developer-seller] stood in the best position to know which contractor could perform the work adequately. The dependent relationship here between the buyers and [the defendant-developer-seller] is the same as if [the defendant-developer-seller] was a builder-seller.*

*Tassan,* 43 Ill.Dec. 769, 410 N.E.2d at 908 (internal quotation marks and citation omitted) (emphasis added). Although *American Towers*—the sole case relied on by Venture 15 on appeal and at the circuit court level—stands for the proposition that an implied warranty of habitability does not extend to residential home purchases in Utah, such a position appears to be a minority one. *See Conklin v. Hurley,* 428 So.2d 654, 656–57 & n. 2 (Fla.1983) (stating that "[a] majority of the jurisdictions in this country now recognizes" an implied warranty of habitability in the sale of new residences and collecting cases from thirty-three states to support such position).

■ Nonetheless, as previously stated, the circuit court in the instant case ruled that the Condominium Public Report, which was the final report issued on Newtown Meadows by the real estate commission, complied with HRS § 514A–61 and that, therefore, the AOAO's implied warranty of habitability claim was effectively disclaimed. HRS § 514A–61, entitled "Disclosure requirements," is set forth in Part IV of HRS chapter 514A, which, in turn, is entitled "Protection of Purchasers." At the time the relevant events took place in this case, HRS § 514A–61 (1985 & Supp.1998) provided in pertinent part:

(a) Each developer of a project subject to this chapter *shall* prepare and *provide* to each prospective initial purchaser an abstract which shall contain the following:

. . . .

(3) A description of all warranties for the individual apartments and the common elements, including the date of initiation and expiration of any such warranties; and if no warranties exist, the developer shall state that no warranties exist[.]

. . . .

(c) This section shall be administered by the real estate commission. *The real estate commission may waive the requirements of subsections (a) and (b) if the information required to be contained in the disclosure abstract is included in the real estate commission's public report on the project.*

(Emphases added.) It is undisputed that Venture 15 was the developer of Newtown Meadows and, thus, subject to HRS chapter 514A. It is unclear, however, whether Venture 15 "followed the dictates of [HRS] § 514A–61" as it claims on appeal. Specifically, it is unclear from the record whether Venture 15 provided to each prospective initial purchaser *an abstract which contained a statement that no warranties exist.* Although Venture 15 correctly points out that the *Condominium Public Report* provides in relevant part that "[t]here are no expressed or implied warranties including any implied warranty of merchantability of fitness of the apartment for a particular purpose[,]" such information was not provided in the *disclosure abstract attached to the Condominium Public Report* as required by HRS § 514A–61(a). Although the disclosure abstract requirement can be waived, HRS § 514A–61(c), the real estate commission did not waive such requirement. In fact, the first page of the Condominium Public Report provides:

| Disclosure Abstract: | Separate Disclosure Abstract on this condominium project: |
|---|---|
| [X] Required– | [ ] Not Required -- disclosures covered in this report. |
| (Exhibit B) | |

(Emphasis in original.) (Format altered.) Exhibit B, the disclosure abstract attached to the Condominium Public Report, merely provides the estimate of maintenance fee disbursements and initial maintenance fee as-

sessments, as required by HRS § 514A–61(a)(2),[20] and does not include any information relating to warranties, as required by HRS § 514A–61(a)(3). Although Venture 15 apparently believes that the Condominium Public Report and the abstract/disclosure abstract referred to in HRS § 514A–61 are one and the same, they are not. Indeed, HRS § 514A–61(c) makes clear that the disclosure abstract and the real estate commission's public report on the project, *i.e.,* the Condominium Public Report, are two *separate* documents.

■ Finally, inasmuch as it does not appear that an abstract containing the requisite information on warranties was prepared by Venture 15, it reasonably follows that "each prospective initial purchaser" was not provided with such an abstract, as required by HRS § 514A–61(a). We, therefore, disagree with Venture 15's assertion that, because "[t]he Condominium Public Report is a public report available to any prospective purchaser of a unit at Newtown Meadows[,]" "the AOAO cannot logically maintain that Venture 15 violated any statutory requirements regarding a disclosure that it was not providing any warranties." Consequently, even assuming *arguendo* that HRS § 514A–61 provides a statutory vehicle for developers to utilize in order to disclaim warranties, including the implied warranty of habitability, Venture 15 cannot rely on HRS § 514A–61 in light of its failure to "follow[ ] the dictates" of such section. Moreover, the burden on Venture 15 to establish that it disclaimed the implied warranty of habitability is "very high," *Bd. of Managers of Chestnut Hills Condo. Ass'n v. Pasquinelli, Inc.,* 354 Ill.App.3d 749, 290 Ill. Dec. 730, 822 N.E.2d 12, 19 (2004), and such disclaimers are strictly construed against the

defendant. *Id.; see also Tusch Enters. v. Coffin,* 113 Idaho 37, 740 P.2d 1022, 1030 (1987) (observing that "[t]he majority of states permit a disclaimer of an implied warranty of habitability, but the disclaimer must be clear and unambiguous and such disclaimers are strictly construed against the [defendant]") (citations omitted). Accordingly, we hold that the circuit court erred in granting summary judgment in favor of Venture 15 on the AOAO's implied warranty of habitability claim.

### b. *express warranties*

The AOAO also contends that the circuit court erred in granting summary judgment in favor of Venture 15 on its breach of express warranties claims.[21] Specifically, the AOAO's argument with respect to its breach of express warranties claims against Venture 15 states, in its entirety:

> Venture 15's summary judgment motion argued [that the AOAO] had no *express* warranty claim because [the AOAO] had no contract with Venture 15. This is flawed because: (1) it contradicts the holding in [*AOAO Park Towers* ], where the court specifically recognized an association's cause of action for breach of *implied* warranty of habitability even though the association was not technically the contracting party; and (2) HRS § 514A–93 specifically grants associations *standing* to bring suit on behalf of its [sic] homeowners.

(Some emphases omitted and some added.)

■ Preliminarily, we note that the AOAO does not indicate to this court what express warranty or warranties, if any, were made by Venture 15 to the AOAO (and/or its mem-

---

**20.** HRS § 514A–61(a)(2) provides:

(a) Each developer of a project subject to this chapter shall prepare and provide to each prospective initial purchaser an abstract which shall contain the following:

. . . .

(2) A breakdown of the annual maintenance fees and the monthly estimated cost for each apartment, revised and updated at least every twelve months and certified to have been based on generally accepted accounting principles[.]

**21.** As previously stated, Venture 15 asserted in its motion for partial summary judgment that *all*

express *and* implied warranties were disclaimed as a result of the alleged disclaimer in the Condominium Public Report. The circuit court's order, however, granted partial summary judgment in favor of Venture 15 only "as to the [implied] warranty of habitability." Thus, it appears that the circuit court never ruled on the other warranty claims. Nevertheless, the circuit court's amended judgment indicates that judgment was entered in favor of Venture 15 on the AOAO's "breach of express *and/or* implied warranty claims." (Emphasis added.)

bers), and this court "is not required to sift through a voluminous record for documentation of a party's contentions." *Int'l Bhd. of Elec. Workers v. Hawaiian Tel. Co.*, 68 Haw. 316, 332, 713 P.2d 943, 956 (1986). The record in this case consists of sixty-four volumes of court documents and over 300 pages of transcripts. Moreover, contrary to the AOAO's characterization, Venture 15's motion for partial summary judgment did *not* "argue[ ]" that the AOAO "had no express warranty claim because [the AOAO] had no contract with Venture 15." Rather, Venture 15 argued that "the AOAO's claims against Venture 15 for breach of warranty must . . . be dismissed, since Venture 15 made no warranties, either express or implied, with regard to . . . Newtown Meadows[,]" and that it "followed the dictates of [HRS] § 514A–61[.]"

The AOAO's first argument raised on appeal, to wit, that the ICA "specifically recognized an association's cause of action for breach of *implied* warranty of habitability even though the association was not technically the contracting party" in *AOAO Park Towers* has no bearing on the AOAO's *express* warranty claim. And, whether the AOAO has standing pursuant to HRS § 514A–93 does not address the issue whether Venture 15 *made* any express warranties to the AOAO. Thus, the AOAO's contentions on appeal relating to its breach of express warranties claims against Venture 15 are without merit. Accordingly, we hold that the circuit court did not err in granting summary judgment in favor of Venture 15 on the AOAO's breach of express warranties claims.

### 2. Royal, Lee, and Liu

 The AOAO contends that the circuit court erred in granting summary judgment in favor of Royal, Lee, and Liu on its breach of warranties claims. The AOAO essentially

argues that Royal, Lee, and Liu extended express warranties to the AOAO and that implied warranties arose by operation of law. The AOAO, however, does not assign as error the circuit court's orders that granted Royal's, Lee's, and Liu's motions for partial summary judgment that asserted that the AOAO's breach of warranties claims were barred by the applicable statute of limitations. And, the AOAO does not present any argument with respect to the circuit court's ruling that the statute of limitations barred the AOAO's breach of warranties claims. Consequently, even assuming *arguendo* that the AOAO prevails on its argument asserted on appeal that Royal, Lee, and Liu extended express warranties to the AOAO and that implied warranties arose by operation of law, the AOAO's breach of warranties claims are barred by the applicable statute of limitations in light of the AOAO's failure to challenge such basis. The AOAO's contention with respect to its breach of warranties claims, therefore, is deemed waived. *See* HRAP Rule 28(b)(4) (2007) ("Points not presented . . . *will be disregarded* [.]" (Emphasis added.)); HRAP Rule 28(b)(7) (2007) ("Points not argued may be deemed waived."); *see also Whitey's Boat Cruises, Inc. v. Napali–Kauai Boat Charters, Inc.*, 110 Hawai'i 302, 318 n. 26, 132 P.3d 1213, 1229 n. 26 (2006). Accordingly, we hold that the circuit court did not err in granting summary judgment in favor of Royal, Lee, and Liu on the AOAO's breach of warranties claims.

### C. *The AOAO's Intentional and Negligent Misrepresentation Claims*

The AOAO next maintains that the circuit court erred in granting summary judgment in favor of Royal, Lee, and Liu on the AOAO's intentional and negligent misrepresentation claims.[22] The AOAO contends that

---

22. On appeal, Venture 15 asserts throughout its answering brief that the circuit court "should have" dismissed the AOAO's misrepresentation claims against Venture 15. As previously discussed, the circuit court *denied* Venture 15's two motions for partial summary judgment addressing the AOAO's misrepresentation claims. Consequently, the circuit court did not enter final judgment in favor of Venture 15 with respect to

the AOAO's misrepresentation claims. Venture 15, however, did not file a cross-appeal in order to challenge the circuit court's denial of its two motions. Thus, the circuit court's denial of Venture 15's motions for partial summary judgment on the AOAO's misrepresentation claims is not before this court. *See Shoemaker v. Takai*, 57 Haw. 599, 607, 561 P.2d 1286, 1291 (1977) (stating that, "[o]rdinarily, an appellee is not entitled

the circuit court erred in ruling that it lacked standing to bring its misrepresentation claims. The AOAO also asserts that: (1) Royal, Lee, and Liu's "pecuniary interest was sufficient to establish a duty"; (2) "liability is not limited to the source of the misleading information"; and (3) "the misrepresentation was false and related to an existing condition." (Capitalization in original omitted.)

Royal and Lee contend that the AOAO lacks standing to bring its misrepresentation claims. Moreover, Royal and Lee argue, *inter alia,* that: (1) they did not owe any duty to the AOAO; (2) they did not make any representations to the AOAO nor did they prepare the Compaction Report that allegedly contains a misrepresentation; and (3) there was no justifiable reliance by the AOAO on any alleged misrepresentations. Liu contends that "there is no evidence of an alleged misrepresentation by Liu in the entire record." (Capitalization in original omitted.) Inasmuch as "every court must determine as a threshold matter whether it has jurisdiction to decide the issues presented," *Akinaka v. Disciplinary Bd. of the Hawai'i Supreme Court,* 91 Hawai'i 51, 55, 979 P.2d 1077, 1081 (1999) (internal quotation marks and citation omitted), we first address Royal's and Lee's contention that the AOAO lacks standing to bring its misrepresentation claims.

### 1. Standing

The AOAO alleges that it has standing, pursuant to HRS § 514A–93, to bring its misrepresentation claims. The AOAO argues that Royal's and Lee's reliance on *Hawaii's Thousand Friends v. Anderson,* 70 Haw. 276, 768 P.2d 1293 (1989), at the circuit court level was "misplaced" in light of the fact that HRS § 514A–93 "unequivocally confers to the [AOAO] authority to sue on behalf of 'two or more apartment owners as their respective interest may appear[.]'" (Second set of brackets in original.) The AOAO claims that

> this case seeks redress not only for individual injuries but primarily for damage to

common areas. HRS § 514A–93 authorizes suit "with respect to any cause of action relating to the common elements or more than one apartment." Individual owner participation is not required.

Moreover, the AOAO argues that "[o]ther jurisdictions authorize associations to sue on behalf of its members for misrepresentation and fraud." (Citations omitted.)

Royal and Lee, on the other hand, contend that the AOAO lacks standing to bring its misrepresentation claims, alleging that *Hawaii's Thousand Friends* presents a "virtually identical situation" with the circumstances in this case. Moreover, Royal and Lee argue that "courts in other jurisdictions have concluded that condominium associations lack standing to sue on behalf of individual condominium owners when the relief requested requires the individual participation of the members in the lawsuit." (Citations omitted.)

In *Hawaii's Thousand Friends,* then-Mayor Frank Fasi directed his administration to embark on a study of available locations in central O'ahu for a city-developed housing project, pursuant to authority granted by the legislature in HRS §§ 359G–4.1 and 46–15.1. 70 Haw. at 278, 768 P.2d at 1296. The study revealed that the Waiola Estate lands were ideal for the proposed housing development. *Id.* Hawaii's Thousand Friends (HTF), a non-profit corporation, learned of the proposed development through a series of public advertisements that touted the then-City and County of Honolulu Managing Director's efforts in the project. *Id.* at 279, 768 P.2d at 1296. Thereafter, HTF commenced an investigation into the Waiola Estate project, concerned that the proposed project was to be situated on land that was designated as agricultural in the State Development Plan. *Id.* at 279, 768 P.2d at 1297. HTF ultimately filed suit, and the State defendants unsuccessfully moved for partial summary judgment based on HTF's lack of standing. *Id.* at 280, 768 P.2d at 1297. Eventually, the case went to trial on HTF's third amended complaint, wherein it alleged, among other things, that the State defendants had "made

on appellate review to attack a judgment without a cross appeal with a view either to enlarging his

own rights or of lessening the rights of his adversary") (citations omitted).

numerous misrepresentations in the advertisements[.]" *Id.* The jury returned a verdict in favor of HTF in the amount of $482,921. *Id.*

On appeal, the State defendants raised, *inter alia,* the issue of HTF's standing. *Id.* at 281, 768 P.2d at 1298. This court held that HTF lacked standing to bring suit, explaining that:

> HTF allege[d] that some of its members who may qualify for low- and moderate-income housing were misled by the ads and suffered injury thereby. This suit, however, is brought by HTF, the corporation, not by the members of HTF individually.
>
> [This court has] in the past recognized suits brought by non-profit organizations on behalf of their membership. In those cases, however, the injury alleged by the organization was suffered by the membership in general. More importantly, the remedy which could be provided to the organization by a favorable judicial decision would also remedy the injury suffered by the members individually.
>
> The situation in this case is different. The injury arising out of the misrepresentation is not alleged to have been suffered by the HTF membership in general. Rather, very few of HTF's members were injured in this way. The injury suffered by these few is a very personalized injury. Each member who claims to have been misled would have undertaken different actions upon reliance on the misrepresentation. The resultant injury, therefore, would be different for each person. Moreover, the remedy which could be awarded to the HTF organization would not compensate each of the members who incurred personal damages as a result of [the State] defendants' misrepresentations.

*Id.* at 284–85, 768 P.2d at 1299–1300 (citation omitted).

Relying on *Hawaii's Thousand Friends,* Royal and Lee claim that:

> Like the injury alleged by the corporation[, *i.e.,* HTF,] in *Hawaii['s] Thousand Friends,* the injury arising out of the alleged misrepresentations in this case is not alleged to have been suffered by the

AOAO's membership in general. The AOAO is asserting its misrepresentation claims on behalf of individual apartment owners, not its membership in general. The alleged resultant injuries are different for each apartment owner. Because the alleged injuries are personalized injuries, the AOAO lacks standing to bring its misrepresentation claims.

(Citations omitted.) Royal further asserts that:

> [T]he AOAO is asserting claims for substantial damages on behalf of individual apartment owners. However, the AOAO will require the participation of the individual apartment owners to pursue its misrepresentation claims. Thus, the participation of individual apartment owners is critical to the AOAO's position, but fatal to the AOAO's assertion of associational standing for the purposes of its misrepresentation claims.

Royal and Lee, however, fail to address the AOAO's contention that HRS § 514A–93 statutorily authorizes the AOAO (by its board of directors) to bring its misrepresentation claims on behalf of the individual apartment owners in the circumstances of the instant case. HRS § 514A–93 provided in relevant part:

> Without limiting the rights of any apartment owner, actions may be brought by the manager or board of directors, in either case in the discretion of the board of directors *on behalf of two or more of the apartment owners,* as their respective interests may appear, with respect to *any cause of action relating to the common elements or more than one apartment.*

(Emphases added.) Other jurisdictions have interpreted similar provisions as HRS § 514A–93 in determining whether condominium or homeowners associations have standing to bring misrepresentation or fraud claims on behalf of apartment owners or homeowners. In *Brickyard Homeowners' Ass'n Management Committee v. Gibbons Realty Co.,* 668 P.2d 535 (Utah 1983) [hereinafter, *Brickyard Homeowners' Ass'n*], the management committee of the Brickyard Homeowners' Association (the

management committee) brought suit against the defendants, who designed, constructed, marketed, and sold the Brickyard Condominiums. *Id.* at 536. The management committee's complaint alleged, *inter alia*, misrepresentation, claiming that the defendants falsely represented that the glass installation in the atriums in the "C" units were double pane insulated and that the walkways around reflection ponds and other common areas would be landscaped and fully maintained. *Id.* The defendants unsuccessfully moved to dismiss the management committee's complaint based on failure to state a claim for relief and for lack of standing and/or capacity to sue. *Id.* Thereafter, the Utah Supreme Court (the court) granted the defendants' petition for interlocutory appeal. *Id.* at 536–37. On appeal, the court was faced with interpreting Utah Code Annotated (UCA) § 57–8–33 (1953), which provides in relevant part:

> Without limiting the rights of any unit owner, actions may be brought by the manager or management committee, in either case in the discretion of the management committee, *on behalf of two or more of the unit owners*, as their respective interests may appear, with respect to *any cause of action relating to the common areas and facilities or more than one unit.*

*Id.* at 538 (emphasis added). Preliminarily, the court determined that the management committee's complaint, which was filed "on behalf of the members of the Brickyard Homeowners' Association under and by virtue of [UCA] § 57–8–33[,]" *id.* at 540–41 (internal quotation marks and citation omitted), "squarely falls within the statutory prescription that action be brought on behalf of two or more unit owners and that it relate to the common areas and facilities or more than one unit." *Id.* at 541. The court then stated that it "must determine whether the management committee has standing to sue on the particular causes of action stated in the complaint, or whether some of the claims have an individual nature which prevents the committee from suing on behalf of the unit owners collectively." *Id.* at 542. The court concluded that none of the claims made on behalf of the unit owners by the management committee, including the misrepresentation claim, were of such individual nature as to prevent the management committee from suing on behalf of the unit owners collectively, explaining that:

> [T]he defendants contend that the claim of misrepresentation ... may not be brought by the management committee inasmuch as the claim is based upon each unit owner's negotiations with [the] defendants, and that individual inquiry is necessary to determine the reliance of each owner on any misrepresentation. *We again reiterate that [UCA] § 57–8–33 is without restriction as to the type of action that may be brought by the management committee.* Moreover, at this juncture in the lawsuit where only the [management committee's] complaint has been filed, the record affords us no clue as to what means the [management committee] intend[s] to use to prove the alleged misrepresentation and reliance. It is entirely conceivable that the [management committee] intend[s] to show a misrepresentation in a sales brochure or other advertising material which was presented to each of the unit owners when he expressed an interest in purchasing a unit, or by some other means which was common to all purchasers. The [management committee] in [its] brief hint[s] that this will be [its] approach since [it] state[s] that proof of misrepresentation to one owner will be proof to all. In that event, the testimony of all the complaining owners may not be necessary. However, we envision no insurmountable problems in the trial of this case even if the testimony of all the complaining owners is required. The allegations of misrepresentation relate only to the glass windows in the atriums in the "C" units and to the walkways around the reflection ponds in the common areas. Being so limited, the allegations would not require the testimony of more than a small fraction of the total number of unit owners.
>
> What we have just said with regard to the proving of the alleged misrepresentation is also true as to the proof of reliance of each unit owner on the alleged misrepresentation.

*Id.* at 542–43 (emphasis added). Accordingly, the court held that it "s[aw] no barrier for

the management committee to pursue its action against the defendants on all causes of action[.]" *Id.* at 543.

In *Sandy Creek Condominium Ass'n v. Stolt & Egner, Inc.*, 267 Ill.App.3d 291, 204 Ill.Dec. 709, 642 N.E.2d 171 (1994), the Sandy Creek Condominium Association, Inc. (the association) brought suit against the builders of the Sandy Creek Condominium development (the defendants), claiming, among other things, that the defendants

> committed fraud in making the following misrepresentations knowing them to be false or with reckless disregard of their truth or falsity: (1) the buildings were constructed in compliance with the condominium plans and specifications; and (2) the buildings were constructed in a good and workmanlike manner, free from defects, and in compliance with applicable standards.

*Id.* at 174. At trial, the jury returned a verdict in favor of the association on its fraud claim, awarding $120,000 to the association. *Id.* at 174. On appeal, the defendants contended that the association lacked standing to bring its fraud claim. *Id.* at 175. The Illinois Appellate Court disagreed, stating that:

> The affairs of the [a]ssociation are statutorily controlled by the [Condominium Property] Act [ (Act) ]. Section 9.1 of the Act specifically states that *"the board of managers of a condominium association shall have standing and capacity to act in a representative capacity in relation to matters involving the common elements or more than one unit, on behalf of the unit owners, as their interests may appear."* In its complaint, the [association] alleged that the defendants fraudulently misrepresented to unit owners that the buildings

were constructed in substantial compliance with condominium plans and that the buildings were constructed in a good and workmanlike manner and free from defects. *Although not all unit owners were affected by the allegedly fraudulent statements of the defendants, the Act statutorily grants the [a]ssociation standing to bring an action if more than one unit is affected.*

*Id.* at 175–76 (original brackets and citations omitted) (emphases added); *see also Milton Co. v. Council of Unit Owners of Bentley Place Condo.*, 354 Md. 264, 729 A.2d 981, 983–84, 988–90 (1999) (holding that association had standing to sue for damages based on defects in multiple units, pursuant to Maryland Code Annotated (Md.Code Ann.), Real Prop. § 11–109(d)(4) (1974 & 1996 Repl. Vol.),[23] notwithstanding allegations that damages were unique to individual unit owners, no individual unit owner was named as a party to the suit, and only a few of the 240 unit owners testified at trial); *Stony Ridge Hill Condo. Owners Ass'n v. Auerbach*, 64 Ohio App.2d 40, 410 N.E.2d 782, 785–86 (1979) (determining that association, on behalf of all unit owners and for each of them, was proper party to bring action for damages for fraudulent misrepresentation pertaining to the common area pursuant to Ohio Revised Code (ORC) § 5311.20,[24] despite the fact that only four of the twenty-four unit owners testified that they sustained damages as a result of the alleged misrepresentations).

■ As previously stated, the AOAO's amended complaint alleged the following with respect to its misrepresentation claims:

> 12. The representation contained in the [ ]Compaction Report[ ] that the Newtown Meadows was "compacted adequately" was

---

23. Md.Code Ann., Real Prop. § 11–109(d)(4) provides in pertinent part:

> (d) The council of unit owners[, *i.e.*, an association,] has ... the following powers:
>
> ....
>
> (4) To sue and be sued, complain and defend, or intervene in litigation or administrative proceedings in its own name on behalf of itself or two or more unit owners on matters affecting the condominium[.]

24. ORC § 5311.20 provided in relevant part:

> In any action relating to the common areas and facilities or to any right, duty, or obligation possessed or imposed upon the unit owners association, by statute or otherwise, the unit owners association may sue or be sued as a separate legal entity.... Any such action brought by or on behalf of the unit owners association shall be pursuant to authority granted by its board of managers.

Section 5311.20 was subsequently amended in 2004. 2004 Ohio Laws 76.

false and known by the [D]efendants to be false.

13. Despite the [D]efendants' knowledge, ... the apartments at the Newtown Meadows were sold to members of the [AOAO] without disclosing the known inadequacies and deficiencies in the compaction of fill materials supporting the building structures of the Newtown Meadows.

14. As a result of the foregoing, among other things, the buildings and foundations at Newtown Meadows have shifted, settled and cracked, causing damage to the buildings and apartments contained therein.

On appeal, the AOAO maintains that the present "case seeks redress not only for individual injuries but primarily for damages to common areas." Although not entirely clear, it appears that the parties do not dispute that the AOAO's misrepresentation claims relate to the common areas and facilities or more than one unit at Newtown Meadows. As such, the AOAO's misrepresentation claims "squarely fall[,]" *Brickyard Homeowners' Ass'n*, 668 P.2d at 541, within the scope of HRS § 514A–93 inasmuch as section 514A–93 plainly stated that actions may be brought "on behalf of two or more of the apartment owners ... with respect to any cause of action relating to the common elements or more than one apartment." Indeed, HRS § 514A–93 is without restriction as to the type of action that may be brought by the board of directors. Moreover, unlike the AOAO's unfair or deceptive acts or practices claims, which are specifically governed by the restrictions contained in HRS § 480–2, the parties do not refer to any statute that would similarly govern the AOAO's misrepresentation claims. Furthermore, even assuming *arguendo* that not all apartment owners were affected by the alleged misrepresentations, HRS § 514A–93 statutorily authorizes the board of directors to bring an action on behalf of two or more apartment owners. *See Sandy Creek Condo. Ass'n*, 204 Ill.Dec. 709, 642 N.E.2d at 175–76. Lastly, the authorities relied on by Royal and Lee to support their contention that condominium associations lack standing to sue on behalf of individual apartment owners when the relief requested requires the participation of the individual owners in the lawsuit are distinguishable from the present case. *See Mission Hills Condo. Ass'n M–1 v. Corley*, 570 F.Supp. 453, 459 (N.D.Ill.1983) (concluding that associations lack standing to bring a claim for damages pursuant to section 4 of the Clayton Act, 15 U.S.C. § 15, because section 4's damage provision expressly restricts suit to "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws" and the associations had not been injured in their "business or property" (internal quotation marks and brackets omitted)); *Bds. of Managers of Dunbar Lakes Condos. v. Dunbar Homes, Inc.*, No. 84C5391, 1985 WL 1379, at *2 (N.D.Ill. May 15, 1985) (unreported) (concluding that "proof of damages to non-common areas requires individual owners to participate" without any discussion of section 9.1 of the Illinois Condominium Property Act as applied in *Sandy Creek Condominium Ass'n* (citation omitted)); *Lakeview Townhomes Condo. Ass'n v. E. Fla. Dev. Corp.*, 454 So.2d 576, 578 (Fla.Dist.Ct.App. 1984) (concluding that "a class action by an association ... will not lie for alleged fraud on its individual members" (citations omitted)). Accordingly, we hold that the AOAO has standing to bring its misrepresentation claims in the circumstances of this case. We next address whether the AOAO established reliance on the alleged misrepresentation contained in the Compaction Report, a necessary element to its negligent and intentional misrepresentation claims against Royal, Lee, and Liu.

2. **Reliance**

The AOAO asserts, without any citation to the record, that "the Newtown Meadows home purchasers relied on the Building Department's approval of the [P]roject, which was based on the false and misleading Compaction Report." Royal argues that, "absent a showing that the AOAO at least received a copy of the Compaction Report prior to the filing of this action or that Royal made representations to the AOAO regarding the soils or the compaction of the fill at [Newtown Meadows], there simply cannot be any reliance on the part of the AOAO." Lee argues that:

[T]he AOAO has not alleged reliance upon the alleged misrepresentation. The AOAO's attempt to gloss over its lack of reliance is telling, as the AOAO's claim of negligent misrepresentation cannot be sustained without a showing of reliance. The AOAO alleges only that members of the [AOAO] bought apartments, not that the AOAO, or even its members for that matter, relied upon any alleged misrepresentation. The AOAO does not contend that its members ever saw either report prepared by Geolabs[, *i.e.*, the Grouting Report and the Compaction Report,] prior to purchasing apartments [at Newtown Meadows].

We have previously indicated that:

Negligent misrepresentation requires that: (1) false information be supplied as a result of the failure to exercise reasonable care or competence in communicating the information; (2) the person for whose benefit the information is supplied suffered the loss; and (3) *the recipient relies upon the misrepresentation. See Kohala Agriculture[ v. Deloitte & Touche,]* 86 Hawai'i [301,] 323, 949 P.2d [141,] 163 [ ( App. 1997) ]; Restatement (Second) of Torts § 552 [ (1977) ].

*Blair v. Ing*, 95 Hawai'i 247, 269, 21 P.3d 452, 474 (2001) (emphasis added). This court has set forth the following elements constituting intentional or fraudulent misrepresentation:

(1) false representations were made by defendants[;] (2) with knowledge of their falsity (or without knowledge of their truth or falsity)[;] (3) in contemplation of plaintiff's reliance upon these false representations[;] and (4) *plaintiff did rely upon them.*

*Shoppe v. Gucci Am., Inc.*, 94 Hawai'i 368, 386, 14 P.3d 1049, 1067 (2000) (citations omitted) (emphasis added).

▮▮▮ Here, the AOAO does not point to any evidence in the record that indicates there was any reliance by the AOAO (or its members) on the allegedly "false and misleading statement in the Compaction Report that soil compaction was adequate," which, according to the AOAO, is "[t]he actual basis of [its] misrepresentation claim[.]" Consequently, we conclude that there is no genuine issue of material fact as to whether there was any reliance by the AOAO (or its members)

on the alleged misrepresentation in the Compaction Report. *Cf. Gouveia v. Citicorp Person–to–Person Fin. Ctr., Inc.,* 101 N.M. 572, 686 P.2d 262, 268 (N.M.Ct.App.1984) (concluding that issue of material fact existed as to whether purchaser of townhouse relied on listing broker's misrepresentation inasmuch as purchaser's deposition testimony indicated reliance on the misrepresentation). Moreover, to the extent that the AOAO argues that the Building Department's purported reliance on the Compaction Report in approving the Newtown Meadows project may be imputed to it (or its members) in order to permit the AOAO to maintain its misrepresentation claims, we reject such an argument. *See Plourde Sand & Gravel Co. v. JGI E., Inc.,* 154 N.H. 791, 917 A.2d 1250, 1258 (2007) (refusing to expand the elements of negligent misrepresentation to "include a scenario where reliance by *anyone* directly or indirectly involved may be imputed to the plaintiff so as to permit the plaintiff to maintain" a negligent misrepresentation claim) (emphasis in original).

▮▮▮ Furthermore, it should be pointed out that it is not entirely clear from the AOAO's opening brief whether the AOAO is arguing an additional basis for its misrepresentation claims against Liu. According to the AOAO's opening brief,

[n]o disclosure was made regarding *deficiencies in the construction of the concrete floor slabs*, which did not conform to minimum Building Code requirements of the project specifications [for Newtown Meadows]. Ultimately, the Newtown Meadows apartments were sold without disclosure of the serious soil compaction *and floor slab deficiencies.* Throughout the initial investigation, the Defendants withheld and/or failed to disclose any of the known information regarding the soil compaction deficiencies *or the deficient floor slabs.*

(Emphases added.) Although the AOAO claims that "the Defendants" withheld information regarding the purportedly deficient floor slabs, it would appear that only Liu, and not Royal or Lee, would be liable for any apparent non-disclosure regarding the deficient floor slabs inasmuch as Liu was the

masonry subcontractor that constructed the floor slabs for the Project. In its reply brief, the AOAO asserts, without any citation to the record, that it "relied on Liu's misrepresentation that it had completed [its] work satisfactorily."[25] Again, the AOAO does not point to any evidence in the record that indicates that there was any reliance by the AOAO (or its members) on Liu's purported misrepresentation.

▮ Nonetheless, relying on *Wong v. City & County of Honolulu,* 66 Haw. 389, 665 P.2d 157 (1983), the AOAO raises on appeal that the "Defendants' destruction of documents[, discussed *infra,*] should have precluded summary judgment." (Capitalization altered.) Specifically, the AOAO argues that "Defendants should not have been granted summary judgment on [the AOAO's] misrepresentation claim where Defendants' destruction of documents should have created an evidentiary presumption in favor of [the AOAO]."

In *Wong,* a pedestrian was struck by an automobile while attempting to cross an intersection controlled by malfunctioning traffic lights. *Id.* at 390–91, 665 P.2d at 159. The pedestrian brought suit against the City and County of Honolulu (the City), alleging that the City's negligent failure to properly maintain the traffic signal control box was the legal cause of the accident. *Id.* at 391, 665 P.2d at 159. Despite informal and formal requests for production of the control box, a private contractor, under the supervision of City employees, subsequently removed and destroyed the control box without the pedestrian's knowledge or consent. *Id.* Consequently, the trial court imposed a preclusion sanction, whereby the City was estopped from claiming that the malfunctioning traffic lights were caused by anything other than its own negligence, which sanction was

upheld on appeal by this court. *Id.* at 396, 665 P.2d at 162–63.

▮ In this case, the destruction of Royal's, Lee's, and Liu's documents at issue occurred *prior to* the initiation of the instant action. According to Royal, it was discovered subsequent to the initiation of the present action that Royal's records pertaining to Newtown Meadows were either destroyed by termites, rain, or were discarded. Lee's vice-president testified in her deposition that Lee "normally keep[s] the records for seven years." Inasmuch as Lee's participation in the construction of Newtown Meadows concluded sometime in the late 1980s, the documents were apparently destroyed prior to the time the AOAO filed its complaint in 1997. And, according to Liu, Liu's records relating to Newtown Meadows were destroyed in a fire in or about 1989. Inasmuch as "key to [this court's] holding in *Wong* was[, *inter alia,*] . . . the City's culpability in destroying a piece of potentially critical evidence formally requested in discovery[,]" *Richardson v. Sport Shinko (Waikiki Corp.),* 76 Hawai'i 494, 507, 880 P.2d 169, 182 (1994), yet the destruction of Royal's, Lee's, and Liu's documents at issue occurred prior to the initiation of the instant action, the AOAO's reliance on *Wong* is without merit.[26] Accordingly, we hold that the circuit court did not err in granting summary judgment in favor of Royal, Lee, and Liu on the AOAO's misrepresentation claims.

## D. *The AOAO's Breach of Contract Claims*

▮ As previously stated, the circuit court granted summary judgment in favor of Venture 15, Royal, Lee, and Liu on the AOAO's breach of contract claims, ruling that the six-year statute of limitations contained in HRS § 657–1 barred the AOAO's claims.

---

**25.** It appears that the AOAO contends that Liu supplied false information, or made a misrepresentation, based on the following rationale: "[W]hen a subcontractor requests final payment, he impliedly represents he has completed the work in accordance with the applicable plans, specifications[,] and governmental requirements." (Footnote omitted.)

**26.** The AOAO also asserts that "Defendants also withheld from discovery, and denied the existence of, documents describing post-litigation

soils testing by Geolabs in 2001." (Footnote omitted.) The AOAO states that "[t]he failure to provide discovery became the focus of a motion for sanctions by [the AOAO]." (Citation to the record omitted.) The AOAO, however, does not challenge the circuit court's order denying the AOAO's motion for sanctions nor does it provide any argument relating to such order. We, therefore, conclude that the AOAO's assertion is waived. *See* HRAP Rules 28(b)(4) & (b)(7).

Specifically, the circuit court orally ruled that "the [s]tatute of [l]imitation[s] as a matter of law is triggered by the breach, and not the date the harm was discovered." The circuit court also granted summary judgment in favor of Royal and Lee, apparently on the additional basis that there was no contract between (1) the AOAO (or its members) and Royal and (2) the AOAO and Lee. We first address whether there is privity of contract between the AOAO and Royal, Lee, and Liu.[27]

### 1. Privity of Contract Between the AOAO and Royal, Lee, and Liu

The AOAO claims that the circuit court "wrongly dismissed [the AOAO's] breach of contract claims against Liu, Royal, and Lee[.]" Specifically, the AOAO asserts that:

[Royal, Lee, and Liu] argued [at the circuit court level] that there was no privity of contract between [the AOAO] and each of them. As to Liu and Lee, [the AOAO's] opposition offered the general contracts between the developer, Venture 15[,] and their general contractors, S. Horita and Royal[,] to establish the terms of these Defendants' subcontracts. The general contracts establish circumstantially the material terms of the subcontracts, specifically the requirement that the subcontractors comply with the "General Conditions" of the general contracts, including plan specifications and the Building Code. For example, standard AIA forms A101 and A201 of the [S.] Horita general contract required [S.] Horita to incorporate in all its subcontracts a requirement that its

subcontractors comply with the "General Conditions." Section 5.3.1 of the General Conditions required S. Horita to include in its subcontracts the requirement that subcontractors "be bound by the terms of the Contract Documents," including the project plans and specifications. Thus, a jury could reasonably find that S. Horita complied and included in its Liu subcontract the requirements that Liu comply with project specifications and the Building Code in performing its work.

(Footnote and citations to the record omitted.) The AOAO then asserts that it is "plainly a third-party beneficiary of the above contracts under Hawai'i law[,]" referring to the aforementioned contracts. (Citations omitted.) Although the AOAO does not elaborate any further, it appears that the AOAO is claiming that it is a third-party beneficiary of the contracts between: (1) Venture 15 and Royal (for its claim against Royal); (2) Royal and Lee (for its claim against Lee); and (3) S. Horita and Liu (for its claim against Liu).

Royal maintains that there is no contract between the AOAO and Royal, arguing that:

As admitted to by the AOAO's counsel at oral argument [on July 29, 2002,] the only contract in this case is between Venture [15] and the individual buyers. Accordingly, the AOAO cannot assert a breach of contract claim against Royal.

In an attempt to now assert a new cause of action against Royal, the AOAO claims that it is a third-party beneficiary of the contract between Geolabs and Royal.[28]

---

**27.** The circuit court granted summary judgment in favor of Liu solely on the basis of HRS § 657–1. In granting summary judgment, the circuit court assumed for purposes of its ruling that there was a contractual relationship between the AOAO and Liu, stating that, "putting aside for a moment the [AOAO's] opposition found to the Liu motion … that there is no contract with Liu so the statute [of limitations] is not applicable, the [c]ourt will go on to *assume* it is; *and if there were a contract*, the [s]tatute of [l]imitation[s] as a matter of law is triggered by the breach, not the date the harm was discovered." (Emphases added.) Because "this court may affirm a grant of summary judgment on any ground appearing in the record, even if the circuit court did not rely on it[,]" *Whitey's Boat Cruises*, 110 Hawai'i at 309 n. 15, 132 P.3d at 1220 n. 15 (internal

quotation marks, brackets, and citation omitted), we decline to "assume" that there is a contract between the AOAO and Liu and, instead, address whether there is privity of contract between the AOAO and Liu as well.

**28.** It is unclear why Royal asserts that the AOAO is claiming that the AOAO is a third-party beneficiary of the contract between Geolabs and Royal. As previously mentioned, Venture 15, not Geolabs, contracted with Royal as the site development general contractor for Newtown Meadows. Although Royal retained Geolabs to perform subsurface grouting beneath Building 3 during the construction of Newtown Meadows, it appears that the basis of the AOAO's claims against Royal is that Royal is liable for the allegedly inadequate

However, the AOAO failed to allege this cause of action in its [f]irst [a]mended [c]omplaint. Although Hawai'i is a notice pleading state, the AOAO failed to provide Royal with *any* notice that the AOAO was asserting that it was a third-party beneficiary under any contract between any of the parties. Moreover, the AOAO's counsel, in response to the [circuit c]ourt's question as to whether the AOAO was withdrawing any claims for breach of contract, specifically conceded that "there is no claim [for] breach of contract."

(Citations omitted.) (Emphasis in original.)

Lee argues that, "[i]n a vain attempt to establish a contract, the AOAO refers to a standard form Subcontractor's Agreement that Royal uses. This was not a standard form agreement *between* Royal and ... Lee, but only *a* standard form that Royal uses." (Emphases in original.) Lee also asserts that "[t]he AOAO's breach of contract claims are a moot point. At oral hearing and upon questioning by the [c]ourt, the AOAO's counsel withdrew its claim for breach of contract [on July 29, 2002]." (Citation to the record omitted.) Liu similarly asserts that "it is undisputed that there is no privity of contract between [the AOAO] and Liu. Now, on appeal, [the AOAO] improperly seeks to 'plead' third-party beneficiary status. This attempt should be rejected as untimely."

As evinced by the foregoing, we preliminarily note that there is much dispute among the parties as to whether the AOAO withdrew its breach of contract claims at the July 29, 2002 hearing before the circuit court. On that day, the circuit court heard oral argument on, *inter alia,* Venture 15's motion for partial summary judgment on the AOAO's "unintentional tort claims" and breach of warranties claims. Venture 15's motion asserted, *inter alia,* that

the economic loss [rule] should preclude any tort-based recovery for economic losses allegedly sustained by the AOAO. The

AOAO's remedy is to do what it has already done, *i.e.*[,] sue Venture 15, the developer, who, in turn, has contractual remedies against the general contractor and design professionals. In essence, the terms of the contract, rather than some tort-based theory, should dictate liability and recovery of economic losses in construction cases.

At the hearing, counsel for the AOAO stated that:

The *only* contracts that *arguably* exist are the sale of contract [sic] between Venture 15 and individual apartment owners that I believe Venture 15 points out that[,] at the time the project was being developed and the operative events took place, the [AOAO] were [sic] not even existent [sic].

(Emphases added.) Subsequently, the following colloquy ensued regarding the AOAO's breach of contract claims against Venture 15:

THE COURT: What I'd like to focus on is do you have breach of contract claims against Venture 15?

[The AOAO's counsel]: I believe that the individual apartment owner would.

THE COURT: And those are pleadings [sic]?

[The AOAO's counsel]: There is a breach of contract claim pleading....

. . . .

THE COURT: ... *But, I need to get to the initial question first as to whether there is or is not and argued at this time withdrawing any claims of contract breach?*

[The AOAO's counsel]: *Well, certainly, on the part of the [AOAO], yes, there's no claim [for] breach of contract because there is no—*

THE COURT: *When we go to trial, will you be arguing any breach of contract for the Plaintiffs or Plaintiff* [29] *against Ven-*

---

soil compaction at Newtown Meadows, which would relate to the contract between Venture 15 and Royal, not between Royal and Geolabs. Indeed, the AOAO's reply brief to Royal's answering brief states that "Royal's obligations were established by a contract between Venture 15, the developer, and Royal, the site work general

contractor. It is under this contract that [the AOAO] asserted rights as third-party beneficiary."

29. Although not entirely clear, the circuit court's reference to "Plaintiffs" (emphasis added) may be to the individual apartment owners, despite

*ture 15 or asking for any jury instructions thereon or bringing any evidence regarding that?*

[The AOAO's counsel]: *As far as the individual homeowners, Your Honor, I haven't really thought that through at this point.*

THE COURT: Well, was it pleaded in the complaint?

[The AOAO's counsel]: There was a cause of action for breach of contract generally against Defendants.

THE COURT: Okay, and, do you—are you saying at this time that does not include defendant Venture 15?

[The AOAO's counsel]: Well, no. As I pointed out there are—there are [sic] a sales contract between Venture 15 and the homeowners.

. . . .

THE COURT: [W]hen you say that there's no contract between the AOAO and Venture 15 . . ., the AOAO is under [HRS ch.] 514–A[30] bringing these claims on behalf of the owners, right?

[The AOAO's counsel]: It's not. It's bringing the claims on behalf of the AOAO. Also, [HRS § ] 541A–92 [sic] also gives it the ability to bring claims that are common to two or more owners. But, the claim itself is brought by the AOAO in [HRS chapter] 514 [sic] gives the AOAO standing to bring claims within the parameters of this lawsuit.

THE COURT: Well, where there was a contract before between the original owners and the others, how can the AOAO get greater relief or damages than the relief and damages that would be available to the original owners on whose behalf they sued?

[The AOAO's counsel]: Well, Your Honor, a condominium is set up where you got individual properties owned by individuals

their own property [sic] and then the association has the common elements.

*Now, what we're—what we're essentially suing for is for repair to what constitutes the common elements.*

*And, so, those claims are not subject to any contract between Venture 15 and the AOAO.*

Now, there may be particular claims—

THE COURT: Sorry to interrupt but which claims are—

[The AOAO's counsel]: Which claims are?

THE COURT: Subject to a contract between the original owners and Venture 15?

[The AOAO's counsel]: Those would be things such as breach of express warranty and sales contract if they are in fact—in fact statute [sic]. I'm not sure that they are.

I—I—I haven't looked at the sales contract.

THE COURT: *I think what's happening is you can't have it both ways. Either there is a contract or there isn't a contract.*

*And you can't bring claims, I don't think, based on there isn't a contract, therefore, I get to bring this claim but over here I'm going to maintain another claim which is based on contract.*

[The AOAO's counsel]: Your Honor, I think what the—all the confusion comes about by saying—by thinking that the association is the same as the individual apartment owners.

Under the statute it's not set up that way.

The association has the ability to bring its own claims with respect to common elements.

In addition to that, they're entitled to bring claims with respect to these other individual apartment owners. These are

the fact that they are not actually parties to the instant action. And, the reference to "Plaintiff" appears to be to the AOAO, which is the only plaintiff in the instant action.

**30.** It appears that the circuit court is referring to HRS § 514A–93, which, as previously stated,

provided in pertinent part that "actions may be brought by the manager or board of directors . . . on behalf of two or more of the apartment owners, as their respective interests may appear, with respect to any cause of action relating to the common elements or more than one apartment."

claims that are separate apartment owners' claims.

Now, to the extend [sic] that these separate individual apartment owners are original purchasers and have a direct contract with Venture 15, *arguably*, and, *I would say arguably*, because I would dispute that that these expressed contracts invoke the applicability or trigger the applicability of the economic loss rule.

. . . .

THE COURT: *Could you for one last moment tell me this[:] whether any of the original owners are going to seek their claim for breach of contract because I believe you have said in this argument that they are the only people who have that—*

[The AOAO's counsel]: *Your Honor, if—if—let me put it this way if the outcome of this motion is dependent upon that, no, they won't.*

I should say at this point in time I don't have the contract in front of me. I don't know what rights they have.

Again, hinge on—the outcome of this motion hinge upon that, I would say no, the [AOAO] concerns [sic] that that they're not—

THE COURT: Okay.

(Emphases added.) At the conclusion of the hearing, the circuit court orally ruled that "there is no genuine issue of material fact as to whether the AOAO has a contract with Venture 15. And, the [AOAO], having conceded that it does not, and, the Defendants having conceded that since it does not, then, the limitation for economic loss rule doctrine does not apply. Therefore, denied as to economic loss doctrine."

At oral argument held on August 22 and 23, 2002, the issue whether the AOAO was asserting breach of contract claims was again raised by the parties and the circuit court. At the hearing, Liu's counsel stated:

Your Honor, . . . it certainly appears that [the AOAO] is being incredibly inconsistent on when or whether or if they're asserting claims for breach of contract against the parties. *When it suits their purposes, they're saying there is no [sic (see infra) ] breach of contract claim, and then when faced with an issue like breach of contract for [s]tatute of [l]imitations which obviously would be premised on a breach of contract claim, they're saying there's no breach of contract claim;* so I think they're being very inconsistent about their position on asserting contractual theories of recovery against any of the parties including Liu.

(Emphasis added.) Subsequently, the AOAO's counsel stated:

*Our position is that the association and the homeowner do have a claim which is based on contract. What it is, is a limited claim and a limited right based upon their status under Hawai'i case law as third-party beneficiaries under a contract which they had no hand in negotiating;* and the question is whether or not that type of contract status is the type of contract status that motivated the Hawai'i Supreme Court to say we're going to remove these very important rights to pursue claims in tort.

Another problem we have with the idea of saying, well, if you got a contract claim, I'm going to take away your tort claim, is that at this point in the litigation, at this point in time *we're really not sure whether we do have a contract claim or not.* Many of the factors that determine whether we have a contract claim will have to await adjudication by the jury. The very existence of a contract, whether we were intended to be third-party beneficiary could ultimately be litigated at some later point in time, so we can get caught in a situation where we're ripsawed.

. . . .

We may have a claim for negligence, we may have a claim for contract. Whether we actually have that claim and can recover that claim cannot be determined until after the jury makes its determination, and I believe that's simply unfair to force the [AOAO] at this point to have to choose one or the other.

(Emphases added.) During the first day of the two-day hearing, the circuit court informed the parties that "elections need be made by both [sides]." Specifically, the circuit court stated:

[W]hat I hear you[, *i.e.*, the AOAO,] saying is you pleaded both [tort and contract claims] because you didn't know what was coming up, but I'm telling everyone who's brought this motion [ (pertaining to the economic loss rule) ]; if what you're saying is that you agree, you stipulate that they're the third-party beneficiaries of any contract, then the economic loss doctrine would apply to the damages; and if you don't, then it's only fair that they should be allowed to move forward in tort.

The next day, however, the circuit court stated that:

[S]ince the defendants have not conceded third-party beneficiary status or assignee status, *I withdraw my requirement that you[, i.e., the AOAO,] would have to elect[, i.e., elect whether it was pursuing only tort-based claims or only contract-based claims].*

(Emphasis added.)

Notwithstanding the fact that the foregoing discussion illustrates that there was much confusion at the circuit court level as to whether the AOAO was intending to pursue its breach of contract claims against Royal, Lee, and Liu, it appears that the AOAO ultimately decided that it would pursue breach of contract claims as a third-party beneficiary under the various construction contracts among the parties. Moreover, the circuit court withdrew its requirement that the AOAO would have to forego its contract-based claims if it chose to pursue its tort-based claims and vice versa. Thus, contrary to Royal's and Lee's assertions, it does not appear that the AOAO withdrew its breach of contract claims—nor was it required to do so by the circuit court—as against Royal and Lee as well as Liu. Accordingly, we next address the AOAO's assertion that it is "plainly" a third-party beneficiary under the parties' construction contracts as pertaining to the AOAO's breach of contract claims against Royal, Lee, and Liu.

▮ The AOAO asserts:

Liu argued [at the circuit court level that the AOAO] lacked standing because it did not plead third-party beneficiary status. [The AOAO's f]irst [a]mended [c]omplaint

alleged breach of contract. Hawai'i is a notice-pleading state and does not require pleading standing as a third-party beneficiary.

(Citation omitted.) As previously mentioned, the AOAO's amended complaint merely alleged that "[t]he Defendants are liable to [the AOAO] based on breach of contract[.]" Clearly, the AOAO did not allege in its amended complaint that it is a third-party beneficiary to the parties' construction contracts. However, even assuming *arguendo* that the AOAO's amended complaint can be construed to include such an allegation based upon the principle that "[p]leadings must be construed liberally[,]" *In re Genesys Data Techs., Inc.*, 95 Hawai'i 33, 41, 18 P.3d 895, 903 (2001) (citation omitted), the AOAO's breach of contract claims fail because, as discussed more fully *infra*, the AOAO does not have *enforceable* contract rights. *See E.B. Harper & Co. v. Nortek, Inc.*, 104 F.3d 913, 921 n. 4 (7th Cir.1997) (noting that the plaintiff did not allege that it was a third-party beneficiary of an agreement and, even if the United States Court of Appeals for the Seventh Circuit were to construe, under its "liberal notice pleading requirements," the plaintiff's complaint to include such an allegation, Illinois law "forecloses the claim" inasmuch as the plaintiff did not have enforceable contract rights).

▮ Generally, "third parties do not have enforceable contract rights. The exception to the general rule involves *intended* third-party beneficiaries." *Pancakes of Hawai'i, Inc. v. Pomare Props. Corp.*, 85 Hawai'i 300, 309, 944 P.2d 97, 106 (App.1997) (emphasis added).

A third party beneficiary is "one for whose benefit a promise is made in a contract but who is not a party to the contract." Black's Law Dictionary 1480 (6th ed.1990) (quoting *Chitlik v. Allstate Ins. Co.*, ... [34 Ohio App.2d 193] 299 N.E.2d 295, 297 ([Ohio Ct.App.] 1973)). "The rights of the third party beneficiary must be limited to the terms of the promise," and this promise "may be express or it may be implied from the circumstances." *Remington Typewriter Co. v. Kellogg*, 19

Haw. 636, 640 (1909) (internal quotation marks and citation omitted).

Furthermore, "a prime requisite to the status of 'third party beneficiary' under a contract is that the parties to the contract must have intended to benefit the third party, who must be something more than a mere incidental beneficiary." Black's Law Dictionary at 1480 (quoting *McKinney v. Davis*, ... [84 N.M. 352] 503 P.2d 332, 333 ([N.M.1972])). For example, if contracting parties intend to confer direct benefits on a third party, that third party will have generally an enforceable contractual right. *Id.* (quoting *Hunt v. First Ins. Co. of Hawai'i*, 82 Hawai'i 363, 367, 922 P.2d 976, 980 (App.), *cert. dismissed*, 83 Hawai'i 204, 925 P.2d 374 (1996)) (some internal citations, brackets, and ellipsis omitted) (format altered).

In *155 Harbor Drive Condo. Ass'n v. Harbor Point Inc.*, 209 Ill.App.3d 631, 154 Ill. Dec. 365, 568 N.E.2d 365 (1991), 155 Harbor Drive Condominium Association (the association) brought an action against the developer, general contractor, and subcontractors for alleged construction defects in the window units and the curtain wall of a condominium building. *Id.* at 366–69. Specifically, Elsa Benson, Inc. (Benson) was the general contractor for the construction of the condominium building. *Id.* at 366. According to the Illinois Appellate Court (the court):

> The contract with Benson to be the general contractor include[d], but [wa]s not limited to, a standard form of agreement between owner and contractor, general conditions of the contract for construction (AIA Document A201), supplementary general conditions, general requirements specifications, and architectural, engineering and shop drawings. These various documents are hereinafter referred to as the "Benson contract." Benson hired [Consolidated Aluminum Corporation (Conalco)] as one of the subcontractors. The contract between Benson and Conalco in-

corporate[d] by reference the terms and conditions of the Benson contract. Conalco worked on the curtain wall and subcontracted some of the work to [Crescent Erection Company (Crescent)].

*Id.* at 366–67. In its complaint, the association alleged "that it was a third-party beneficiary to the developer's contract with Benson, Benson's contract with Conalco, and Conalco's contract with Crescent." *Id.* at 369. Benson, Conalco, and WDS (an alleged successor-in-interest to Crescent) successfully moved to dismiss the association's complaint on the basis that the association was not a third-party beneficiary of the contract and warranties given by Benson and Conalco.[31] *Id.*

On appeal, the association maintained that it was entitled to recover its losses on account of certain warranty violations because it was "a direct and intended third party beneficiary of the contracts between Benson, Conalco, and Crescent." *Id.* at 373. Specifically, the association argued that it was a third-party beneficiary of the contract between the developer and Benson "because the contract ma[d]e repeated references to the individual condominium unit owners who comprise the [a]ssociation[ ] and their warranty rights." *Id.* at 374. Additionally, the association argued that it was a third-party beneficiary of the contract between Benson and Conalco because: (1) "it incorporate[d] by reference nine warranty and guaranty provisions of the contract between Benson and [the developer]"; (2) "the Conalco contract established a 'warranty fund' as a security for the performance by the subcontractor of warranty service to the condominium purchasers"; and (3) "the contract between Conalco and Benson guaranteed the materials and workmanship used by Conalco." *Id.* at 374. The court disagreed with the association, stating that:

> With respect to construction contracts, this court has held that "it is not enough

---

**31.** The association named the developer, Benson, Conalco, and WDS as defendants. Crescent was later substituted for WDS as a defendant after the association and WDS agreed that Crescent was the proper party to the underlying action. 154 Ill.Dec. 365, 568 N.E.2d at 369. The substi-

tution occurred subsequent to the defendants filing their motion to dismiss. *Id.* Thus, at the time the defendants moved to dismiss, WDS was still a party to the action and Crescent was not yet substituted for WDS.

that the parties to the contract know, expect or even intend that others will benefit from the construction of the building in that they will be users of it. The contract must be undertaken for the plaintiff's direct benefit and the contract itself must affirmatively make this intention clear." *Waterford Condo[. Ass'n] v. Dunbar Corp.*[, 104 Ill.App.3d 371, 60 Ill.Dec. 110, 432 N.E.2d 1009, 1011 (1982) ].

. . . .

We find that the trial court properly dismissed [the association's] third-party beneficiary claims. *[The association] has the burden of proving that defendants intended to confer a direct benefit upon the [a]ssociation.* [The association] has failed to meet this burden. *The [a]ssociation has failed to identify any language in the subcontract which constitutes a virtual express declaration to overcome the presumption that the parties contracted only for themselves.* The subcontracts make no reference to the [a]ssociation or its members[ ] and do not express an intent to directly benefit either the [a]ssociation or its members. The provisions in the construction contracts regarding guarantees to be provided by the contractor and the subcontractors do not mention the unit owners. *There is no question that the parties were aware that the building was being built for subsequent purchasers. However, it is not enough that the parties know, expect or even intend that such people may benefit or that they are referred to in the contract.*

*Id.* at 374–75 (some citations, brackets, and internal quotation marks omitted) (emphases added).

In *Kisiel v. Holz*, 272 Mich.App. 168, 725 N.W.2d 67 (2006), a landowner contracted with a construction company for the construction of a residence. *Id.* at 69. The owner of the construction company entered into an oral subcontract for excavation work and the pouring of concrete. *Id.* Sometime after the residence was completed, numerous cracks emerged in the basement walls and the basement floors. *Id.* Consequently, the landowner brought an action against the construction company and several other defen-

dants, including the subcontractor. *Id.* The landowner's allegation against the subcontractor included breach of the oral subcontract between the construction company and the subcontractor. *Id.* The trial court apparently granted summary judgment in favor of the subcontractor. *Id.* On appeal, the landowner argued that "he was an intended third-party beneficiary under the oral subcontract between [the subcontractor] and [the construction company]." *Id.* The Michigan Court of Appeals disagreed, stating that:

In general, although work performed by a subcontractor on a given parcel of properly ultimately benefits the property owner, the property owner is not an intended third-party beneficiary of the contract between the general contractor and the subcontractor. *Absent clear contractual language to the contrary, a property owner does not attain intended third-party beneficiary status merely because the parties to the subcontract knew, or even intended, that the construction would ultimately benefit the property owner.*

In the present case, on the basis of an objective review of the contract, we conclude that [the landowner] was not an intended third-party beneficiary of the oral subcontract between [the subcontractor] and [the construction company]. Before the start of construction, [the construction company] orally subcontracted with [the subcontractor] for excavation and concrete work. [The landowner] does not dispute the scope of this oral subcontract. There is nothing in the scope of the oral contract to suggest that [the subcontractor] expressly promised to provide [the landowner] with concrete walls. Because the oral contract did not contain an express promise to create the basement walls for [the landowner's] benefit, and because the contract was primarily executed for the benefit of the contracting parties, [the landowner] was only an incidental beneficiary. Accordingly, [the landowner] is unable to maintain an action against [the subcontractor] for breach of the subcontract.

*Id.* at 70 (citations and footnote omitted) (emphasis added); *see Vogel Bros. Bldg. Co.*

*v. Scarborough Constructors, Inc.,* 513 So.2d 260, 261 (Fla.Dist.Ct.App.1987) (applying the general rule that "a property owner is not the intended third-party beneficiary of a contract between a general contractor and a subcontractor") (citation omitted); *Lake Placid Club Attached Lodges v. Elizabethtown Builders, Inc.,* 131 A.D.2d 159, 161–62, 521 N.Y.S.2d 165 (N.Y.App.Div.1987); Restatement (Second) of Contracts § 302, cmt. e, illustration 19 (1981) (property owner is merely an incidental beneficiary of construction subcontract between general contractor and subcontractor).

Here, the AOAO clearly has not met its burden of proving that Venture 15, Royal, Lee, S. Horita, and Liu (*i.e.,* the contracting parties to the three relevant construction subcontracts) intended to confer a direct benefit upon the AOAO. The AOAO fails to identify any language in the relevant subcontracts which constitutes a "virtual express declaration to overcome the presumption that the parties contracted only for themselves." *155 Harbor Drive Condo. Ass'n,* 154 Ill.Dec. 365, 568 N.E.2d at 375. In fact, the AOAO does not point to any language in the relevant subcontracts that makes any reference to the AOAO or its members. Although "[t]here is no question that the parties were aware that [Newtown Meadows] was being built for subsequent purchasers[,]" *id.,* "it is not enough that the parties know, expect[,] or even intend that such people may benefit or that they are referred to in the contract." *Id.* (internal quotation marks, original brackets, and citation omitted); *see also Kisiel,* 725 N.W.2d at 69–70. Consequently, the AOAO is not an intended third-party beneficiary of the construction contracts between: (1) Venture 15 and Royal; (2) Royal and Lee; and (3) S. Horita and Liu. The AOAO, therefore, does not have enforceable contract rights. Accordingly, because we may affirm a grant of summary judgment on any ground appearing in the record, *see Whitey's Boat*

*Cruises,* 110 Hawai'i at 309 n. 15, 132 P.3d at 1220 n. 15, we hold that the circuit court did not err in granting summary judgment in favor of Royal, Lee, and Liu on the AOAO's breach of contract claims.[32]

### 2. Venture 15

Although not entirely clear, it appears that the AOAO is contesting the circuit court's ruling that the six-year statute of limitations in HRS § 657–1 bars the AOAO's breach of contract claims against Venture 15 (as well as against Royal, Lee, and Liu), despite the fact that the AOAO does not mention any of the parties by name in its argument section pertaining to the statute of limitations. Venture 15, on the other hand, contends that:

> In its list of orders from which it is appealing in this matter, the AOAO does not include Venture 15's motion for partial summary judgment regarding the AOAO's claims for breach of contract against Venture 15. Moreover, in its opening brief . . ., the AOAO does not include Venture 15 in the group of Defendants–Appellees [ (*i.e.,* Royal, Lee, and Liu) ] whom it claims that the trial court wrongfully granted summary judgment with respect to the AOAO's claims for breach of contract. However, in its [e]xhibits attached to the opening brief, the AOAO includes the order granting partial summary judgment to Venture 15 regarding the breach of contract claims asserted by the AOAO. The omission of an appeal of the order effectively dismissing the AOAO's breach of contract claims against Venture 15 is surprising, considering the appeal of similar partial summary judgments granted to . . . Liu, Royal, and Lee. However, Venture 15 will rely on the AOAO's apparent decision not to appeal the order granting partial summary judgment with regard to Venture 15's motion[.]

Nevertheless, Venture 15 maintains that:

> During the [July 29, 2002] hearing of [Venture 15's] motion [for partial summary

---

32. In support of its assertion that it is "plainly" a third-party beneficiary of the relevant construction contracts, the AOAO relies on *Villa Sierra Condominium Ass'n v. Field Corp.,* 878 P.2d 161 (Colo.Ct.App.1994) [hereinafter, *Villa Sierra*]. *Villa Sierra,* however, is distinguishable from the instant case. In that case, the Colorado Court of Appeals followed a line of cases that stand for the proposition that "an agreement between a local government and another party was designed to bestow a direct benefit upon private property, thereby making the owners of that property direct third-party beneficiaries of the agreement." *Id.* at 166 (citations omitted). Because such line of cases is not germane to this case, the AOAO's reliance on *Villa Sierra* is without merit.

judgment regarding the AOAO's "unintentional tort" and breach of warranty claims,] *the AOAO asserted that it had no contract with Venture 15,* and since privity of contract between the parties is a predicate for application of the economic loss doctrine, the doctrine could not apply to dismiss the AOAO's tort-based claims for negligent and intentional misrepresentation. The [circuit] court gave the AOAO the choice at that point of standing by its assertion that it had no contract with Venture 15, and thereby foregoing any claims of breach of contract against Venture 15, or admitting that there was a contract and having the economic loss doctrine apply to bar the AOAO's claims of negligent and intentional misrepresentation against Venture 15. The AOAO chose to forego its breach of contract claim in favor of its misrepresentation claims against Venture 15, and the portion of Venture 15's motion for partial summary judgment regarding the misrepresentation claims (intentional and unintentional torts) was denied.

While the AOAO calls its election to forego its breach of contract claim in favor of pursuing its tort claims a "Hobson's choice," *there either is privity of contract between the parties, whether by direct contract, third-party beneficiary[,] etc., or there is not.*

(Emphases added.) (Citations omitted.)

In response, the AOAO asserts that it "properly appealed" the order granting partial summary judgment in favor of Venture 15 as to the AOAO's breach of contract claims. Moreover, the AOAO asserts that it "did not voluntarily forgo its contract claims against Venture 15 or any of the Defendants." Specifically, the AOAO alleges:

At the hearing on the "economic loss" motion[, presumably, the July 29, 2002 hearing, the AOAO] was compelled to forego its contract claim to avoid dismissal of its negligence claim. Forced to choose, [the AOAO] chose its tort over its contract claim. In fact, the [circuit] court admits it "forced" [the AOAO] to make an election between tort claims and contract claims based on the economic loss rule. Hence, the [circuit] court acknowledged [the

AOAO's] concession was made only to avoid dismissal of the negligence claim and was not an abandonment. [The AOAO's] third-party beneficiary contract claim, however, should not have triggered the economic loss rule in the first place because, as a mere third-party beneficiary, [the AOAO] was not able to negotiate the terms of the contract or allocate the risks thereunder.

(Citation to the record omitted.)

■ Initially, we note that, contrary to Venture 15's assertion, the points of error set forth in the AOAO's opening brief include the order granting partial summary judgment in favor of Venture 15 on the AOAO's breach of contract claims and the AOAO's objections thereof, with corresponding record references. Nonetheless, based on the various arguments made at the hearings held by the circuit court, as discussed *supra,* it is unclear whether the AOAO is pursuing breach of contract claims *against Venture 15* and, if so, *the basis of such claims,* notwithstanding the fact that the circuit court withdrew its requirement that the AOAO would have to forego its contract-based claims if it chose to pursue its tort-based claims and vice versa. As previously mentioned, on July 29, 2002, the AOAO's counsel stated that, "on the part of the AOAO ..., there's *no* claim [for] breach of contract[.]" (Emphasis added.) And, counsel for the AOAO stated that "[t]he *only* contracts *that arguably exist* are the sale of contract [sic] between Venture 15 and individual apartment owners[.]" (Emphases added.) Moreover, when the circuit court inquired whether the AOAO would "be arguing any breach of contract for the Plaintiffs or Plaintiff against Venture 15 or asking for any jury instructions thereon or bringing any evidence regarding that" at trial, the AOAO's counsel responded that, "[a]s far as the individual homeowners ..., I haven't really thought that through at this point." The circuit court further inquired as to the AOAO's breach of contract claims against Venture 15, asking, "[w]hen you say that there's no contract between the AOAO and Venture 15 ..., the AOAO is under [HRS ch.] 514A bringing these claims on behalf of

the owners, right?". Counsel for the AOAO, however, responded:

> It's not. It's bringing the claims on behalf of the AOAO. Also, [HRS § ] 541A–92 [sic] also gives it the ability to bring claims that are common to two or more owners. But, the claim itself is brought by the AOAO in [HRS chapter] 514 [sic] gives the AOAO standing to bring claims within the parameters of this lawsuit.

(Emphases added.) Thus, according to the AOAO, it is apparently bringing breach of contract claims against Venture 15 "on behalf of the AOAO," not the individual apartment owners who had "[t]he only contracts that arguably exist[.]" However, the AOAO does not explain how it is bringing breach of contract claims on behalf of itself in light of the fact that the AOAO previously asserted that, "on the part of the AOAO ..., there's no claim [for] breach of contract[.]" (Emphasis added.) Nor does the AOAO assert or present any argument that it is an intended third-party beneficiary of the sales contracts "that arguably exist" between Venture 15 and the individual apartment owners. Consequently, even assuming arguendo that the AOAO is pursuing breach of contract claims on behalf of itself, it is not clear from the record the basis of such claims. Indeed, the AOAO does not point to any contract contained in the record that may form the basis of its breach of contract claims against Venture 15. Accordingly, inasmuch as we may affirm a grant of summary judgment on any ground appearing in the record, see Whitey's Boat Cruises, 110 Hawai'i at 309 n. 15, 132 P.3d at 1220 n. 15, we hold that the circuit court did not err in granting summary judgment in favor of Venture 15 on the AOAO's breach of contract claims.

### E. The AOAO's Negligence Claims

#### 1. Statute of Limitations

The AOAO contends that the circuit court erred in granting summary judgment in favor of the Appellees[33] on its negligence claims on the basis of the two-year statute of limitations contained in HRS § 657–7 because there were genuine issues of material fact as to

(1) whether and when [the AOAO] reasonably should have discovered Defendants' breaches of duty; (2) whether Defendants "lulled" [the AOAO] into inaction; and (3) whether Defendants concealed material information of their own fault and misrepresented the true cause of [the AOAO's] injury.

(Numbering altered.) Specifically, the AOAO asserts that its "collective evidence" raised genuine issues of material fact as to whether:

> (1) [the AOAO] acted with reasonable diligence by seeking professional assistance from those responsible for the design and construction of the project[ ] and from independent engineers when Defendants' recommendations failed to work; (2) Defendants withheld from [the AOAO] important incriminating information such as the ... Grouting Report, which identified inadequate soil compaction as having caused ground settlement and resulting building distress damage; and (3) Defendants lulled [the AOAO] by misrepresenting the severity and cause of the problem, i.e.[,] by assuring the problem was not serious and was caused by excess water and inadequate drainage rather than improper soil compaction.

The AOAO argues that it "undertook a reasonable and timely investigation," (capitalization in original altered), explaining that:

> Once [the AOAO] became aware of building damage, ... Kobashigawa sought assistance from the defendants involved in the design and supervision of the project. At Kobashigawa's request, a site inspection was held on May 13, 1992.... Following the inspection, separate letter reports were furnished by Lau and Bob Wong (then president of Geolabs). Both stated the problem was due to poor drainage. Neither mentioned: (1) the earlier ... Grouting Report; or (2) Honma's 1988 letter [to Asher] acknowledging inadequate soil compaction as the root cause. Ignorant of the undisclosed information, [the AOAO] followed Lau's and Wong's recommendations

---

33. As previously noted, Geolabs did not file an answering brief. See supra note 1.

and hired a contractor ... to re-grade to drain water away from the foundations. Less than a year later, Kobashigawa learned of continued cracking despite the remedial efforts.... Kobashigawa wrote to Lau informing him that[,] despite implementation of his recommendation to divert the water, problems continued at Building 8, including cracking and jammed doors. The letter also reported complaints from owners in Buildings 5, 6, and 7, and reiterated the [AOAO's] request for a site inspection of these additional buildings. Honma responded to Kobashigawa[,] stating that, according to Lau, the owners needed to wait for about a year for the ground under the building to dry and resettle. Based on this response, [the AOAO] waited until September of 1994 to reassess the problem.

Despite the re-grading and yearlong wait, the building damage continued unabated. In early 1995, Kobashigawa wrote to Honma of the continuing problem. *Kobashigawa asked the developer[, i.e., Venture 15,] to again look into the problem and render assistance as soon as possible.* Simultaneously, the [b]oard [of directors] began looking into hiring an independent engineer. Despite mounting concerns, the [b]oard [of directors] looked to the developer [ (Venture 15) ] and soils engineer [ (Geolabs) ] for guidance for a second time. A site inspection was held on March 21, 1995,[34] to inspect the cracking problem at Building 6. Lau again opined the problem was due to infiltration of water into the subgrade soil over an extended period. Lau recommended the soils engineer, Geolabs, "be further consulted to confirm that the settlement is the probable cause of the cracking problem, also as to whether the settlement movements have subsided or is still subsiding." Based on test drilling conducted by Geolabs at the site, "shallow water" with a "strong septic odor" was discovered at Building 6, and Geolabs suggested that a sewer leak might be the problem.... [The AOAO] hired a contractor to check the sewer lines. No leaks were found.

Continuing to blame excess water for the problem, Geolabs recommended installing subdrains to intercept water before it infiltrated the soil beneath the building areas. Based on recommendations and details provided by Geolabs, [the AOAO] solicited an estimate for the proposed subdrain installation.... The installation was postponed when a leak was discovered at Building 5. Further leak testing was conducted.

Meanwhile, the [b]oard [of directors, through Kobashigawa,] solicited proposals from independent soils engineers for a second opinion on the problem and on Geolabs' subdrain recommendation. Weidig responded with an opinion that the defendants' recommendations were a "quick fix" and that a more thorough subsoil investigation should be undertaken. Weidig's proposal was accepted and [its] investigation revealed to [the AOAO] for the first time that inadequate soil compaction was the true cause of the problem. The [AOAO's c]omplaint herein was filed on February 18, 1997.

(Citations to the record and emphasis omitted.) (Emphases added.) The AOAO also contends that the "the lulling and concealment exceptions tolled the statute of limitations." (Capitalization altered.) Specifically, the AOAO asserts that "the Defendants" lulled the AOAO by "misrepresenting the severity and cause of the problem, *i.e.*[,] by assuring the problem was not serious and was caused by excess water and inadequate drainage rather than improper soil compaction." The AOAO argues that the evidence reveals that:

(1) [the AOAO] engaged Defendants to investigate the building distress problem; (2) Defendants falsely attributed the cause to a ground water condition that did not implicate fault on their part; (3) [the AOAO] relied on Defendants' misdiagnoses and recommendations, including lengthy wait-and-see recommendations following misdirected initial repair attempts; and (4) Defendants withheld known and documented information of their own negligence as the cause.

**34.** It appears from the record that the site inspection was held on *April,* not March, 21, 1995.

(Citation to the record omitted.) Consequently, the AOAO claims that:

A jury could reasonably have inferred that Defendants' repair proposals, which focused on a localized ground water condition as the problem, were intended to: (1) conceal incriminating information of the Defendants' liability; (2) divert [the AOAO's] attention away from the serious and costly-to-correct problem of inadequate soil compaction throughout [Newtown Meadows]; and (3) lull [the AOAO] into the false belief that: (a) the problem was a minor one; and (b) following the Defendants' recommendations would make it go away.

Lastly, the AOAO directs this court to the "policy in favor of adjudication of claims on the merits[.]" (Citation omitted.)

■ Venture 15, Royal, Lee, and Liu essentially maintain that the AOAO's negligence claims accrued no later than April/May 1992, when (1) individual unit owners first became aware of the cracks in their units and reported such knowledge to the AOAO (through Kobashigawa), (2) the first site inspection was conducted on May 13, 1992, and (3) the AOAO received the May 1992 reports prepared by Lau and Geolabs.[35] Royal also asserts that the AOAO knew "by the latest [in] January[ ] 1995[ ] that it had sustained an injury, *i.e.*, cracks in the slabs and drywall, and that someone was responsible." Consequently, because the AOAO's original complaint was filed on February 18, 1997, more than two years from when the AOAO's negligence claims allegedly accrued, Venture 15, Royal, Lee, and Liu maintain that the AOAO's negligence claims are barred by HRS § 657–7.

Moreover, Royal and Liu contend that the AOAO's "lulling and concealment arguments" do not apply to them. Specifically, Royal argues that:

In this case, *a distinction must be made between the various defendants as to what representations were made to the AOAO regarding the cause of the. cracks.* It is significant to note that the AOAO does not set forth any facts that Royal had any involvement in the post–1988 investigation; concealed any facts during the investigation; made misrepresentations that "lulled" the AOAO into inaction; or had any input into the expert's recommendations. *Instead, the AOAO glosses over these facts and, as it does throughout its [o]pening [b]rief, the AOAO lumps all of the defendants together and alleges that it was "lulled" into inaction.* However, the facts are clear that Royal (1) did not have any contact with the AOAO until it was served [with the complaint]; (2) was not involved in the AOAO's decision to hire their experts; (3) did not provide the AOAO with any input as to the probable cause of the cracking; and (4) did not make any recommendations as to possible solutions.

(Emphases added.) Similarly, Liu asserts that:

[The AOAO's] [o]pening [b]rief groups Liu within the general category of "Defendants" which allegedly lulled [the AOAO] into inaction and concealed the improper soil compaction problems. *However, none of the investigations and alleged facts involve Liu. . . .*

. . . . *Where all of [the AOAO's] allegations of concealment and lulling refer to other defendants, there are no disputed issues of material fact related to the tolling of the applicable statute of limitations as to Liu.*

(Citation to the record omitted.) (Emphases added.)

■ HRS § 657–7 provides in relevant part that "[a]ctions for the recovery of compensation for damage or injury to per-

---

35. Venture 15 additionally asserts that "[t]he [circuit] court properly held that the AOAO's design and construction claims against Venture 15 are barred by [HRS] § 657–8." (Capitalization altered.) It does not appear that the AOAO addresses that part of the circuit court's order dismissing the AOAO's negligent design and construction claims based on HRS § 657–8 (specific two-year statute of limitations for construction-related claims). Rather, it appears that the AOAO focuses solely on HRS § 657–7 (general two-year statute of limitations for tort claims). Consequently, inasmuch as the AOAO fails to discuss whether the circuit court incorrectly dismissed its negligent design and construction claims against Venture 15 on appeal, any challenge to the dismissal of such two "sub-claims" is deemed waived.

sons or property shall be instituted within two years after the cause of action accrued, and not after[.]" Under HRS § 657–7, a tort claim accrues when the plaintiff discovers, or through the use of reasonable diligence should have discovered, the negligent act, the damage, and the causal connection between the two. *Yamaguchi v. Queen's Med. Ctr.*, 65 Haw. 84, 90, 648 P.2d 689, 693–94 (1982). In the context of property damage, this court has previously stated that, under Revised Laws of Hawai'i (RLH) § 241–7 (1955),[36] a predecessor to HRS § 657–7, the statute of limitations begins to run "when the plaintiff knew or in the exercise of reasonable care should have discovered that an actionable wrong has been committed against his property." *Basque v. Yuk Lin Liau*, 50 Haw. 397, 399, 441 P.2d 636, 637–38 (1968); *see also Bd. of Dirs. of Ass'n of Apartment Owners of Regency Tower Condo. Project v. Regency Tower Venture*, 2 Haw.App. 506, 511, 635 P.2d 244, 248 (1981). A plaintiff need only have factual knowledge of the elements necessary for an actionable claim; legal knowledge of a defendant's negligence is not required. *Buck v. Miles*, 89 Hawai'i 244, 249–50, 971 P.2d 717, 722–23 (1999) (citation omitted).

> Concerning the [issue whether the plaintiff,] through the use of reasonable diligence, should have discovered [the negligent act, the damage, and the causal connection between the two], that issue is . . . for the trier of fact.

> It bears repeating, however, that even when there is no dispute as to the facts, it usually is for the jury to decide whether the conduct in question meets the reasonable man standard[.]

[10A Wright, Miller & Kane, Federal Practice & Procedure: Civil] § 2729.

> When there has been a belated discovery of the cause of action, the issue whether the plaintiff exercised reasonable diligence is a question of fact for the court or jury to decide. The drastic remedy of summary judgment may not be granted unless reasonable minds can draw only one conclusion from the evidence.

*Enfield v. Hunt*, 154 Cal.Rptr. 146, 147, 91 Cal.App.3d 417, 419 (1979).

*Jacoby v. Kaiser Found. Hosp.*, 1 Haw.App. 519, 527–28, 622 P.2d 613, 618 (1981). Nevertheless,

> an essential part of an injured plaintiff's duty of diligence regarding the timely prosecution of his or her claim imposed by a statute of limitations is to seek legal advice regarding the presence and/or viability of a potential claim; a plaintiff's failure to seek legal advice from an attorney will not alone entitle the plaintiff to respite from a statute of limitations.

*Hays v. City & County of Honolulu*, 81 Hawai'i 391, 399, 917 P.2d 718, 726 (1996). Indeed, "[t]he exercise of reasonable diligence means simply that an injured party must act with some promptness where the facts and circumstances of an injury would put a person of common knowledge and experience on notice that some right of his has been invaded or that some claim against another party might exist." *Moriarty v. Garden Sanctuary Church of God*, 341 S.C. 320, 534 S.E.2d 672, 676 (2000) (internal quotation marks and citation omitted).

> As the discovery rule has developed, the salient point giving rise to its application is the inability of the injured, despite the exercise of reasonable diligence, to know that he is injured and by what cause. We have clarified that[,] in this context, reasonable diligence is not an absolute standard, but is what is expected from a party who has been given reason to inform himself of the fact upon which his right to recovery is premised. As we have stated: " '[T]here are [very] few facts which diligence cannot discover, but there must be some reason to awaken inquiry and direct diligence in the channel in which it would be successful. This is what is meant by reasonable diligence.' " Put another way, "[t]he question in any given case is not, what did the plaintiff know of the injury done him? [B]ut, what might he have

---

**36.** RLH § 241–7 was substantively identical to HRS § 657–7 and provided that "[a]ctions for the recovery of compensation for damages or injury to persons or property shall be instituted within two years after the cause of action accrued, and not after."

known by the use of the means of information within his reach, with the vigilance the law requires of him?" While reasonable diligence is an objective test, "[i]t is sufficiently flexible . . . to take into account the difference[s] between persons and their capacity to meet certain situations and the circumstances confronting them at the time in question." Under this test, a party's actions are evaluated to determine whether he exhibited "those qualities of attention, knowledge, intelligence and judgment which society requires of its members for the protection of their own interest and the interest of others."

*Vidinha v. Miyaki*, 112 Hawai'i 336, 341, 145 P.3d 879, 884 (App.2006) (quoting *Fine v. Checcio*, 582 Pa. 253, 870 A.2d 850, 858 (2005)) (format altered) (brackets and ellipsis in original), *aff'd*, No. 26188, *Vidinha v. Miyaki* (Haw. June 26, 2007)(sdo), 2007 WL 1957196.

Moreover,

[t]here is a difference between asking whether a reasonable inquiry would have produced knowledge, and whether a plaintiff's particular inquiry—which was unproductive—was reasonable. Putting the question in the abstract tends to place the focus on an ideal inquiry, whereas in reality there may have been several possible reasonable courses of inquiry, some of which would be productive and some of which would not be productive. Where the plaintiff actually attempts an inquiry, the fairer question in our view, is to ask whether his inquiry was reasonable. Where there is no attempt, however, there is no choice but to put the question in the abstract.

*Pedersen v. Zielski*, 822 P.2d 903, 908 (Alaska 1991) (footnote omitted).

In *Ehrenhaft v. Malcolm Price, Inc.*, 483 A.2d 1192 (D.C.1984), the District of Columbia Court of Appeals (the court) advanced several public policy rationales that support the application of the discovery rule in an action based upon tort claims arising out of an allegedly deficient design and construction of an addition to a house. First, the court explained that a lay person

who has arranged for the design and construction of a new room to his house[ ] must undoubtedly rely upon the professional skills of those hired to perform the work. As a lay person, he is most likely without the requisite knowledge to determine whether the room has been properly designed or constructed. Moreover, it is unreasonable to expect the client to engage yet another professional to oversee the work as it is performed.

*Id.* at 1202 (citation omitted).

Second, the court observed that "the difficulty in recognizing a deficiency in either design or construction is even more problematical when the deficiency is latent in nature." *Id.* Comparing cases involving latent defects such as asbestos and certain pharmaceutical drugs, the court stated that a design or construction defect "may also not manifest itself until after the statute of limitations has run under traditional principles. Surely it is inconsistent with our notions of justice to interpret the 'accrual' of a cause of action to occur prior to a point in time at which a person would reasonably have knowledge of any wrongdoing." *Id.* (citation omitted).

Third, the court stated that "[a]pplication of the discovery rule in suits based upon deficient design and construction does not frustrate the policies underlying the statute of limitations where the injured party does not, and in the exercise of reasonable diligence, could not have known of his claim prior to its discovery. A plaintiff who will benefit by invocation of the discovery rule will not be one who has 'sat' on his rights to gain legal advantage." *Id.* at 1203 (internal quotation marks and citation omitted).

Fourth and finally, the court pointed out "that the interests of judicial economy militate in favor of application of the discovery rule. In cases like the one at bar, *where the professional returns upon request to remedy damages resulting from defective work, to preclude application of the [discovery] rule would likely serve to encourage litigation in the first instance, rather than as a last resort.*" *Id.* (citation omitted) (emphasis added).

In *Leaf v. City of San Mateo*, 104 Cal. App.3d 398, 163 Cal.Rptr. 711 (1980), the

plaintiffs purchased a duplex in the City of San Mateo (the city) in January 1972. *Id.* at 713. Shortly after occupying their duplex in June 1972, the plaintiffs "discovered that some of the floors were not level[ ] and that there were some cracks in the exterior of the building." *Id.* Subsequently, the plaintiffs consulted with two different engineering firms, the first in August 1972 and the second in July 1973,

> the consensus being that the structural problems were being caused by differential settlement and subsidence due to movement of the fill on [the] plaintiffs' lot caused by water absorption. The problem was symptomatic on the south side of [the] plaintiffs' duplex, and the only test borings were made on that side of [the] plaintiffs' property. It was recommended that a subsurface drainage system be installed to stop the subsidence and that the structure be restored to a level condition approximately one year after drainage installation.

*Id.* In January 1974, the plaintiffs sued the developer/builder, the seller of the duplex, and various engineers and contractors, essentially seeking recovery on the ground of "defective engineering and manufacture of [the] plaintiffs' lot pad" [hereinafter, Suit 1]. *Id.* The parties in Suit 1 ultimately reached a settlement in June 1976 and, with the proceeds of the settlement, the plaintiffs began construction of the recommended drainage system in August 1976. *Id.* During the course of excavation in the vicinity of the city's sewers, a cave-in occurred, exposing a previously excavated sewer trench. *Id.*

> Subsequent investigation revealed that back-fill in the [city's] storm and sanitary sewer trenches on and near [the] plaintiffs' property had not been compacted[ ] and that the trenches were acting as subterranean water channels which were funneling water onto [the] plaintiffs' property. Investigation also showed that the section of the sanitary sewer main extending in an easement along the north side of [the] plaintiffs' home was located too close to the foundation, and that its close proximity,

combined with lack of compaction of the material in that portion of the trench, was resulting in the north side of the building being deprived of lateral and subjacent support.

*Id.* at 713–14. When the city refused to take action to correct the alleged defective condition, the plaintiffs filed an action against the city on January 28, 1977 [hereinafter, Suit 2]. *Id.* at 714. The city successfully moved for summary judgment on the ground that Suit 2 was time-barred, and the plaintiffs appealed. *Id.*

On appeal, the California Court of Appeals (the court) first noted that the applicable statute of limitations for injury to real property was three years.[37] *Id.* at 715 n. 2. The court then observed that "[w]hether or not [the] plaintiffs' claim is barred by [the] statute of limitations is dependent upon a determination of when the cause of action accrued." *Id.* at 715 (footnote omitted). The court summarized the parties' positions, stating that,

> [the city] ... takes the position that [the] plaintiffs' cause of action accrued when [the] plaintiffs became aware of the damage to their property, *i.e.*, when they noticed the unlevel floors and cracks in the building exterior. [The p]laintiffs, on the other hand, urge the 'rule of discovery,' which would start a statute running only when [the] plaintiffs not only were aware of the damage, but became aware of its negligent cause, *i.e.*, at the time of the cave-in.

*Id.* The court ultimately agreed with the plaintiffs, stating that:

> The discovery rule operates to protect the plaintiff who is "blamelessly ignorant" of his cause of action. Accordingly, we do not think that [the] plaintiffs' cause of action in this case should accrue from the occurrence of the last essential fact, nor from discovery of the damage to their property, as [the city] contends, but rather from the point in time when [the plaintiffs] became aware of [the city's] negligence as a cause, or could have become so aware

37. It appears that the court relied on the three-year statute of limitations in subsection 338(b) of the California Code of Civil Procedure for "trespass and injury to real property." 163 Cal.Rptr. at 715 n. 2.

through the exercise of reasonable diligence.

The ultimate question therefore is whether [the] plaintiffs exercised reasonable diligence in discovering the negligent cause of their injuries. *We see no reason to commence the running of the statute of limitations when [the] plaintiffs, at the outset, made reasonable, but unsuccessful, efforts to identify the negligent cause of damage. Where, as in this case, [the] plaintiffs consulted with professional engineers as to the source of their injury, they were entitled to rely upon that advice. It would be contrary to public policy to require that [the] plaintiffs file a lawsuit against [the city] at a time when the evidence available to them failed to indicate a cause of action against this defendant.*

Thus, under the facts alleged by [the] plaintiffs, their cause of action against the [city] would have accrued at the time of the cave-in of the sewer trench.

*Id.* at 716–17 (citations omitted) (emphasis added).

██ In the instant case, we cannot conclude, as the circuit court did, that, *as a matter of law,* the AOAO discovered, or through the use of reasonable diligence should have discovered, the negligent act, the damage, and the causal connection between the two more than two years prior to the initiation of the present action on February 18, 1997. Although a reasonable fact finder could determine that the AOAO discovered or should have discovered that the damage, *i.e.,* the cracks in the walls and floors of the various units at Newtown Meadows, was caused at least in part by a construction or design defect more than two years prior to February 18, 1997, such question should be resolved by the trier of fact. *See Di Biase v. A & D, Inc.,* 351 A.2d 865, 868 (Del.Super.Ct.1976) (observing that "[i]t may be that individuals such as the plaintiffs, untrained in the home construction industry, should recognize that cracks in the walls of a structure can indicate an unsound foundation. This question, however, should be resolved by the trier of fact.")

Moreover, a reasonable fact finder could determine that the AOAO exercised reasonable diligence in pursuing any possible claims against the Appellees. *Cf. Hays,* 81 Hawai'i at 398, 917 P.2d at 725 (stating that "[a] party must exercise reasonable diligence in pursuing a claim. *If* a plaintiff fails to exercise such diligence in a timely manner, the cause of action should be barred by the statute of limitations." (Emphasis added.)). It is undisputed that the AOAO sought assistance from Newtown Meadows' developer, Venture 15, which ultimately led to Geolabs' and Shigemura Inc.'s involvement in investigating the cracks in the various units at Newtown Meadows, within one month after the AOAO was made aware of such cracks sometime in April 1992. Subsequent to the May 13, 1992 site inspection attended by, *inter alia,* Fraim (a Geolabs representative) and Lau (a Shigemura Inc. representative), Geolabs and Lau both reported their findings and recommendations to the AOAO. Essentially, both reports attributed the cracks to settlement of the foundations due to water infiltration. Lau's report "re-assure[d] [the AOAO] that the[ ] cracks do not appear to indicate any catastrophic structural failures or any impending collapse problems." Geolabs' report indicated that the interior cracks appeared to be the "result of minor amounts of foundation settlements." Based on the reports prepared by Lau and Geolabs, the AOAO "undertook the remedial and diagnostic measures recommended by these experts as well as their 'wait-and-see' recommendation to see if the recommended remedial measures took care of the problem." A reasonable fact finder could determine that the AOAO was entitled to rely on the recommendations made by Geolabs and Shigemura Inc. in order to determine the source of the damage. *See Leaf,* 163 Cal.Rptr. at 716–17; *Ehrenhaft,* 483 A.2d at 1203; *see also Di Biase,* 351 A.2d at 868 ("In permitting defendants to patch with plaster the first cracks in the garage, and believing assurances allegedly made by defendants that the structure itself was sound, did plaintiffs exercise 'reasonable diligence' in attempting to discover the structural defect, or should they have consulted an independent expert at this point? . . . . These questions and others should be resolved by the trier of fact before the applicability of the statute of limitations ... can be ascer-

tained."). Nonetheless, we also believe that a reasonable fact finder could conclude that the AOAO should have had "a suspicion of wrongdoing, and therefore an incentive to sue," when the recommendations made by Geolabs and Shigemura Inc. and implemented by the AOAO were not resolving the damage, during approximately late 1993 until approximately January 1995.[38] *Jolly v. Eli Lilly & Co.*, 44 Cal.3d 1103, 245 Cal.Rptr. 658, 751 P.2d 923, 928 (1988) (en banc), *superseded by rule as state in Hernandez v. Whitman Corp.*, No. A108245, 2006 WL 331205 (Cal.Ct.App. Feb.14, 2006) (unreported); *see also Hays*, 81 Hawai'i at 398, 917 P.2d at 725 (stating that "[a] discovery rule which conditions accrual of an action on a plaintiff's *specific* knowledge of another's negligence means, in many cases, that an action will not accrue until a party walk's [sic] into a lawyer's office and is advised that he [or she] has an actionable claim. This should not be the law." (Quoting *In re Hawai'i Fed. Asbestos Cases*, 854 F.Supp. 702, 708 (D.Haw.1994).) (some brackets added and some in original.) (Emphasis added.)).

 We believe, however, that, despite the AOAO's apparent inclusion of *all* the Appellees via its utilization of the term "the Defendants," it appears that the AOAO's assertions of the "lulling and concealment exceptions" pertain only to Venture 15 and Geolabs. Indeed, the AOAO does not point to anywhere in the record to indicate that Royal, Lee, and Liu (1) were "engaged to investigate the building distress problem," (2) "attributed the cause to a ground water condition," (3) made alleged "misdiagnoses and recommendations," and (4) "withheld known and documented information of their own negligence as the cause."[39] Furthermore, it appears that the AOAO's assertions of the "lulling and concealment exceptions" were raised for the first time in its unsuccessful motion for reconsideration. Indeed, the AOAO's memoranda in opposition to the Appellees' motions for summary judgment makes no mention of any "lulling and concealment exceptions." However, "[r]econsideration is not a device to relitigate old matters or to raise arguments or evidence that could and should have been brought during the earlier proceeding." *Sousaris v. Miller*, 92 Hawai'i 505, 513, 993 P.2d 539, 547 (2000) (footnote and citations omitted). Here, the AOAO's arguments based on the "lulling and concealment exceptions" could and should have been brought in its memoranda in opposition.

 Nonetheless, based on the state of the record and viewing the inferences drawn therefrom in a light most favorable to the AOAO, we conclude that genuine issues of material fact exist as to whether the AOAO, through the use of reasonable diligence, should have discovered the negligent act, the damage, and the causal connection between the two more than two years prior to the initiation of the present action on

**38.** Venture 15 maintains that "the AOAO ... failed to follow the investigative and remedial instructions provided by Geolabs[.] According to the report [Geolabs] wrote about the post-owner complaint inspections of [B]uildings 6 and 8, the AOAO was to monitor cracks so it could be determined if these problems compromised the integrity of the structures. Mr. Kobashigawa admitted during his deposition that the AOAO never undertook any monitoring of the cracks or other alleged problems with [B]uildings 6 and 8." (Citations to the record omitted). The AOAO, however, asserts that Kobashigawa testified that "he himself did not personally monitor the cracks in the walls of individual units because he did not have access to the units on a bi-weekly basis. Instead, he told the individual unit owners to monitor the cracks." (Citation to the record omitted.) Inasmuch as a reasonable fact finder could conclude that it was proper for the AOAO (through Kobashigawa) to require the individual unit owners, rather than the AOAO, to monitor the cracks in the individual units, Venture 15's assertion is without merit.

**39.** The AOAO raises for the first time on appeal in its reply brief to Royal that, "[u]nder principles of concert of action, vicarious liability, respondeat superior, agency, and implied or express authority, the lulling actions of Venture 15 and Geolabs can and should be attributed to Royal." The AOAO also raises for the first time on appeal in its reply brief to Liu that "[i]t is Liu's non-disclosure of [Uniform Building] Code violations that properly tolled the statute of limitations[.]" Inasmuch as the AOAO failed to raise such arguments in its opening brief, such arguments are deemed waived. *See In re Hawaiian Flour Mills, Inc.*, 76 Hawai'i 1, 14 n. 5, 868 P.2d 419, 432 n. 5 (1994) (holding that arguments raised for the first time in the reply brief on appeal were deemed waived).

February 18, 1997 and whether the AOAO exercised reasonable diligence in pursuing its claims.[40] Such a conclusion comports with the principle that "[t]he drastic remedy of summary judgment may not be granted unless reasonable minds can draw only one conclusion from the evidence." *Jacoby*, 1 Haw.App. at 528, 622 P.2d at 618 (citation omitted). Thus, we hold that the circuit court erred when it concluded that the AOAO's negligence claims were barred by HRS § 657–7 as a matter of law. Accordingly, we hold that the circuit court erred in granting summary judgment in favor of Venture 15, Geolabs, Royal, Lee, and Liu on the AOAO's negligence claims based on HRS § 657–7. The inquiry whether the circuit court erred in entering judgment in favor of Liu on the AOAO's negligence claims does not end here, however, because Liu raises in its cross-appeal that the circuit court erred in denying its motions for partial summary judgment on the bases that the statute of repose, laches, and the economic loss rule did not bar the AOAO's negligence claims.[41]

### 2. Statute of Repose

Liu contends that the circuit court erred in denying its motion for summary judgment on

the ground that the ten-year statute of repose contained in HRS § 657–8 did not bar the AOAO's claims, asserting that "neither [the AOAO] nor any party in this case filed suit against Liu within ten (10) years after Liu completed its work on the ... Project." HRS § 657–8 provides in relevant part:

(a) No action to recover damages for any injury to property, real or personal, or for bodily injury or wrongful death, arising out of any deficiency or neglect in the planning, design, construction, supervision and administering of construction, and observation of construction relating to an improvement to real property shall be commenced more than two years after the cause of action has accrued, *but in any event not more than ten years after the date of completion of the improvement.*

(Emphasis added.)

Relying on HRS § 657–7.5 (1993), quoted *infra*, and HRCP Rule 14 (2007), quoted *infra*, the AOAO contends that, because the claims alleged in the AOAO's complaint "over against" Liu filed on January 23, 2002 "related back" to the claims alleged in the AOAO's original complaint filed on February 18, 1997 and the Project was "substantially completed in May 1988[,]" its negligence claims were

**40.** It should be pointed out that none of the Appellees on appeal discuss the 1987–88 events surrounding the "soil problem" under Building 3 and Asher's communications with S. Horita in support of their argument pertaining to the accrual of the AOAO's negligence claims. Although Venture 15 asserts that "the AOAO ... was ... aware of damage at least to the common elements of [B]uilding 3 and the consequent remediation of the problem initiated by Venture 15[,]" such assertion was made with respect to the accrual of the AOAO's misrepresentation claims and not the accrual of the AOAO's negligence claims. Inasmuch as the Appellees do not present any argument as to the AOAO's knowledge of the "soil problem" under Building 3 to this court, the Appellees essentially waive such argument.

**41.** We note that Royal's and Lee's answering briefs include an argument that the circuit court erred in denying their respective motions for partial summary judgment on the ground that the economic loss rule did not bar the AOAO's negligence claims. Royal and Lee, however, did not file a cross-appeal to challenge the denial of their motions for partial summary judgment. Consequently, such issue as pertaining to Royal and Lee is not before this court. *See City Ex-*

*press, Inc. v. Express Partners*, 87 Hawai'i 466, 468 n. 2, 959 P.2d 836, 838 n. 2 (1998) ("While the general rule is that a prevailing party may not file a direct appeal, there is an exception for cross-appeals. If the appellate court reverses the ruling of the [circuit] court, then it must address any relevant issues *properly raised on cross-appeal.*" (Citation omitted.) (Emphasis added.)).

The AOAO asserts that this court lacks appellate jurisdiction to decide Liu's cross-appeal inasmuch as "the summary judgment denials were not included as part of the 'final judgment' rendered in the ... [a]mended [j]udgment filed below." The circuit court's May 21, 2004 amended judgment, however, entered final judgment in favor of Liu on the AOAO's negligence claims. We believe that Liu properly filed the instant cross-appeal in the context of this case, and, thus, we may review the denials of its various summary judgment motions. *See id.; cf. Lussier v. Mau–Van Dev., Inc.*, 4 Haw.App. 359, 395, 667 P.2d 804, 827 (1983) (stating that "[i]t is well-settled that an appeal from a final judgment brings up for appellate review all interlocutory orders dealing with issues in the case not appealable directly as of right") (citing *Pioneer Mill Co. v. Ward*, 34 Haw. 686, 694 (1938) (other citation omitted)).

not barred by the statute of repose. HRS § 657–7.5 provides:

> When a defendant, against whom action has been timely brought, brings in a third-party defendant who is or may be liable to the defendant or to the plaintiff for all or part of the plaintiff's claim against the defendant, plaintiff within thirty days after the date of filing of the third-party defendant's answer, may assert against the third-party defendant any claim, arising out of the original transaction or occurrence that is also the subject matter of the third-party plaintiff's claim against the third-party defendant, which would have been timely if the third-party defendant had been joined originally as a defendant, *notwithstanding any statutory period of limitations otherwise applicable to plaintiff's claim.* Nothing herein shall preclude the plaintiff from asserting any claim which the plaintiff might have asserted without the benefit of this section.

(Emphasis added.) And, HRCP Rule 14(a) provides in relevant part that "[t]he plaintiff may assert any claim against the third-party defendant arising out of the transaction or occurrence that is the subject matter of the plaintiff's claim against the third-party plaintiff[.]"

In this case, the circuit court apparently agreed with the AOAO that the AOAO's claims against Liu "relate[d] back" to the AOAO's claims alleged in its original complaint filed on February 18, 1997, pursuant to HRS § 657–7.5 "or" HRCP Rule 14. Specifically, the circuit court orally stated:

> ... Yesterday it was argued [by Liu] that the claims against Liu do not arise out of the original transaction as they must to relate back, either under [HRCP] Rule 14 or under [HRS § ] 657–7.5.
>
> This morning[,] the [AOAO] argued, and I believe correctly so, that the applicable case law is found in *Kest [v. Hana Ranch,*

*Inc.,* 7 Haw.App. 565, 785 P.2d 1325 (1990) ]. It's a two-part test. The [c]ourt must look at the [AOAO's] original complaint, which I did, that was filed February 18, 1997. The first amended complaint was filed October 20, 1998. In any event, the two-part test is whether the claim against Liu arises out of the same transaction that was alleged and whether the facts alleged give notice of a reasonable likelihood that Liu would or could later be included.

> The original complaint was very broad, it basically alleged construction defects. Liu is the subcontractor that created the slabs. I think the two-part test has been met, and[,] therefore[,] the [c]ourt denies the motion [for summary judgment] as to [HRS § ] 657–8[.[42]]

■ Although not entirely clear, it appears that the circuit court and the parties assumed that *Kest* provides a two-part test for HRCP Rule 14. Indeed, the AOAO refers to *Kest's* two-part test as the "HRCP Rule 14 two-part test," and Liu does not dispute otherwise in its reply brief. *Kest,* however, sets forth a two-part test for HRCP Rule *15(c)* (2007), entitled "Relation back of amendments." *See Kest,* 7 Haw.App. at 571, 785 P.2d at 1329 (stating that, "when confronted with amendments that add plaintiffs with new claims, courts can protect defendants from the perils statute of limitations are enacted to prevent while effectuating the policies of [HRCP R]ule 15(c) by applying a two-step analysis") (citation omitted). Inasmuch as Liu does not present any argument to this court as to why *Kest's* HRCP Rule 15(c) two-part test should apply to this case and, as the AOAO points out, "nothing in ... Liu's [opening] brief supports the supposition that *Kest* ... governs the application of HRS § 657–7.5," we decline to reach the issue whether *Kest* should apply under the circumstances of this case.

---

**42.** Technically, the circuit court stated at the hearing that it "denies the motion as to [HRS § ] 657–8 as to the [s]tatute of [l]imitations regarding contract." It appears that the circuit court meant to state "statute of repose" rather than "statute of limitations." Additionally, it is not entirely clear why the circuit court was referring solely to "contract." Liu moved for summary judgment on the basis of the statute of repose on the AOAO's breach of warranties, intentional and negligent misrepresentation, breach of contract, negligence, and strict products liability claims. In its written orders, the circuit court denied Liu's motions on the basis of the statute of repose as to all of the aforementioned claims.

Moreover, Liu does not provide this court with what it believes is "the date of completion of the improvement[,]" HRS § 657–8, that would commence the running of the statute of repose. Consequently, this court would be left to speculate as to such date, which we decline to do. Accordingly, we decline to consider whether the circuit court erred in denying Liu's motion for summary judgment on the basis that the statute of repose did not bar the AOAO's negligence claims.

### 3. Laches

Liu next contends that the AOAO's negligence claims are barred by laches, arguing that the AOAO

waited more than fourteen years after Liu completed its work at Newtown Meadows to bring a claim against Liu. As early as February of 1988, [the AOAO] had knowledge of ground settlement and structural distress problems related to Building 3. And[,] by May of 1992, [the AOAO's] resident manager and managing agent both participated in an inspection involving cracks in the walls and slabs of Buildings 6 and 8. In 1988, or at least in 1992, [the AOAO] could have started its own investigation and/or filed a lawsuit related to these alleged damages. Instead, [the AOAO] purposefully chose to disregard any potential claims and unreasonably delayed in bringing this lawsuit.

(Citations to the record omitted.) Liu also asserts that it has been "severely prejudiced" by the AOAO's "failure to press its claims in a timely fashion." Thus, Liu claims that the circuit court erred in denying summary judgment on the basis that laches did not bar the AOAO's negligence claims.

The AOAO maintains that, because its "action is exclusively in law, not in equity[,] ... the timeliness of suit is governed by law, as set forth in the applicable statute of limitations, not by equity and laches." (Citation omitted.) Nevertheless, the AOAO argues that, "even if laches governed," "Liu does not explain ... how ... unavailable documents or witnesses could conceivably excuse Liu's admitted violation of minimum Building Code requirements."

"The doctrine of laches reflects the equitable maxim that equity aids the vigilant, not those who slumber on their rights." *Adair v. Hustace*, 64 Haw. 314, 320, 640 P.2d 294, 300 (1982) (internal quotation marks and citation omitted).

There are two components to laches, both of which must exist before the doctrine will apply. First, there must have been a delay by the plaintiff in bringing his claim[ ] and that delay must have been unreasonable under the circumstances. Delay is reasonable if the claim was brought without undue delay after plaintiff knew of the wrong or knew of facts and circumstances sufficient to impute such knowledge to him. Second, that delay must have resulted in prejudice to defendant. Common but by no means exclusive examples of such prejudice are loss of evidence with which to contest plaintiff's claims, including the fading memories or deaths of material witnesses, changes in the value of the subject matter, changes in defendant's position, and intervening rights of third parties.

*Id.* at 321, 640 P.2d at 300 (citations omitted).

Here, even assuming *arguendo* that laches governs the timeliness of the AOAO's assertion of its negligence claims against Liu, *see Wellman v. Wellman*, 205 Mont. 504, 668 P.2d 1060, 1062 (1983) (stating that laches is "considered as a bar independent of the statute of limitations"); *but see DOIT, Inc. v. Touche, Ross & Co.*, 926 P.2d 835, 845 (Utah 1996) ("where the plaintiff's claims are based in law, the statute of limitations, not the doctrine of laches, governs the timing surrounding a plaintiff's filing of a complaint") (citation omitted), Liu has failed to present to this court any evidence of prejudice caused by the claimed unreasonable delay. Instead, as previously stated, Liu merely asserts in conclusory fashion that it has been "severely prejudiced[.]" Thus, we decline to reverse the circuit court's ruling. *See Vincent v. Longwater*, 245 Ga.App. 516, 538 S.E.2d 164, 166 & n. 4 (2000) (holding that trial court did not err in declining to dismiss complaint or to grant summary judgment in favor of defendant on the applicability of laches because defendant merely asserted that the delay in

bringing suit was "inherently prejudicial" and defendant did not present any evidence of prejudice caused by the delay). Accordingly, we hold that the circuit court did not err in denying Liu's motion for summary judgment on the AOAO's negligence claims based on laches.

### 4. The Economic Loss Rule

Finally, Liu contends that the AOAO's "purely economic losses" are barred by the economic loss rule. Liu argues that, contrary to the AOAO's position, "privity of contract is not required for the economic loss [rule] to apply." (Citations omitted.) Moreover, Liu asserts that "the allegedly defective concrete slabs provided by Liu did not result in any damage other than to the slabs themselves." Liu claims that "[t]he point of the [economic loss rule] is not to guarantee and/or ensure some contractual recovery to the plaintiff (which could be barred on some other basis besides privity, such as timeliness, lack of proof, etc.) before applying the [rule] as it was intended in cases such as this, where [the AOAO] cannot point to any credible admissible evidence of personal injury or damage to other property arising out of Liu's allegedly defective work at Newtown Meadows." Consequently, Liu maintains that the circuit court erred in denying summary judgment on the basis that the economic loss rule did not bar the AOAO's negligence claims.

The AOAO contends that the circuit court correctly denied summary judgment inasmuch as "a contract between the parties is a prerequisite to application of the [economic loss rule]." Moreover, the AOAO asserts that, although the economic loss rule bars damages constituting "purely economic losses," the AOAO also suffered damage to "other property," the recovery of which under a negligence theory is not barred by the economic loss rule.

In *State ex rel. Bronster v. United States Steel Corp.*, 82 Hawai'i 32, 919 P.2d 294 (1996), we observed that the economic loss rule, *i.e.*, "that a cause of action in products liability will not lie where a plaintiff alleges a purely economic loss stemming from injury only to the product itself[,]" *id.* at 39, 919 P.2d at 301, was "accepted by a majority of

jurisdictions that have had occasion to consider it." *Id.* at 40, 919 P.2d at 302 (citations omitted). We, therefore, adopted such rule "insofar as it applies to claims for relief based on a product liability or negligent design and/or manufacture theory." *Id.* In so doing, we extensively discussed *East River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986), wherein "the United States Supreme Court acknowledged the 'economic loss' rule, effectively adopted the rationale of the California Supreme Court in *Seely v. White Motor Co.*, . . . [63 Cal.2d 9, 45 Cal.Rptr.17] 403 P.2d 145 ([Cal.] 1965), and held that no products liability claim lies in admiralty when a commercial purchaser alleges injury only to the product itself, resulting in purely economic loss." *United States Steel*, 82 Hawai'i at 39, 919 P.2d at 301. We observed that the Supreme Court held that "a manufacturer in a commercial relationship has no duty under either a negligence or strict products liability theory to prevent a product from injuring itself." *Id.* We also recognized the Supreme Court's rationale for such a holding, stating:

> The distinction that the law has drawn between tort recovery for physical injuries and warranty recovery for economic loss is not arbitrary and does not rest on the "luck" of one plaintiff in having an accident causing physical injury. The distinction rests, rather, on an understanding of the nature of the responsibility a manufacturer must undertake in distributing his [or her] products. *Seely* [, 403 P.2d at 151]. When a product injures only itself[,] the reasons for imposing a tort duty are weak and those for leaving the party to its contractual remedies are strong.
>
> . . . .
>
> Damage to a product itself is most naturally understood as a warranty claim. Such damage means simply that the product has not met the customer's expectations, or, in other words, that the customer has received "insufficient product value."

*Id.* at 40, 919 P.2d at 302 (quoting *East River S.S. Corp.*, 476 U.S. at 871–72, 106 S.Ct. 2295) (citation omitted) (format altered). Nonetheless, we held that the economic loss

rule did not bar a claim for negligent misrepresentation based on Restatement (Second) of Torts § 552 (entitled "Information Negligently Supplied for the Guidance of Others") because such claim did not sound in products liability. *Id.* Specifically, we based our holding on "three principal reasons": (1) "the tort of negligent misrepresentation is founded on the breach of a duty separate and distinct from the duty abolished by the economic loss," *id.;* (2) we had previously recognized that "pecuniary losses are recoverable in a claim for negligent misrepresentation," *id.* at 42, 919 P.2d at 304; and, (3) although "one of the principal considerations enunciated by courts adopting the economic loss rule is that permitting recovery of economic losses in a claim based on products liability would undermine provisions of the Uniform Commercial Code (UCC)[,] . . . such consideration is not applicable to actions based on negligent misrepresentation because the UCC itself contemplates actions based on misrepresentation," *id.* at 43, 919 P.2d at 305. Consequently, we held that the circuit court had erred in relying on the economic loss rule to dismiss the State of Hawaii's (the State) negligent misrepresentation claim against a steel manufacturer that had allegedly made misrepresentations to the State that its product was appropriate for the construction of a sports stadium. *Id.* at 45, 919 P.2d at 307.

Two years later, this court revisited the economic loss rule in *City Express, Inc. v. Express Partners,* 87 Hawai'i 466, 959 P.2d 836 (1998). In that case, we held that, "in the context of construction litigation, where a party is in privity of contract with a design professional, economic loss damages are limited to contractual remedies, and a negligence action may not be maintained." *Id.* at 469, 959 P.2d at 839. Specifically, this court stated:

> The economic loss rule bars recovery in tort for purely economic loss. Where, as in this case, negligent design of a building is claimed, economic loss damages are those that pertain solely to the costs related to the operation and value of the building itself. Excluded are costs for personal injuries caused by the defective design or damage to property other than the building itself. The damages claimed by [the development corporation that owned the building] . . . are purely economic—additional costs, lost rent, the cost of remedying the alleged building defects, and the difference between the value of the building as designed and the value it would have had if it had been properly designed.
>
> . . . .
>
> In the context of construction litigation involving design professionals, sound policy reasons counsel against providing open-ended tort recovery to parties who have negotiated a contractual relationship.
>
> > If tort and contract remedies were allowed to overlap, certainty and predictability in allocating risk would decrease and impede future business activity. *The construction industry in particular would suffer, for it is in this industry that we see most clearly the importance of the precise allocation of risk as secured by contract. The fees charged by* architects, engineers, *contractors,* developers, vendors, and so on *are founded on their expected liability exposure as bargained and provided for in the contract.*
>
> *Berschauer/Phillips [Constr. Co. v. Seattle Sch. Dist. No. 1,* 124 Wash.2d 816, 881 P.2d 986, 992 (1994) ].* Academic commentary recognizes that "there is a growing trend of cases which bar recovery in negligence between parties to a contract, where the damages constitute what is known as 'economic loss.' " Steven Stein, *Construction Law* § 11.04[2] (1997).
>
> Parties have the freedom to contract. "Construction projects are characterized by detailed and comprehensive contracts that form the foundation of the industry's operations. Contracting parties are free to adjust their respective obligations to satisfy their mutual expectations." *American Towers* [, 930 P.2d at 1190].

*Id.* at 469–70, 959 P.2d at 839–40 (footnote and some emphases omitted) (some emphases added). This court distinguished *United States Steel,* stating that:

> In *United States Steel,* the issue of whether contractual privity would prevent

the application of [Restatement (Second) of Torts] section 552 was not presented. No contract existed between the steel manufacturer and the State[.] The injury to the State was arguably foreseeable and the manufacturer had made direct representations to the State regarding its product. We agreed with the State that the circuit court erred in dismissing its tort claims on the basis that the economic loss rule barred the negligent misrepresentation claim.

. . . .

We recognize that section 552 contemplates a tort action for negligent misrepresentation by the party who contracts directly with the supplier of information. However, several other jurisdictions that have considered the issue presented by this appeal have concluded that, in the context of construction litigation regarding the alleged negligence of design professionals, a tort action for negligent misrepresentation alleging damages based purely on economic loss is not available to a party in privity of contract with a design professional. We agree. In this case, involving a design professional who acts under contract with the owner, we hold that recovery is properly limited to contract remedies and that a tort action under section 552 is not available.

. . . .

. . . When the plaintiff has contracted to protect against economic liability caused by the negligence of the defendant, there is no claim under [section] 552 for purely economic loss. We believe that this ruling not only encourages the parties to negotiate the limits of liability in a contractual situation, but it holds the parties to the terms of their agreement. Our holding preserves the right of design professionals to limit their exposure to liability through contract.

*Id.* (footnote, citation, and original brackets omitted) (format altered).

In *Plourde Sand & Gravel Co. v. JGI Eastern, Inc.,* 154 N.H. 791, 917 A.2d 1250 (2007), the New Hampshire Supreme Court (the court) observed that the application of the economic loss rule "becomes more com-

plicated in claims between a plaintiff and a defendant who have no contractual relationship and hence no privity between them." *Id.* at 1254. Specifically, the court stated:

A few courts hold that[,] since the principle behind the economic loss [rule] is to prevent tort law's unreasonable interference with principles of contract law, the economic loss [rule] does not apply where there is no contractual relationship, and[,] thus, no privity between the parties.

*Many courts, however, have expanded the economic loss [rule] to bar economic recovery in tort cases where there is no contract and[,] thus[,] no privity. The policy behind this principle is to prevent potentially limitless liability for economic losses:* "While the physical consequences of negligence usually have been limited, the indirect economic repercussions of negligence may be far wider, indeed[,] virtually open-ended." 4 F. Harper *et al., The Law of Torts* § 25.18A at 623 (2d ed.1986).

Other courts recognize exceptions to this rule[ ] and permit economic loss recovery in tort despite the lack of privity where there is: (1) a "special relationship" between the plaintiff and the defendant that creates a duty owed by the defendant; or (2) a negligent misrepresentation made by a defendant who is in the business of supplying information. Restatement (Second) of Torts § 552[.]

*Id.* (some citations, brackets, and ellipsis omitted) (emphasis added); *see also Carstens v. City of Phoenix,* 206 Ariz. 123, 75 P.3d 1081, 1085 (Ariz.Ct.App.2003) (concluding that application of the economic loss rule does not depend upon the plaintiff also having a viable contract claim against the defendant; rather, "irrespective of a plaintiff's contractual claims against a defendant, the rule bars recovery of economic damages in tort because such damages are not cognizable in tort absent actual injury."); *Anderson Elec., Inc. v. Ledbetter Erection Corp.,* 115 Ill.2d 146, 104 Ill.Dec. 689, 503 N.E.2d 246, 249 (1986) (stating that "[a] plaintiff seeking to recover purely economic losses due to defeated expectations of a commercial bargain cannot recover in tort, regardless of the

plaintiff's inability to recover under an action in contract").

In *Plourde Sand,* Hiltz Construction, Inc. (Hiltz), a subcontractor for a private construction project, hired the plaintiff to supply gravel for purposes of constructing the base for a roadway. 917 A.2d at 1252. After the plaintiff supplied the gravel, engineers hired by the Town of Pembroke, the apparent owner of the roadway, hired the defendant to test the gravel to determine whether it met town specifications. *Id.* Subsequent to testing the gravel, the defendant reported to the town engineers that it contained "insufficient stone content and excessive fines." *Id.* (internal quotation marks omitted). Consequently, Hiltz required the plaintiff to remove and replace the gravel at its own expense with material that met town specifications. *Id.* Subsequently, the plaintiff tested the gravel and discovered that "it did in fact meet town specifications." *Id.* Thereafter, the plaintiff brought a negligence claim against the defendant. *Id.* The defendant moved to dismiss, claiming that the damages sought were purely economic losses which are not recoverable in tort. *Id.* Determining "that it was undisputed that the plaintiff[ ] ... alleged only economic loss damages and that there was no contractual privity between the plaintiff and the defendant, the [trial] court granted the defendant's motion to dismiss." *Id.* at 1252–53.

On appeal, the court agreed with the "many courts" that had expanded the economic loss rule to bar economic recovery in tort cases where there was no privity of contract between the plaintiff and the defendant. *Id.* at 1254. The court, however, also agreed with the courts that recognized exceptions to such a rule, permitting recovery in tort despite the lack of privity where there is a "special relationship" or a negligent misrepresentation claim asserted by the plaintiff. *Id.* Nonetheless, the court determined that there was no "special relationship" in the case before it, stating:

> [P]ermitting economic loss recovery in tort here would blur the distinction between contract and tort law. The plaintiff is essentially alleging that the defendant negligently performed its duties under its contract with another party and that[,] as a result, the plaintiff has lost the benefit of its bargain with Hiltz. *Where the defendant and its partner have allocated the risks and benefits of performance in their contract, the court upsets that allocation when it imposes tort liability on the defendant.* ...
>
> ....
>
> ... The economic loss the plaintiff suffered in removing and replacing the gravel arose "solely from disappointed commercial expectations" in that the plaintiff "lost the anticipated profits of its contract" with Hiltz. *Imposing a tort duty upon the defendant in this case would disrupt the contractual relationships between and among the various parties. This we are unwilling to do.* Accordingly, we find no "special relationship" between the plaintiff and the defendant such that the defendant owed to the plaintiff an independent duty in tort to prevent economic loss.

*Id.* at 1256–57 (internal quotation marks, citations, brackets, parenthesis, and ellipsis omitted) (emphases added); *cf. Francis v. Lee Enters., Inc.,* 89 Hawai'i 234, 241, 971 P.2d 707, 714 (1999) ("Predictability in contractual relations enables parties to estimate the financial risks and rewards of doing business and thereby encourages commercial activity." (Citation omitted.)). The court also determined that the plaintiff's negligent misrepresentation claim failed in light of the fact that the plaintiff could not establish reliance, a necessary element for such a claim. 917 A.2d at 1258. Consequently, the court affirmed the trial court. *Id.*

In *Redarowicz v. Ohlendorf,* 92 Ill.2d 171, 65 Ill.Dec. 411, 441 N.E.2d 324 (1982), a homeowner (the plaintiff), who purchased his house from the original owner, brought an action to recover against the builder on the theories of contract, negligence, fraud, and implied warranty of habitability. *Id.* at 325. Sometime after the plaintiff purchased his house, he discovered that "the chimney and adjoining brick wall were beginning to pull away from the rest of the house. Upon further inspection[,] the plaintiff found that the wall and chimney were set in loose soil[.]" *Id.* at 326. "[T]he basement wall was

cracked and there was water leakage in the basement as well as leakage in the roof area around the chimney." *Id.* The plaintiff sought recovery for, *inter alia,* damages in tort for the faulty construction of his residence, seeking recovery for the cost of repair or replacement of the defectively constructed chimney and wall. *Id.* Apparently, the plaintiff and the builder were not in privity of contract because the builder "concede[d] that privity is not a necessary element of a tort action brought in negligence." *Id.* (citation omitted). The Illinois Supreme Court (the court) ultimately held that the plaintiff's economic losses were not recoverable under a negligence theory, explaining that:

> While it is foreseeable that a house will be sold more than once[ ] and that substandard construction that results in structural defects could harm a subsequent purchaser, we need not discuss in detail the scope of the duty owed to this plaintiff. For it is now clear in view of our decision in *Moorman Manufacturing Co. v. National Tank Co.,* ... [91 Ill.2d 69, 61 Ill. Dec.746] 435 N.E.2d 443 ( [Ill.] 1982), that a plaintiff cannot recover solely economic losses in tort. In *Moorman*[,] the plaintiff had purchased a bolted-steel grain-storage tank from the defendant. The tank had developed a crack in one of its steel plates. The plaintiff brought an action alleging in count I that the tank was not reasonably safe due to defects in its design and manufacturing and in count III that the defendant had negligently designed the tank.
>
> We affirmed the trial court's dismissal of both the strict liability and negligence counts in *Moorman.* We concluded that a complaint alleging qualitative defects in a product does not belong in tort. *A disappointed consumer of a storage tank or a disgruntled purchaser of a certain house cannot assert that, due to inferior workmanship that led to eventual deterioration, he can recover under a negligence theory in tort.* We find no sound reason to treat either of the aforementioned purchasers differently from one another.
>
> . . . .
>
> To recover in negligence[,] there must be a showing of harm above and beyond disappointed expectations. *A buyer's desire to enjoy the benefit of his bargain is not an interest that tort law traditionally protects.* (*See* Prosser, Torts [§ ] 92, at 613 (4th ed.1971).) ...
>
> This is not a case where defective construction created a hazard that resulted in a member of the plaintiff's family being struck by a falling brick from the chimney. The adjoining wall has not collapsed on and destroyed the plaintiff's living room furniture. The plaintiff is seeking damages for the costs of replacement and repair of the defective chimney [and] adjoining wall[.] *While the commercial expectations of this buyer have not been met by the builder, the only danger to the plaintiff is that he would be forced to incur additional expenses for living conditions that were less than what was bargained for.* The complained-of economic losses are not recoverable under a negligence theory.

*Id.* at 326–27 (emphases added). The court, however, held that the plaintiff could assert an implied warranty of habitability claim based on the damages incurred by the plaintiff. *Id.* at 331.

Similarly, in *Crowder v. Vandendeale,* 564 S.W.2d 879 (Mo.1978) (en banc), *overruled on other grounds by Sharp Bros. Contracting Co. v. Am. Hoist & Derrick Co.,* 703 S.W.2d 901 (Mo.1986) (en banc), a subsequent homeowner (the plaintiff) brought an action against the contractor who built the house and sold it to the plaintiff's sellers, who were the previous occupants of the house. 564 S.W.2d at 880. The plaintiff alleged that,

> shortly after purchasing the house, [she] discovered that the front porch and steps were settling and separating from the house foundation, causing cracks in the brickwork and the foundation wall. [She] further alleged that it later developed that the foundation wall all along the south side of the house was also settling, resulting in cracks in the brickwork and foundation wall as well as a crack in the ground floor slab. In addition, the concrete driveway adjacent to the house settled and cracked.

*Id.* The plaintiff claimed that the damages to the house resulted from the contractor's

"negligence in failing to conduct a proper analysis of existing soil conditions, improperly preparing and pouring footings for the foundation and, in general, failing to construct the house in a good, workmanlike manner." *Id.* The plaintiff sought to recover expenses incurred in repairing the house and the driveway. *Id.* Although the Missouri Supreme Court recognized an implied warranty of habitability in the new house, it concluded that recovery for deterioration alone, caused by latent structural defects, was not actionable in negligence, stating that:

> In negligence, the focus is on both conduct and result. Generally, the standard of negligence is the requirement that the actor use ordinary care and skill. Yet this is particularly difficult to determine in the case of a completed home. The quality of new homes varies considerably. This is no particular evil standing alone because the variance in quality is substantially reflected in the price, thereby providing a broader market and enabling many to own their own homes. Purchasers are not ignorant of the more obvious variations in quality. Indeed, this largely accounts for the variation in price. Thus, there is little need to protect consumers from discoverable shortcuts in construction. However, as to latent structural defects in a completed home, where protection is needed, it may be difficult to pinpoint the exact cause of the defect. Often[,] the only proof will be by inference from the result [—] a difficult problem where, as will often be the case, many parties may be involved in design, providing materials[,] and construction.

A duty to use ordinary care and skill is not imposed in the abstract. It results from a conclusion that an interest entitled to protection will be damaged if such care is not exercised. Traditionally, interests which have been deemed entitled to protection in negligence have been related to safety or freedom from physical harm. Thus, where personal injury is threatened, a duty in negligence has been readily found. Property interests also have generally been found to merit protection from physical harm. However, where mere deterioration or loss of bargain is claimed,

the concern is with a failure to meet some standard of quality. This standard of quality must be defined by reference to that which the parties have agreed upon. *Id.* at 882.

In *Washington Courte Condominium Ass'n–Four v. Washington–Golf Corp.,* 150 Ill.App.3d 681, 103 Ill.Dec. 752, 501 N.E.2d 1290 (1986), a condominium association and certain unit owners [hereinafter, collectively, the plaintiffs] brought an action against Washington–Golf Corp., the developer/general contractor of the condominium, and numerous subcontractors, including Corra Plumbing Company (Corra) and Weather Shield Manufacturing, Inc. (Weather Shield). *Id.* at 1291. The plaintiffs sought recovery of damages from the subcontractors under the theories of negligence and breach of the implied warranty of habitability. *Id.* at 1292. The plaintiffs alleged that, "as a result of Corra's negligent installation of plumbing and plumbing fixtures, the sinks and shower units emitted strong, unpleasant odors and the toilets leaked at the base and did not flush properly." *Id.* Consequently, the plaintiffs alleged that they have paid or will have to pay to repair or replace sink and shower drains, garbage disposals, and toilets. *Id.* Furthermore, the plaintiffs alleged that Weather Shield "had negligently supplied the windows and exterior sliding glass doors for the units and is responsible for resulting water damage to insulation, walls, ceilings, and electrical outlets." *Id.* The plaintiffs additionally alleged that "the insulation, window units, sliding doors and cracked and stained wallboard in both the individual units and in the common areas must be repaired or replaced." *Id.* On appeal, the Illinois Appellate Court (the court) ruled that the losses alleged were solely economic, for which damages could not be recovered in negligence. *Id.* at 1295. Specifically, the court stated:

> With respect to Corra, plaintiffs allege improper sink, shower[,] and toilet installation and improper design and construction of the sink and shower, resulting in the repair or replacement of the sink and shower drains, garbage disposal, and toilets. [The p]laintiffs did not allege damage to property other than to the plumbing

fixtures, nor did they allege personal injury resulting from the allegedly defective plumbing fixtures. Thus, we find that the alleged damages resulting from Corra's installation of the plumbing fixtures constitute solely economic losses not recoverable in tort. . . .

A different situation arises with respect to the allegations of negligence against Weather Shield. . . . At the outset, we must determine whether the alleged property damage to insulation, walls, ceiling, floors, and electrical outlets constitutes consequential economic loss which would be barred from tort recovery . . . or whether the damage constitutes a valid exception to the economic loss [rule]. . . .

. . . .

In the present case, we find that the alleged property damage incidental to the defective windows and doors is . . . damage consequent to the qualitative defects and not recoverable in tort. . . .

. . . .

. . . [I]n the case at bar, *both Corra and Weather Shield had a direct contractual relationship with Washington–Golf [Corp.], the general contractor/developer/vendor; and the alleged damages related directly to reasonable commercial expectations.*

*Id.* at 1293–95 (emphasis added). Consequently, the court ruled that the trial court erred in denying Corra's and Weather Shield's motions to dismiss the plaintiffs' negligence claims. *Id.* at 1295.

In *Calloway v. City of Reno,* 116 Nev. 250, 993 P.2d 1259 (2000), *overruled on other grounds by Olson v. Richard,* 120 Nev. 240, 89 P.3d 31 (2004), the Nevada Supreme Court (the court) set forth the following reasons in support of its holding that the economic loss rule applies to construction defect cases:

The crux of the [economic loss rule] is the premise that economic interests are protected, if at all, by contract principles, rather than tort principles. Contract law is designed to enforce the expectancy interests created by agreement between the parties and seeks to enforce standards of quality. This standard of quality must be defined by reference to that which the parties have agreed upon. In contrast, tort law is designed to secure the protection of all citizens from the danger of physical harm to their persons or to their property and seeks to enforce standards of conduct. These standards are imposed by society, without regard to any agreement. Tort law has not traditionally protected strictly economic interests related to product quality—in other words, courts have generally refused to create a duty in tort to prevent such economic losses.

. . . .

This court has applied the economic loss [rule] outside of the products liability context[ ] and has suggested that it could apply with respect to damages to a dwelling. Additionally, the economic loss [rule] has been specifically applied by other jurisdictions in construction defects cases. *See, e.g., Nastri v. Wood Bros. Homes, Inc.,* 142 Ariz. 439, 690 P.2d 158 (Ct.App.1984) (applying the economic loss doctrine to a negligent construction against builder); *2314 Lincoln Park West Condo. v. Mann,* 136 Ill.2d 302, 144 Ill.Dec. 227, 555 N.E.2d 346 (1990) (applying the economic loss doctrine to an architectural malpractice action); *Atherton Condo. Bd. v. Blume Dev.,* 115 Wash.2d 506, 799 P.2d 250 (1990) (applying the economic loss doctrine to a negligent construction claim).

We conclude that damages sought, in tort, for economic losses from a defective building are just as offensive to tort law as damages sought for economic losses stemming from a defective product. The Florida Supreme Court has fittingly recognized that the economic loss doctrine must be considered in construction defects cases:

Buying a house is the largest investment many consumers ever make, and homeowners are an appealing, sympathetic class. If a house causes economic disappointment by not meeting the purchaser's expectations, the resulting failure to receive the benefit of the bargain is a core concern of contract, not tort, law. There are protections for home-buyers, however, such as statutory warranties, the general warranty of habita-

bility, and the duty of sellers to disclose defects, as well as the ability of purchasers to inspect houses for defects. Coupled with homebuyers' power to bargain over price, these protections must be viewed as sufficient when compared with the mischief that could be caused by allowing tort recovery for purely economic losses.

*Casa Clara v. Charley Toppino and Sons,* 620 So.2d 1244, 1247 (Fla.1993) (citations and footnotes omitted).[43] Accordingly, ... we conclude that the economic loss doctrine applies to construction defect cases.

993 P.2d at 1265–66 (some citations, internal quotation marks, ellipsis, emphases, and footnote omitted). The court further noted that

permitting tort recovery for economic losses from construction defects would create a general, societally imposed duty on the part of builders and developers to avoid such losses. These losses are not properly addressed by tort law, which has as its underlying policy the promotion of safety. Instead, such harm is paradigmatically addressed by the policies underlying contract law—to enforce standards of quality as defined by the parties' contractual relationships.

*Id.* at 1266 n. 3.[44]

 Here, it appears that the AOAO's negligence claims against Liu are based on Liu's alleged violations of (1) contract specifications and (2) the Uniform Building Code (UBC). Although the AOAO and Liu are not in privity of contract, "[p]ermitting economic loss recovery in tort here [for the AOAO's negligence claims based on violations of con-

tract specifications] would blur the distinction between contract and tort law." *Plourde Sand,* 917 A.2d at 1256. Similar to the plaintiff in *Plourde Sand,* the AOAO is essentially alleging that Liu "negligently performed its duties under its contract with another party[, *i.e.,* S. Horita,] and that[,] as a result, the [AOAO (and/or its members) ] has[/have] lost the benefit of its bargain with [the vendor]." *Id.* Where Liu and S. Horita have allocated the risks and benefits of performance in their contract, we would upset that allocation were we to impose tort liability on Liu. *See id.* Stated differently, "[i]mposing a tort duty upon the defendant in this case would disrupt the contractual relationships between and among the various parties." *Id.* at 1256–57. Consequently, we agree with those jurisdictions that bar economic recovery in negligence where there was no privity of contract between the plaintiff and the defendant when allowing such recovery would blur the distinction between contract and tort law. *See Plourde Sand,* 917 A.2d at 1256–57; *see also Redarowicz,* 65 Ill.Dec. 411, 441 N.E.2d at 326–27; *Washington Courte,* 103 Ill.Dec. 752, 501 N.E.2d at 1293–95; *Crowder,* 564 S.W.2d at 882; *Calloway,* 993 P.2d at 1265–67. Indeed, as we have previously recognized, "[t]he construction industry in particular would suffer" "[i]f tort and contract remedies were allowed to overlap," *City Express,* 87 Hawai'i at 470, 959 P.2d at 840 (citation omitted), and "[t]he fees charged by ... contractors ... are founded on their expected liability exposure as bargained and provided for in the contract." *Id.* (citation and emphasis omitted). In our view, the AOAO's negligence claims—specifically, those *based on violations of contract*

43. We note that *Casa Clara* was somewhat called into doubt—but not overruled—by *Moransais v. Heathman,* 744 So.2d 973 (Fla.1999). Nevertheless, as the Wisconsin Court of Appeals recognized in *Bay Breeze Condominium Ass'n, Inc. v. Norco Windows, Inc.,* 257 Wis.2d 511, 651 N.W.2d 738 (Wis.Ct.App.2002), a "number of jurisdictions" have adopted the reasoning of *Casa Clara* as the law in their jurisdictions. *Id.* at 746 & n. 6. *See, e.g., Calloway,* 993 P.2d at 1265–66; *Bay Breeze Condo. Ass'n,* 651 N.W.2d at 746.

44. In *Olson,* the Nevada Supreme Court explained that, prior to its decision in *Calloway,* the Nevada Legislature enacted Nevada Revised

Statutes (NRS) chapter 40 "to aid in resolving construction defects disputes between contractors and homeowners." 89 P.3d at 33. However, because the claims alleged in *Calloway* predated the enactment of chapter 40, the *Calloway* court did not address whether a negligence claim could be brought under chapter 40. *Id.* at 33. The *Olson* court concluded that, notwithstanding its holding in *Calloway,* "a negligence claim can be alleged in a construction defects cause of action initiated under [c]hapter 40." *Id.* In other words, *Calloway* applies to common law negligence claims, whereas *Olson* applies to statutory negligence claims.

*specifications*—fall within the purview of the economic loss rule as set forth above.

Nonetheless, as previously mentioned, the AOAO contends that the damages it suffered do not constitute "purely economic losses." Rather, the AOAO maintains that "other property" was damaged as a result of Liu's negligent construction of the concrete floor slabs. Specifically, the AOAO argues that "factual issues remain[ ] as to whether consequential damage occurred to property other than the floor slabs, such as cracked floor tile, demising walls, skewed door jambs and windows and damage caused by termites entering through the excessive floor cracks."

In *City Express,* this court stated that, where negligent design of a building is alleged by the plaintiff, "economic loss damages are those that pertain solely to the costs related to the operation and value of the building itself. Excluded are costs for personal injuries caused by the defective design or damage to property other than the building itself." 87 Hawai'i at 469, 959 P.2d at 839; *see also Kawamata Farms, Inc. v. United Agri Products,* 86 Hawai'i 214, 254, 948 P.2d 1055, 1095 (1997) (stating that, "[w]here the finished product caused damage to other property, the economic loss [rule] does not apply"). Other jurisdictions have similarly defined economic loss as "damages for inadequate value, costs of repair and replacement of [the] defective product, or consequent loss of profits-without any claim of personal injury or damage to other property." *Oceanside at Pine Point Condo. Owners Ass'n v. Peachtree Doors, Inc.,* 659 A.2d 267, 270 n.4 (Me.1995) (internal quotation marks and citation omitted) [hereinafter, *Oceanside* ]; *see also Moorman Mfg. Co. v. Nat'l Tank Co.,* 91 Ill.2d 69, 61 Ill.Dec. 746, 435 N.E.2d 443, 449 (1982) (same); *Flowers v. Viking Yacht Co.,* 366 N.J.Super. 49, 840 A.2d 291, 296 (2003) (same).

In *Calloway,* the Nevada Supreme Court recognized that:

> Other jurisdictions have concluded that a defective building creates only economic loss, even if the particular defect causes damage to other parts of the structure. *See, e.g., Chicago Heights Venture v. Dynamit Nobel of America,* 782 F.2d 723 (7th Cir.1986) (holding roof material that failed during windstorm, resulting in leaks, was not legally significant, and only economic losses were at issue); *Nastri v. Wood Bros. Homes, Inc.,* 142 Ariz. 439, 690 P.2d 158 (Ct.App.1984) (holding cracks in kitchen floor, vinyl flooring, family room and bedroom, and buckling of the roof, cracked bricks and joists, all involved damage to the structure itself; therefore, only economic losses were presented and owners could not sue in tort); *Danforth v. Acorn Structures, Inc.,* 608 A.2d 1194 (Del.1992) (holding homeowner who brought tort action against seller of building kit for negligent design could not recover because deterioration of windows, door frames and exterior siding was strictly economic loss); *Casa Clara [Condo. Ass'n] v. Charley Toppino and Sons,* 620 So.2d 1244 (Fla.1993) (holding homeowners could not recover in tort for allegedly defective concrete that cracked and broke off); *Redarowicz v. Ohlendorf,* 92 Ill.2d 171, 65 Ill.Dec. 411, 441 N.E.2d 324 (1982) (holding owner of home who sought recovery for costs of repair and replacement for defectively constructed chimney, wall and patio suffered only economic losses not recoverable in tort because homeowner alleged only qualitative defects; inferior workmanship that leads to eventual deterioration is not properly addressed by tort law); *Chenango C. Indus. D.A. v. Lockwood Greene E.,* 114 A.D.2d 728, 494 N.Y.S.2d 832 (1985) (holding building owners could not sue roofing material manufacturer in tort for cracks, splits and leaks in the roof because owners suffered only economic losses)[.]

993 P.2d at 1268 (holding that water intrusion, damage to flooring and ceilings, and structural and wood decay caused by defective framing in townhouses constituted damage to the townhouses themselves and, thus, the plaintiffs suffered purely economic losses not recoverable in negligence). In *Oceanside,* owners of condominium units and the condominium association [hereinafter, collectively, the plaintiffs] brought an action against the manufacturer of windows installed in the units based on, *inter alia,* negligence. 659 A.2d at 269. In concluding that

294

the plaintiffs' negligence claim was barred by the economic loss rule, the Maine Supreme Judicial Court stated:

> Whether a product has injured only itself may, of course, be a difficult question to answer. *We follow the approach taken by those courts when considering facts analogous to those before us, and look to the product purchased by the plaintiff, as opposed to the product sold by the defendant, to determine whether a product has injured only itself.* See, e.g., *Easling v. Glen–Gery Corp.,* 804 F.Supp. 585, 590 (D.N.J.1992) (no recovery permitted under strict liability theory for building damage caused by defective bricks because plaintiffs purchased completed apartment complex and not a load of bricks); *Casa Clara Condo[.] Ass'n,* ... 620 So.2d [at] 1247 ... (rejecting homeowners' argument that damages caused to a condominium by defective concrete was damage to other property because plaintiffs purchased finished homes, not component parts)[.]
>
> *The plaintiffs here purchased finished condominium units, not individual components of the units. Because the windows were integrated into the finished product purchased by the plaintiffs, the damages caused by any defects in the windows constituted damage only to the product itself, not damage to "other property."*
>
> [The p]laintiffs' claims for economic damages—"the costs of all repairs, renovation, corrections and replacements related to the [window manufacturer's] performance of its contract"—are properly addressable under a warranty theory. The trial court correctly determined that the plaintiffs may not recover for these damages in tort and its grant of a summary judgment on this basis did not constitute an error of law.

*Id.* at 271 (citation omitted) (emphases added); *see Washington Courte Condo. Ass'n–Four,* 103 Ill.Dec. 752, 501 N.E.2d at 1294 (water damage to insulation, walls, ceilings, and electrical outlets allegedly caused by "negligently supplied" windows and sliding glass doors constituted consequential economic loss which is barred from tort recovery under economic loss rule); *Prendiville v.*

*Contemporary Homes, Inc.,* 32 Kan.App.2d 435, 83 P.3d 1257, 1264 (2004) (concluding that "damage by a defective component of an integrated system to either the system as a whole or other system components is not damage to 'other property' which precludes the application of the economic loss [rule]"; damage to home caused from flooding due to defective siding was not damage to "other property" for purposes of economic loss rule) (internal quotation marks, citation, and brackets omitted); *Bay Breeze Condo. Ass'n v. Norco Windows, Inc.,* 257 Wis.2d 511, 651 N.W.2d 738, 745–46 (Wis.Ct.App.2002) (concluding that economic loss rule applies to condominium building construction defects when the defective product is a component part of an integrated structure; damage to interior and exterior walls and casements allegedly caused by defective windows not recoverable in negligence); *but see Berish v. Bornstein,* 437 Mass. 252, 770 N.E.2d 961, 975 (2002) (concluding that allegations that defects in condominium units included poor construction of retaining walls, improper installation of skylights and sliding glass doors, improper construction of foundations, and failure to install adequate flashing on roofs gave rise to reasonable inference that these defects caused property damage (including water damage to the units) beyond the defects in the units themselves).

 In the instant case, it is undisputed that the AOAO is not seeking damages for any personal injuries caused by the allegedly defective concrete floor slabs. As previously mentioned, the AOAO essentially alleged the following as damages: (1) damage to the units at Newtown Meadows; (2) a continuous exposure to conditions which resulted in damage to the units; (3) loss in value of the units; (4) the costs of experts; (5) an increase in maintenance costs; (6) the cost to remedy the defects; and (7) "other consequential damages." Such damages, however, consist of purely economic losses. *See City Express,* 87 Hawai'i at 469, 959 P.2d at 839; *see also Oceanside,* 659 A.2d at 270 n. 4. Moreover, even assuming *arguendo* that the cracked floor tiles, demising walls, skewed door jambs and windows, and damage caused by termites entering through the cracks were caused by the allegedly defective floor slabs,

such consequential damages do not constitute damage to "other property." *See Washington Courte Condo. Ass'n–Four,* 103 Ill.Dec. 752, 501 N.E.2d at 1294; *Oceanside,* 659 A.2d at 271; *Calloway,* 993 P.2d at 1268; *Bay Breeze Condo. Ass'n,* 651 N.W.2d at 745–46. Furthermore, it should be pointed out that the AOAO does not provide any citation to the record to support its assertions that it incurred damage as a result of termite infestation and that skewed door jambs and windows resulted from the allegedly defective floor slabs. Consequently, the damages alleged by the AOAO against Liu consist of purely economic losses not recoverable in negligence. Thus, we conclude that the AOAO's negligence claims *based on violations of contract specifications* are barred by the economic loss rule.

 With respect to the AOAO's negligence claims—specifically, those *based on violations of the UBC*—the AOAO urges this court to adopt the exception carved out by the South Carolina Supreme Court in *Kennedy v. Columbia Lumber & Manufacturing Co.,* 299 S.C. 335, 384 S.E.2d 730 (1989). In that case, the court held:

> A builder may be liable to a home buyer in tort despite the fact that the buyer suffered only "economic losses" where: (1) *the builder has violated an applicable building code;* (2) the builder has deviated from industry standards; or (3) the builder has constructed housing that he knows or should know will pose serious risks of physical harm.

*Id.* at 738 (format altered) (emphasis added). In so holding, the court stated that "a violation of a building code violates a legal duty for which a builder can be held liable in tort

for proximately caused losses." *Id.* at 737 (citation omitted). The court, therefore, concluded that

> a cause of action in negligence will be available where a builder has violated a legal duty, no matter the type of resulting damage. The "economic loss" rule will still apply where duties are created *solely* by contract. In that situation, no cause of action in negligence will lie.

*Id.* (emphasis in original) (footnote omitted). We believe the foregoing approach is sound, and, thus, we agree with the *Kennedy* court to the extent that a homeowner may pursue a negligence claim against a builder where it is alleged that the builder has violated an applicable building code, despite the fact that the homeowner suffered only economic losses. We decline to address whether we would adopt the second and third exceptions to the economic loss rule announced by the *Kennedy* court inasmuch as the AOAO did not contend that Liu "deviated from industry standards[,]" *id.* at 738, or that Liu "constructed housing that [it] knows or should know will pose serious risks of physical harm[,]" *id.* We, therefore, conclude that the AOAO's negligence claims *based on violations of the UBC* are *not* barred by the economic loss rule.

 Accordingly, based on the foregoing, we affirm in part and vacate in part the circuit court's denial of Liu's motion for summary judgment as it pertains to the AOAO's negligence claims. Specifically, inasmuch as the economic loss rule: (1) bars the AOAO's negligence claims *based on violations of contract specifications,* we hold the circuit court erred; and (2) does not bar the AOAO's negligence claims *based on violations of the UBC,* we hold the circuit court did not err.[45]

---

45. Liu also raises in its cross-appeal that "the law of the case [doctrine] should not have prevented the [circuit] court from reaching the proper ruling on Liu's motion based on the economic loss [rule]." (Capitalization altered.) Approximately two years prior to Liu's motion, Geolabs had moved for partial summary judgment on the basis that the economic loss rule barred the AOAO's tort-based claims. The circuit court denied Geolabs' motion, and it appears undisputed that the circuit court denied such motion based on the circuit court's belief that the economic loss rule requires the plaintiff and defendant to be in privity of contract. Subse-

quently, at the hearing on Liu's motion, the circuit court orally denied Liu's motion with respect to the AOAO's negligence claims based on the law of the case doctrine, presumably believing that it was constrained by its earlier ruling on Geolabs' motion. Curiously, however, the circuit court orally granted Liu's motion with respect to the AOAO's strict products liability claims on the apparent basis that the economic loss rule bars such claims. The law of the case doctrine "refers to the usual practice of courts to refuse to disturb all prior rulings in a particular case, including rulings made by the judge [her-ₑ]self." *Wong v. City & County of Honolulu,* 66

### F. The AOAO's Strict Products Liability Claims

 The AOAO contends that the circuit court erred in granting summary judgment in favor of Liu on its strict products liability claims on the bases of (1) the two-year statute of limitations contained in HRS § 657-7 and (2) the economic loss rule.[46] The AOAO, however, did not assign as error the circuit court's order granting Liu's motion for partial summary judgment on the ground that HRS § 657-7 barred the AOAO's "tort based claims," *i.e.*, the AOAO's negligence *and* strict products liability claims. Moreover, the AOAO fails to point out whether the circuit court applied the proper test in determining when the statute of limitations commences to run on a strict products liability claim, which, as the United States District Court for the District of Hawai'i (federal district court) observed, is "different" from the test that applies in determining when the statute of limitations commences to run on a negligence claim. *In re Hawai'i Fed. Asbestos Cases*, 854 F.Supp. 702, 706 (D.Haw.1994). Indeed, after discussing the test utilized in determining when the statute of limitations commences to run on a negligence claim, the federal district court stated:

> A different test applies to products liability actions. The statute of limitations commences to run on a products liability action on the earliest date that a plaintiff knows, or in the exercise of reasonable diligence, should know of the following elements: (1) that the defendant is engaged in the business of manufacturing or selling the product; (2) that the product contains a defect dangerous to the user or consumer; and (3) that the defect is the cause of his injury. *Johnson v. Raybestos–Manhattan, Inc.*, 69 Haw. 287, 740 P.2d 548, 549 (1987).

*Id.* at 706-07 (concluding that plaintiff's negligence and products liability claims, which arose from death of plaintiff's husband alleg-edly caused by pulmonary disease caused by his exposure to automotive products containing asbestos manufactured by defendants, may have accrued on different dates). The AOAO essentially "lumps" together its strict products liability claims with its negligence claims for purposes of its statute of limitations discussion and, thus, appears to believe that the statute of limitations for both claims commence at the same time or on the same date. Consequently, based on the AOAO's failure to assign as error the circuit court's order granting Liu's motion for partial summary judgment on the ground that HRS § 657-7 barred the AOAO's strict products liability claims and the AOAO's failure to present an argument that Liu did not prove that the AOAO had knowledge of the foregoing three elements required for accrual of the statute of limitations, we deem the AOAO's contention with respect to its strict products liability claims against Liu to be waived. *See* HRAP Rules 28(b)(4) & (b)(7). Accordingly, we hold that the circuit court did not err in granting summary judgment in favor of Liu on the AOAO's strict products liability claims.

### G. The AOAO's Claims for Punitive Damages

Finally, the AOAO contends that the circuit court erred in granting summary judgment in favor of Royal, Lee, and Liu on its claims for punitive damages. The AOAO argues that,

> [a]lthough there are more, two points alone should have permitted the issue of punitive damages to reach the jury: (1) [t]he defendants knew the defective nature of their work would be hidden beneath or within hardened concrete and would be difficult and costly to discover; and (2) [t]he work was so defective and pervasive that, when considered together with the fact that the defects would necessarily be hidden, a fair inference arises that the defendants per-

---

Haw. 389, 396, 665 P.2d 157, 162 (1983) (citations omitted). Even assuming *arguendo* that Liu is correct in stating that the circuit court was not constrained by its earlier ruling pertaining to Geolabs, our review is not affected by such a conclusion.

46. As previously noted, the AOAO does not challenge the circuit court's entry of summary judgment in favor of Royal, Lee, and Geolabs on its strict products liability claims on appeal. *See supra* notes 14 & 16.

formed the work with an "entire want of care" and/or a "conscious indifference to consequences" that was motivated by a desire to cut costs and boost profits.

Specifically, with respect to Royal and Lee, the AOAO asserts that:

> Royal admittedly knew of the serious soil compaction deficiency at Building 3, yet made no effort to: (1) determine if the same defective condition existed under any of the other buildings; or (2) inform the City Building Department or prospective purchasers of this serious and potentially costly defect. As the subcontractor responsible for the defective soil compaction, Lee could reasonably be inferred to have had the same information as Royal regarding the deficient compaction at Building 3.

The AOAO claims that, with respect to Liu, "[t]he concrete floor deficiencies were not isolated to one or two floor slabs but found throughout the project, which consisted of multiple townhouse structures. This pervasiveness permits a reasonable inference that the deficient methods used by Liu to install the floors was a systematic practice motivated by a desire to cut costs and boost profits." Specifically, the AOAO argues that "[t]he slabs did not conform to project specifications and the Building Code [because, i]n many areas[,] the slabs were significantly thinner than the required minimum of [four] inches[ ] and . . . metal reinforcement was so misplaced so as to render them ineffective."

Royal contends that, "even *assuming arguendo* that the compaction work was done improperly . . . and that the Compaction Report was incorrect, these facts do not establish by clear and convincing evidence that Royal acted wantonly, oppressively, or with malice to warrant an award of punitive damages." Lee similarly contends that "the AOAO has not and cannot establish that [Lee] acted wantonly, oppressively, with a spirit of mischief or criminal indifference, or acted with an entire want of care that would raise a presumption to conscious indifference to the consequences." Liu maintains that "the record remains devoid of any support, much less clear and convincing evidence, for [the AOAO's] punitive damage claim against Liu."

 Punitive damages "are generally defined as those damages assessed in addition to compensatory damages for the purpose of punishing the defendant for aggravated or outrageous misconduct and to deter the defendant and others from similar conduct in the future." *Masaki v. Gen. Motors Corp.*, 71 Haw. 1, 6, 780 P.2d 566, 570 (1989) (citations omitted). In order to recover punitive damages, "[t]he plaintiff must prove by clear and convincing evidence that the defendant has acted wantonly or oppressively or with such malice as implies a spirit of mischief or criminal indifference. to civil obligations, or where there has been some wilful misconduct or that entire want of care which would raise the presumption of a conscious indifference to consequences." *Id.* at 16–17, 780 P.2d at 575 (citation omitted).

> In determining whether an award of punitive damages is appropriate, the inquiry focuses primarily upon the defendant's mental state, and to a lesser degree, the nature of his conduct. In the case of most torts, ill will, evil motive, or consciousness of wrongdoing on the part of the tortfeasor are not necessary to render his conduct actionable. In a negligence action, for example, the defendant may be required to make compensation if it is shown that he failed to comply with the standard of care which would be exercised by an ordinary prudent person, no matter how innocent of desire to harm. In contrast, *to justify an award of punitive damages, "a positive element of conscious wrongdoing is always required." Thus, punitive damages are not awarded for mere inadvertence, mistake, or errors of judgment.* Restatement (Second) of Torts § 908, comment b; [W.P. Keeton,] Prosser [& Keeton on the Law of Torts § 2], at 10 [ ( 5th ed.1984) ]. *"Something more than the mere commission of a tort is always required for punitive damages."* Prosser, at 9.

*Id.* at 7, 780 P.2d at 570–71 (some citations omitted) (emphases added).

 Here, even assuming *arguendo* that Royal and Lee inadequately compacted the soil at Newtown Meadows, thereby resulting in damages to the AOAO, such actions would amount to a "mere commission of

a tort," not justifying an award of punitive damages. *Masaki*, 71 Haw. at 7, 780 P.2d at 571 (citation omitted). Furthermore, even assuming *arguendo* that Royal and Lee were or should have been aware of the "serious soil compaction deficiency at Building 3," the AOAO does not cite to any authority in support of its position that Royal and Lee were obligated to "determine if the same defective condition existed under any of the other buildings" or to "inform the City Building Department or prospective purchasers of th[e] serious and potentially costly defect." Likewise, with respect to Liu, even assuming *arguendo* that Liu improperly constructed the floor slabs at Newtown Meadows, such action would amount to "mere inadvertence, mistake, or errors of judgment[,]" *id.*, under the circumstances of this case. Inasmuch as the AOAO has not shown "a positive element of conscious wrongdoing" in order to justify an award of punitive damages, *id.*, against Royal, Lee, and Liu, we hold that the circuit court did not err in granting summary judgment in favor of Royal, Lee, and Liu on the AOAO's claims for punitive damages.[47]

## IV. *CONCLUSION*

Based on the foregoing, we affirm the circuit court's May 21, 2004 amended judgment in all respects except as follows:

(1) we vacate that part of the circuit court's February 12, 2003 order entering summary judgment in favor of Venture 15 and against the AOAO on the AOAO's implied warranty of habitability claim; and

(2) with respect to the AOAO's negligence claims that the circuit court concluded were barred by HRS § 657–7, we vacate that part of the following circuit court orders entering summary judgment against the AOAO and in favor of: (a) Venture 15, filed October 8, 2002; (b) Royal, filed October 9, 2002; (c) Lee, filed October 7, 2002; (d) Liu,

filed October 17, 2002; and (e) Geolabs, filed October 21, 2002.

We remand this case to the circuit court for further proceedings consistent with this opinion.

Finally, with respect to the AOAO's negligence claims that the circuit court concluded were not barred by the economic loss rule, we vacate that part of the circuit court's October 8, 2002 order denying summary judgment in favor of the AOAO and against Liu and remand this case to the circuit court with instructions to enter an order granting summary judgment in favor of Liu and against the AOAO on the AOAO's negligence claims based on violations of contract specifications as a matter of law. However, we affirm that part of the circuit court's October 8, 2002 order denying summary judgment on the AOAO's negligence claims based on violations of the UBC.

Concurring and Dissenting Opinion by ACOBA, J.

I concur in the result, except for two matters.

Respectfully I would hold that the economic loss rule does not "bar[ ] the AOAO's negligence claims based on violations of contract specifications," majority opinion at 129 (emphasis omitted), insofar as the alleged defective concrete floor slabs caused damages to "other property." The majority posits that consequential damages to other property such as "the cracked floor tiles, demising walls, skewed door jambs and windows, and damage caused by termites entering through the cracks were caused by the allegedly defective floor slabs, ... [and] do not constitute damage to 'other property.'" Majority opinion at 294–95, 167 P.3d at 287–88 (citations omitted). The residential townhouse condominium is comprised of 152 units within ten two-story buildings. However, "[a]ccepting [the AOAO's] allegations as

---

47. The AOAO also claims that it "should not be penalized for having to rely on circumstantial evidence to establish Defendants' punitive liability where the Defendants all claim in unison to have lost all of the records from which their liability might have been established directly." As discussed *supra*, however, destruction or loss of Royal's, Lee's, and Liu's documents at issue occurred prior to the initiation of the instant action and such destruction or loss was a result of damage due to fire, water, and termite infestation and/or a company retention policy. Consequently, we believe that the AOAO's contention is without merit.

true, it is reasonable to infer that the enumerated 'defects and deficiencies' caused property damage beyond the defects in the condominium units themselves, and, therefore, that [the AOAO] could have [otherwise] demonstrated that they were entitled to relief on their negligence claims." *Berish v. Bornstein*, 437 Mass. 252, 770 N.E.2d 961, 975 (2002). Accordingly, I would affirm the court and allow the negligence claim as "to other property" damages to be resolved at trial in light of "reasonable inferences" that may be drawn from the evidence presented.

Also, I would vacate the summary judgment order as to punitive damages under the circumstances posed. The AOAO argues, in part, that

> [t]he work was so defective and pervasive that, when considered together with the fact that the defects would necessarily be hidden, a fair inference arises that the defendants performed the work with an "entire want of care" and/or a "conscious indifference to consequences" that was motivated by a desire to cut costs and boost profits.

In light of the substantial injury to the residences caused by the alleged defective work and its latent nature, whether such damages should be awarded in this case is quintessentially a question of fact, after a trial, and is not resolvable on appeal at this point inasmuch as " 'a positive element of conscious wrongdoing,' " majority opinion at 298, 167 P.3d at 291 (quoting *Masaki v. Gen. Motors Corp.*, 71 Haw. 1, 7, 780 P.2d 566, 571 (1989)), may be established by circumstantial evidence.

MOTIONS FOR RECONSIDERATION

Upon consideration of the motions for reconsideration filed by defendant-appellee/cross-appellant Liu Construction, Inc. and plaintiff-appellant/cross-appellee Association of Apartment Owners of Newtown Meadows, the papers in support thereof, and the record herein,

IT IS HEREBY ORDERED that the motions are denied.

CONCURRENCE AND DISSENT BY ACOBA, J.

I would grant reconsideration with respect to the economic loss rule and punitive damages as stated in my opinion concurring in part and dissenting in part, but deny reconsideration in other respects.